**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | |
|---|---|
| HARLEMAN MANUFACTURING, LLC,<br>a Missouri limited liability company,<br><br>          Plaintiff-Counterdefendant,<br><br>    v.<br><br>PENGO CORPORATION,<br>a Delaware corporation,<br><br>          Defendant-Counterplaintiff,<br><br>and<br><br>DANA SCUDDER,<br>a Florida citizen,<br><br>          Defendant. | Case No. 6:14-cv-03498-MDH |

# EXHIBIT 2

# Transcript of the Testimony of
# **Dana Scudder**

**Date:** January 28, 2015

**Case:** Harleman v. Pengo
6:14-cv-03498-MDH; USDC



Alpha Reporting Service
Phone:417-887-4110
Fax:417-889-4246
Email:transcripts@alphareportingservice.com
Internet: www.alphareportingservice.com

1

1          IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
2                     SOUTHERN DIVISION

3     HARLEMAN MANUFACTURING,
      LLC, a Missouri limited
4     liability company,

5
                      Plaintiff/Counter Defendant,
6
      vs.                           Case No.
7                                   6:14-cv-03498-MDH
      PENGO CORPORATION, a
8     Delaware corporation,

9
                      Defendant/Counter Plaintiff
10    and

11    DANA SCUDDER, a
      Florida citizen.
12

13     VIDEOTAPED DEPOSITION OF MR. DANA SCUDDER,

14    produced, sworn, and examined on Wednesday,

15    January 28, 2015, at 9:32 a.m. of that day,

16    at the law offices of Taylor, Stafford, Clithero,

17    FitzGerald & Harris, 3315 East Ridgeview Street,

18    Suite 1000, in the City of Springfield, County of

19    Greene, and State of Missouri, before me,

20    PAULA JOHNSON KAVANAGH, CCR, RPR, in the

21    above-captioned cause; taken on behalf of the

22    Plaintiff/Counter Defendant.

23
                   ALPHA REPORTING SERVICE
24                  3230-G South National
                 Springfield, Missouri 65807
25                    (417) 887-4110

```
 1           A P P E A R A N C E S

 2   For Plaintiff,        MR. WARREN E. HARRIS
     Counter Defendant:    MR. LANCE ROSKENS
 3                         TAYLOR, STAFFORD, CLITHERO,
                           FITZGERALD & HARRIS
 4                         3315 E. Ridgeview, Suite 1000
                           Springfield, MO 65804
 5

 6   For Defendant,        MR. FREDERICK J. SPERLING
     Counter Plaintiff:    MS. RACHEL A. REMKE
 7                         SCHIFF HARDIN
                           233 South Wacker Drive
 8                         Suite 6600
                           Chicago, IL 60606
 9

10   Videotaped by:        MR. STEVE ATTEBERY
                           EAGLE EYE VISUALS
11                         144 S. Carlisle Drive
                           Nixa, MO 65714
12

13   Also present:        Mr. Ron Harleman

14

15

16              I N D E X

17   TESTIMONY OF
     MR. DANA SCUDDER:
18                                   EXAMINATION

19   BY MR. HARRIS:                       5

20   BY MR. SPERLING:                   125

21   REPORTER'S CERTIFICATE:            131

22

23

24

25
```

```
 1                  E X H I B I T S

 2     NO.           DESCRIPTION                 IDENTIFIED

 3     Exhibit 40    1/9/09 e-mail to Mr. Rickards      29

 4     Exhibit 41    1/8/10 e-mail to Mr. Matthias      31

 5     Exhibit 42    3/17/10 e-mail chain               36

 6     Exhibit 43    3/31/10 e-mail from Ms. Pohlman    38

 7     Exhibit 44    3/31/10 e-mail response            39

 8     Exhibit 45    E-mail summarizing margins         39

 9     Exhibit 46    Memorandum to Dawn Jamison         44

10     Exhibit 47    E-mail chain from Ms. Pohlman      47

11     Exhibit 48    5/20/10 e-mail from Mr. Frost      49

12     Exhibit 49    5/3/10 e-mail to Mr. Harleman      54

13     Exhibit 50    6/9/10 e-mail from Mr. Tomlen      56

14     Exhibit 51    6/28/10 e-mail from Mr. Matthias 58

15     Exhibit 52    7/6/10 e-mail from Ms. Pohlman     61

16     Exhibit 53    7/9/10 e-mail from Mr. Matthias  62

17     Exhibit 54    9/16/10 e-mail from Mr. Tomlen     64

18     Exhibit 55    9/23/10 e-mail from Mr. Matthias 66

19     Exhibit 56    Response to 9/23/10 e-mail         68

20     Exhibit 57    E-mail from Scudder to Rickards  72

21     Exhibit 58    E-mail from Scudder to Harleman  74

22     Exhibit 59    Mr. Harleman's response            74

23     Exhibit 60    EAU calculations                   77

24     Exhibit 61    11/11/10 e-mail to Mr. Harleman, 78
                     updated schedule

25
```

4

1    Exhibit 63    Purchase order, single cut heads 84

2    Exhibit 64    E-mail from Ms. Jamison about      87
                   foundry price increases
3
     Exhibit 65    4-page e-mail chain               90
4
     Exhibit 66    E-mail from Mr. Tomlen regarding 93
5                  Harleman dig-off video

6    Exhibit 67    3/1/11 letter to Harleman         96

7    Exhibit 68    E-mail summarizing conversation 103
                   with Mr. Harleman
8
     Exhibit 69    3/21/11 e-mail from Harleman     104
9
     Exhibit 70    3/11/11 e-mail with purchase     104
10                 order

11   Exhibit 71    3/21/11 e-mail from Mr. Tomlen   107

12   Exhibit 72    E-mail from Phillip Zhou         108

13   Exhibit 73    4/12/11 e-mail from Harleman     110

14   Exhibit 74    Flight agreement                 116

15   Exhibit 75    E-mail from Ms. Jamison to       116
                   Ms. Pohlman
16
     Exhibit 76    Photo of auger head              122
17

18

19

20

21   (Exhibits 40 through 76 were attached to the

22   original deposition transcript, with scans sent to

23   Mr. Harris and Mr. Sperling.)

24   Phonetic spellings are signified by: (ph.)

25   Exactly as stated: (sic)

5

1    THE VIDEOGRAPHER: We are on the record at
2  9:32.
3    You may swear the witness.
4  Whereupon,
5    MR. DANA SCUDDER,
6  Defendant herein, being produced, sworn, and
7  examined, testified as follows:
8    EXAMINATION
9  BY MR. HARRIS:
10  Q  Would you state your full name, please.
11  A  Dana Gwinnett Scudder.
12  Q  And, Mr. Scudder, have you ever had your deposition
13  taken before?
14  A  Yes, I have.
15  Q  How many times?
16  A  More than ten.
17  Q  So you're very familiar with the process?
18  A  Yes.
19  Q  All right. I won't go over all my normal ground
20  rules, but I'll just have one agreement with you.
21  If for some reason you don't understand my question,
22  please tell me and I'll rephrase it or explain it
23  until we get to where we can understand each other.
24  Fair enough?
25  A  Yes, sir.

6

1  Q  What's your home address?
2  A  132 Saint Pierre Way, Jupiter, Florida 33458.
3  Q  And what's your date of birth?
4  A  August 20th, 1963.
5  Q  And you are employed with Pengo; is that correct?
6  A  Correct.
7  Q  What is your position with Pengo?
8  A  Vice president, sales and marketing.
9  Q  How long have you been in that position?
10  A  Around eight years.
11  Q  And what's your educational background?
12  A  Some college in sales and marketing with San Jacinto
13  University.
14  Q  No degree?
15  A  No, sir.
16  Q  And prior to working for Pengo, what did you do?
17  A  Essentially I've done the same thing my whole
18  career, either being involved in the equipment sales
19  and/or auger manufacturing.
20  Q  Who did you work for before Pengo?
21  A  I started originally with a company called
22  Mobile Equipment in Houston, Texas. I was there
23  around ten years.
24    And then went to a company called
25  Reedrill Texoma. And I was there for about eight

7

1  years. And then that division was sold to a company
2  called Time Manufacturing. And I was there about
3  ten years.
4  Q  And with regard to this deposition that we're here
5  today about in the case of Harleman Manufacturing
6  versus Pengo, what have you done to prepare for this
7  deposition?
8  A  I went back and reviewed the documents that -- that
9  we had prepared and presented and also went through
10  the documents that we had received from the Harleman
11  side. And then met with counsel to go over some
12  information.
13  Q  When you -- well, when did you meet with counsel?
14  A  Yesterday.
15  Q  Was anyone present other than your attorneys -- or
16  Pengo's attorneys, I should say?
17  A  No.
18  Q  Explain to us, Pengo -- what -- what is -- we've
19  said "Pengo." What is Pengo?
20  A  We manufacture augers for the agricultural, utility,
21  foundation, and construction industry.
22  Q  And what -- what is an auger, for those who might
23  not know?
24  A  An auger is used to put a hole in the ground for
25  various reasons, primarily for the foundation side

8

1  on -- for buildings, such as this, on providing
2  solid bases to build buildings, bridges, roads,
3  things along that line.
4  Q  How -- generally, how large a company is Pengo? How
5  would you measure the size of Pengo?
6  A  From a --
7  Q  Well, let's break it down. How many employees does
8  Pengo have?
9  A  A hundred plus. It varies.
10  Q  And as far as annual sales, does -- is that a
11  statistic that you publish regularly?
12  A  Not publicly, no.
13  Q  All right. How is -- in the marketplace in which
14  Pengo operates, there are many competitors. Would
15  that be a fair statement?
16  A  Yes, sir.
17  Q  Do you consider Harleman Manufacturing to be a
18  competitor?
19  A  Yes, sir.
20  Q  Can you give me an idea of where Pengo ranks as far
21  as sales volume in the auger industry? Is it No. 1,
22  No. 2, or do you know?
23  A  It varies by markets. As I said, we cover four
24  distinct markets, and our market share varies in
25  each one of those markets.

### 9

1  Q  How about in the utility market?
2  A  I would say that we are the market leader in the
3     utility market segment.
4  Q  How about agriculture?
5  A  There as well.
6  Q  Construction?
7  A  Probably middle of the pack.
8  Q  And what was the fourth one?
9  A  Foundation.
10 Q  All right. Where are you at there?
11 A  Probably -- about the same. About middle of the
12    pack.
13 Q  Now, where are Pengo's corporate offices located?
14 A  In Laurens, Iowa.
15 Q  And can you give us an idea of where that's at in
16    relation to, say, Des Moines or --
17 A  It's in northwest Iowa. It's near Spencer,
18    Storm Lake are the two biggest towns. It's about
19    three hours from Des Moines, about three hours from
20    Omaha, depending on.
21 Q  Now, back in 2008/2009, was Pengo the market leader
22    in utility augers?
23 A  I would say yes.
24 Q  And would that also be true of agricultural back
25    then?

### 10

1  A  Yes.
2  Q  Do you have any idea -- did you do any kind of
3     customer satisfaction surveys or anything like that
4     back at that time to -- to determine what the
5     perception of Pengo was by its customers?
6  A  We did not, no.
7  Q  Did you have a general knowledge of what Pengo's
8     perception was in the utility and agricultural
9     industry back in 2008/2009?
10 A  Yes.
11 Q  What would that be?
12 A  From a -- I need a little more specific on...
13 Q  Well, I mean, did people think Pengo's products were
14    good? Did they think they were bad? Did you have a
15    good reputation, a bad reputation, back in that time
16    frame?
17 A  We had a good -- a good reputation in the industry
18    across all market segments.
19 Q  Now, who is your immediate supervisor at Pengo?
20 A  Brian Rickards.
21 Q  And what is his position with the company?
22 A  Vice president and general manager.
23 Q  Now, in your position as vice president of sales, do
24    you have people in which you supervise?
25 A  Yes, sir.

### 11

1  Q  Approximately how many people do you supervise?
2  A  Thirteen.
3  Q  Now, there's some people's names that we have in the
4     documents, and I just kind of want to figure out the
5     pecking order at Pengo and whether or not you
6     supervised them. A gentleman by the name of
7     Jim Tomlen, was he under your supervision?
8  A  Yes, sir, he was.
9  Q  Mary Pohlman?
10 A  Yes, sir.
11 Q  Eric Matthias?
12 A  No, sir.
13 Q  Now, I know -- is he in engineering?
14 A  Yes, sir, he's director of engineering.
15 Q  Did he also report to Mr. Rickards?
16 A  Yes, sir.
17 Q  And then Dawn Jamison?
18 A  Works for me.
19 Q  And then there's another gentleman. Is it Hemerick?
20 A  Hennarichs.
21 Q  Hennarichs?
22 A  And he worked for me as well.
23 Q  Okay. Now, you were present for Mr. Harleman's
24    deposition when it was taken in this case by Pengo's
25    attorney; correct?

### 12

1  A  Yes, sir, I was.
2  Q  And I'm going to ask you a general question, and
3     we'll see what you say about it, but as you sit here
4     today, reflecting back on Mr. Harleman's deposition,
5     do you recall things that he said that you just
6     thought were completely inaccurate or incorrect?
7        MR. SPERLING: Objection, ambiguous.
8  A  There were things that were different, yes.
9  Q  (By Mr. Harris) Could -- I mean, did you keep any
10    kind of list of those or document them in any way?
11 A  I did at the time. But I didn't keep a list, but...
12 Q  All right. Now, how did you first become aware of
13    Harleman Manufacturing?
14 A  I had heard the name in the industry before, but the
15    first time that I had any real knowledge of
16    Harleman Manufacturing was when I was approached
17    by -- at that time Eric Hennarichs was our product
18    manager for helicoid and flights, and he had
19    approached me about making a visit to be able to
20    sell Harleman Manufacturing the sectional flighting.
21 Q  And is this something he wanted to do or he wanted
22    you to go with him?
23 A  He wanted me to go with him. That's my job to
24    support the field guys.
25 Q  Do you recall when that was?

6 (Pages 9 to 12)

**Alpha Reporting Service**
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 8 of 54

---

13

1   A   I don't have a specific date on it, but it was
2       around that '08 time frame.
3   Q   And would that be the first time that you ever met
4       Ron Harleman when you and he went to meet
5       Mr. Harleman?
6   A   I believe so, yes.
7   Q   And that occurred at Harleman's facilities in
8       El Dorado Springs?
9   A   Correct.
10  Q   And do you recall -- I think Mr. Harleman's
11      testimony was that that was in the fall of 2007.
12      Does that sound right to you?
13  A   That could be accurate, yes.
14  Q   Now, do you recall had you been -- prior to visiting
15      Mr. Harleman -- to Westar Energy on that trip?
16  A   Not on that trip, but I have been there many times,
17      yes.
18  Q   Do you ever recall being at Westar Energy when they
19      told you that they were using the Harleman auger
20      heads?
21  A   I do, yes.
22  Q   And then was it after that that you visited
23      Mr. Harleman's facility?
24  A   Possibly. I don't recall. I had many visits to
25      Westar.

14

1   Q   On the first visit that you had at Mr. Harleman's
2       facility, did you talk with him about his auger
3       heads?
4   A   Didn't have any specific conversations. I was there
5       to talk about the flighting and the parts business.
6       I don't know if that came up in conversation. I
7       don't recall.
8   Q   Do you recall a visit to the Harleman facility when
9       you viewed a video that Mr. Harleman had comparing
10      one of his augers to a Pengo auger?
11  A   No.
12  Q   You don't recall that ever occurring?
13  A   No. I saw many videos, but not -- not a comparison
14      video.
15  Q   Prior to going to visit Mr. Harleman's facility for
16      the first time, had you done any research on any of
17      his augers?
18  A   No, sir.
19  Q   Now, you agree with me that there was an occasion
20      when you and some other individuals from Pengo went
21      to Mr. Harleman's ranch?
22  A   Yes, sir.
23  Q   And at that meeting at Mr. Harleman's ranch, there
24      was, for lack of a better word, a drilling
25      competition between a Pengo auger head and a

15

1       Harleman auger head?
2   A   No, I would not agree with that statement.
3   Q   Okay. Why not?
4   A   At that point in time, we had discussions about
5       doing cast head augers for Harleman. And I was
6       asked if we could send some samples down to
7       Harleman. And I checked the inventory on what we
8       had the most quantity of on two different sizes --
9       which I couldn't even tell you today what those
10      were -- but we shipped two auger heads down to
11      Harleman for them to see what our cast heads looked
12      like as part of our proposal to be able to cast his
13      heads on a spiral design. So it was kind of some
14      samples as a comparison to show what our
15      capabilities were.
16  Q   How did it come about that you ended up at the
17      Harleman ranch?
18  A   They took the cast heads and built them up as
19      augers. And at that time, I can't remember if it
20      was Eric Hennarichs or Jim Tomlen. They both
21      handled the account. There was some transfer.
22      During that time frame, I changed positions with the
23      sales team. So we went from product managers to
24      territory managers. Jim Tomlen lived in
25      Kansas City, so he had the Harleman account at that

16

1       time.
2       Anyway, between one of the two, let us know
3       that they had built the augers up and wanted us to
4       come down and take a look at them. So we went down,
5       had a meeting at the Harleman facility. They took
6       the Pengo augers, put them on a truck, and we took
7       them out to an area on some land that Ron had that
8       had some tough rock, drilling rock. And at that
9       point we drilled with the Pengo tools.
10      And a short time later, after we were finished,
11      then the truck came back again, and it had Harleman
12      augers on it. And at that point, the Harleman
13      augers were -- were drilled.
14  Q   Was there ever occasion when they were drilling side
15      by side?
16  A   No. We drilled with the Pengo augers and then put
17      the Harleman augers on and drilled down. We didn't
18      go too far, but...
19  Q   Did you have people there from Pengo who were
20      videotaping it?
21  A   No. No one from Pengo was videotaping.
22  Q   You agree that Mr. Harleman had someone there
23      videotaping?
24  A   Yes, I do.
25  Q   And you've seen that video?

17

1  A  I have seen some of it, yes.
2  Q  Did you review it in preparation for this
3    deposition?
4  A  No, I did not.
5  Q  But it's your recollection from reviewing that
6    video, there's never an occasion when there are two
7    what I would call bobcats drilling side by side?
8  A  No, there was only one machine on site.
9  Q  So is it your testimony you had no understanding
10    that the augers that -- that Pengo had sent down to
11    Harleman were going to be used for drilling?
12  A  No.  I sent the heads down as samples.  And if we
13    were going to do a drill-off, I wouldn't have sent
14    those augers for that drill-off.
15  Q  Okay.  Which -- which ones did you send?
16  A  I sent two cast head augers.
17  Q  Do you recall what model they were?
18  A  I know they're double cut cast heads.  But I don't
19    know specifically which ones that we sent down.
20  Q  Which ones would you have sent down?
21  A  Well, we have seven different diameters, and then we
22    also have them available -- actually, I guess 14
23    because we have them in dirt and rock.  So I'm not
24    sure if we sent one rock and one dirt or if we sent
25    two rock heads down.

18

1  Q  Okay.
2  A  But again, the purpose was just to illustrate our
3    capabilities on producing cast heads.
4  Q  But you can't say which ones you would have sent
5    down if you knew there was going to be a test?
6  A  If I was doing a test against a Harleman auger, I
7    wouldn't have sent a cast head.
8  Q  Why is that?
9  A  Because we had multiple -- excuse me -- multiple
10    other auger designs, and I would have sent something
11    comparable to a spiral-type design auger.
12  Q  But you can't, as you sit here today, say what it
13    would have been?
14  A  Oh, I would have sent our spiral design rock auger.
15  Q  Does it have a name?
16  A  No, it's just our spiral.
17  Q  Is that the Rock Ripper?
18  A  No.  That's a separate rock auger.
19  Q  Is the Rock Ripper a spiral design?
20  A  It is not.  It's a "S" pattern flat bottom.
21  Q  At any point when you were there, did you ask
22    Mr. Harleman or his people to stop videoing?
23  A  I did not, no.
24  Q  Who all -- in addition to you, who else was present
25    from Pengo?

19

1  A  Brian Rickards, Jim Tomlen, and I'm not certain
2    about Mary Pohlman or Eric Hennarichs.  I just don't
3    recall, but they could have been there.
4      THE VIDEOGRAPHER:  Excuse me.  Could we go off
5    the record for a second.
6      MR. HARRIS:  Sure.
7      THE VIDEOGRAPHER:  Okay.  We're off the record.
8      (Discussion was held off the record.)
9      THE VIDEOGRAPHER:  Okay.  We're back on the
10    record.
11  Q  (By Mr. Harris) What was the end result of the --
12    the meeting at the ranch?
13  A  We had an agreement in place already on the
14    flighting that we were supplying.  And the agreement
15    was that we would move forward on putting together
16    pricing for the cast head design for Harleman
17    Manufacturing.
18  Q  Now, at any point when you were there at the ranch
19    and they were using the Pengo auger, did you make
20    any kind of statement about, Hey, that auger is not
21    designed to do that kind of drilling?
22  A  No, I did not.
23  Q  What was the next step in -- in the process of
24    putting together this agreement?
25  A  Harleman was going to build up the weldments for the

20

1    spiral design heads that they manufacture and send
2    to Pengo, for lack of a better term, for reverse
3    engineering to produce drawings.
4  Q  Prior to that, did you ever have a phone call with
5    Mr. Harleman when you inquired about obtaining a
6    licensing agreement for the Pengo -- or I'm sorry,
7    for the Harleman head?
8  A  At one point we had some what I would call generic
9    conversations on kind of a joint venture of going to
10    market together for different products.
11  Q  And what was the result of those conversations?
12  A  The end result was we ultimately decided not to go
13    that direction.
14  Q  Now, did you ever have a conversation with Mr. --
15    with Mr. Harleman where you talked about a visit or
16    a phone call you'd had from Keys Electric, a power
17    company in Florida?
18  A  Yes, I do.
19  Q  What was the nature of that conversation?
20  A  Basically, the conversation was to pay a compliment
21    to Harleman Manufacturing.  I was down on a job
22    site.  They were having some trouble drilling some
23    tough coral.  They had been using a Terex product,
24    and they bought a Harleman -- Harleman auger and it
25    resolved their problems.  And I let him know that

8 (Pages 17 to 20)

---

**21**

1    that was the case.

2    Q   Then did you make another trip after that phone call

3        to the Harleman facility?

4    A   At some point, yes.

5    Q   And what was the purpose of that trip?

6    A   That visit was when we were getting closer to having

7        everything put together and essentially just did a

8        review on what we were getting prepared to present

9        to Harleman.

10   Q   And is that -- during that meeting, did you propose

11       that Pengo would buy auger heads from Harleman?

12   A   No.  We had some, again, generic discussions about

13       the possibility of doing something along those

14       lines.  But again, ultimately decided not to go that

15       direction.

16   Q   You would agree with me, wouldn't you, though, that

17       at the time you put this deal together with Harleman

18       that the intent was that Pengo was going to purchase

19       heads from Harleman?

20   A   No.  There's two separate discussions that we had.

21       One for us being able to provide cast heads to

22       Harleman, and the other discussion was the

23       possibility of our two companies doing business

24       together in some shape or fashion.

25   Q   They were never part of the same discussion?

---

**22**

1    A   No, never.  Two completely separate.

2    Q   Never part of the same agreement?

3    A   No.

4    Q   You never drafted an agreement or a proposed

5        agreement whereby Pengo would pay a percentage

6        royalty to Harleman for purchasing his heads?

7    A   No.

8    Q   At any point in time during any of your meetings

9        with Mr. Harleman, did you ever say that Pengo would

10       be interested in buying twenty-five to 3,500 auger

11       heads per year from Harleman?

12   A   No.

13   Q   Now, at some point, you did provide Mr. Harleman

14       pricing for Pengo to cast his auger heads?

15   A   Yes, sir.

16   Q   And you also priced what we call "tooling"; is that

17       correct?

18   A   Yes, sir.

19   Q   And tell us what "tooling" is so that the ladies and

20       gentlemen of the jury who might view this video

21       would understand what we're talking about.

22   A   The tooling is what's used to make the actual

23       casting.  So it's much like a -- like a candle mold,

24       where you have that -- they pour the hot liquid in,

25       it forms, and you end up with the end result

---

**23**

1    casting.

2    Q   And I think the price that you came up with was

3        $43,000?

4    A   Yeah.  I'm not sure if it was exactly 43, but in

5        that ballpark, yes, sir.

6    Q   And what was that to cover?

7    A   That was the cost to produce all the different molds

8        for the cast products.

9    Q   Do you recall how much Pengo actually spent to

10       produce the cast molds, the tooling?

11   A   Not specifically, no.

12   Q   And then I assume there was some engineering time

13       that was factored into that $43,000 number?

14   A   No, sir.  That was part of the overhead cost.

15   Q   Do you know how much in engineering time Pengo spent

16       coming up with the castings?

17   A   We estimated around 100-plus hours.

18   Q   At what rate?

19   A   I don't know the rate.

20   Q   And the idea was that Pengo would sell these auger

21       heads once they were cast to Harleman?

22   A   To only Harleman, correct.

23   Q   And it was only Harleman because Mr. Harleman had a

24       patent on his auger head?

25       MR. SPERLING:  Objection to the extent the

---

**24**

1    question calls for a legal conclusion.

2    Q   (By Mr. Harris) You can go ahead and answer, if you

3        can.

4    A   Yeah, our agreement was to sell just to Harleman.

5        It was their product.  We were building it for them,

6        which we do for many other customers.

7    Q   And you were aware that there was a patent that

8        Mr. Harleman had; correct?

9    A   Yes.

10   Q   And as part of this process, you obtained that

11       patent and reviewed it?

12   A   I have seen it, yes.

13   Q   What was the purpose of obtaining the patent and

14       reviewing it?

15   A   At the time I just wanted to see exactly what was

16       patented.  So just because you have a patent, you

17       know, on a cup, I mean, you could have a patent on a

18       handle or you could have a patent because it's a

19       flat bottom.  I was curious what he had patented on

20       that particular tool.

21   Q   And what was your understanding of what he had

22       patent on?

23   A   From what I recall, it was on the layout of the

24       tooth and the percussion style drill pattern that

25       produced.

9 (Pages 21 to 24)

---

25

1  Q   Now, Pengo is set to make a profit on each head that
2      it sold Harleman?
3      MR. SPERLING:  Would you read the question
4      back, please?
5          (The requested portion of the record was
6      read by the reporter.)
7      MR. SPERLING:  Object to the term "set" as
8      ambiguous.
9  Q   (By Mr. Harris) Well, let me rephrase the question
10     for you.  You developed pricing for Mr. Harleman's
11     company for these auger heads that you were going to
12     build; correct?
13 A   Yes, sir.
14 Q   And as part of that pricing, you included a profit
15     margin for Pengo?
16 A   Yes, sir.
17 Q   Do you recall what that profit margin was?
18 A   I don't remember where it ended up.  And the reason
19     being is during this process, we ended up changing
20     suppliers.  So we actually had a price increase when
21     we made that change of suppliers, and we elected to
22     take the price increase ourself and not pass it onto
23     Harleman and keep their pricing the same.  So I
24     couldn't tell you exactly where our margins ended
25     up.

---

26

1  Q   But the original profit margin you built in, would
2      you agree with me, was 47 percent?
3  A   No, sir, I would not.
4  Q   And Pengo did ultimately sell some heads to Harleman
5      as a result of the casting; correct?
6  A   Yes, sir, we did.
7  Q   Do you recall how many heads they sold to
8      Harleman Manufacturing?
9  A   No, I don't know that number.
10 Q   Do you know the total dollar sales to Harleman for
11     the auger heads?
12 A   I don't know the exact number, no.
13 Q   Do you have an approximate number?
14 A   Maybe a hundred thousand.
15 Q   Did Pengo make profit on those sales?
16 A   Yes, we did.
17 Q   Do you know how much total profit you made off the
18     sales to Harleman of the auger heads?
19 A   No, sir, I do not.
20 Q   Now, during your negotiations with Mr. Harleman, was
21     there a discussion about who was going to pay the
22     $43,000 for the tooling?
23 A   Yes, there was.
24 Q   And how -- what was the nature of the negotiations
25     regarding who was going to pay for the tooling?

---

27

1  A   We had discussions on it because the tooling cost is
2      based on whether we're going to pay for it or the
3      customer's going to pay for it, so that factors in,
4      you know, the overall pricing.  So once it was
5      decided that Harleman was going to pay for the
6      tooling, then we took our tooling cost and put a
7      small markup on that from a carrying cost standpoint
8      and presented those numbers to Harleman.
9  Q   Now, before there was any written agreement entered
10     into, Harleman Manufacturing built some heads to
11     send to Pengo for reverse engineering; true?
12 A   I'm not sure of the -- of the time frame of -- if it
13     was before or after the agreement was signed, so...
14 Q   Would you -- would you agree with me that Harleman
15     shipped some of its heads to Pengo to be reverse
16     engineered in December of 2009?
17 A   I just don't know.
18 Q   Okay.
19     MR. SPERLING:  Let's take a break for a moment.
20     MR. HARRIS:  Okay.
21     THE VIDEOGRAPHER:  Okay.  We're off the record.
22     (Short break taken.)
23     (Exhibit 40 was marked for
24     identification.)
25     THE VIDEOGRAPHER:  Okay.  We're back on the

---

28

1      record.
2  Q   (By Mr. Harris) Mr. Scudder, we're back on the
3      record after we took a break, and you met with your
4      attorney.  I know we were talking about the tooling.
5      You said that there was a small markup on the
6      tooling that Pengo included in that.  Do you recall
7      what that markup was?
8  A   I do not recall the exact percentage.
9  Q   Approximate percentage?
10 A   20 percent.
11 Q   And then you also said that there were other
12     companies that Pengo casted heads for.  Back at this
13     time frame of 2009, who else do you recall that you
14     were casting heads for?
15 A   Actually, I didn't say cast heads.  I said other
16     cast products.  The only other cast heads that we
17     produced were double cut, double carry cast heads
18     for Pengo use.
19 Q   Why was Pengo willing to cast heads for a
20     competitor?
21 A   We do business with several different competitors on
22     the parts side as well as the helicoid and sectional
23     flight side.
24 Q   Okay.  But why would you be willing to do it on the
25     head side?

---

10 (Pages 25 to 28)

---

29

1   A   Because we had the capabilities for the cast
2       products. We bring a lot of cast products in and
3       felt that could be an opportunity for Pengo to
4       supply product and make a product margin on it.
5   Q   In other words, make a profit?
6   A   Make a profit.
7   Q   Now, I was asking you, I think before the break,
8       about whether or not Harleman had heads ready to
9       ship by December 1st of 2009, and you couldn't
10      recall. I want to show you a document that I've
11      marked as Exhibit 40. It's labeled Pengo 147. Is
12      that an e-mail from you to Brian Rickards dated
13      December 1 of 2009?
14  A   Yes, sir, it is.
15  Q   And you authored that e-mail?
16  A   Yes, sir, I did.
17  Q   And in that it says that "Ron has heads ready to
18      ship to us for casting"?
19  A   Yes, sir, it does.
20  Q   So after seeing that, would you agree with me that
21      Mr. Harleman had the heads ready to ship to Pengo by
22      December 1st of 2009?
23  A   Yes, I would agree.
24  Q   And in that e-mail, he's requesting that Pengo sign
25      a confidentiality agreement; is that correct?

---

30

1       You're relaying -- you're -- excuse me -- you're
2       relaying that to Mr. Rickards?
3   A   I am, yes.
4   Q   And then I think what we previously marked in
5       Mr. Harleman's deposition as Exhibit 2 is a copy of
6       the Confidentiality Agreement that was actually
7       signed?
8   A   Yes, it is.
9   Q   And that's dated January the 8th of 2010; is that
10      correct?
11  A   That is correct.
12  Q   And that was signed by Mr. Rickards on behalf of
13      Pengo Corporation?
14  A   That's correct.
15  Q   And that form was a standard Pengo Nondisclosure
16      Agreement; is that right?
17  A   That's correct.
18  Q   And then after that agreement was signed,
19      Mr. Harleman's company sent the heads to Pengo for
20      reverse engineering; is that correct?
21  A   I don't recall the exact date when Harleman shipped
22      the heads to Pengo.
23          (Exhibit 41 was marked for
24      identification.)
25  Q   (By Mr. Harris) All right. I'll show you what we've

---

31

1       marked as Exhibit 41. And that's an e-mail. It
2       appears to be from you to Eric Matthias -- is it
3       Matthias?
4   A   Matthias, yes.
5   Q   Dated Friday, January 8th, 2010, saying, "FYI, the
6       Harleman heads shipped out today to Laurens. 10
7       complete weldments"; correct?
8   A   Yes.
9   Q   So after viewing that, you would agree with me the
10      heads shipped January 8th, 2010?
11  A   Yes.
12  Q   And that's the same day that nondisclosure agreement
13      was signed?
14  A   Yes.
15  Q   Now, as far as this project was concerned, what kind
16      of priority did you place on it?
17  A   It would be our standard priority with the exception
18      of the engineering time to produce the drawings for
19      the tooling from China.
20  Q   And so I guess the way to say that is: You treated
21      it like any other business deal. You didn't make it
22      high priority or low priority. It was just standard
23      business?
24  A   It was higher priority, but certainly it fell into
25      our standard way of doing business.

---

32

1       So like the e-mail that you -- on this document
2       you presented for 41, I'm explaining to Eric that
3       I'll call him to discuss the time line and telling
4       Jim he needs to take the lead role. So putting the
5       assignments out there for everybody to be able to
6       tackle this project.
7   Q   And I think you previously told me Mr. Matthias was
8       the director of engineering?
9   A   That's correct.
10  Q   And then Jim Tomlen was the sales representative for
11      the region where Mr. Harleman's plant was located?
12  A   That's correct.
13  Q   And in that e-mail, you state that you want Jim to
14      take the lead role from here; correct?
15  A   Correct.
16  Q   So you're -- would it be correct to say you were
17      turning the project over to him?
18  A   Correct.
19  Q   And what was his title at that time?
20  A   He would -- southern territory manager.
21  Q   And I assume that meant he would call on a group of
22      customers in a geographic area. Would that be
23      correct?
24  A   Correct.
25  Q   How big was his geographic area? Do you recall?

11 (Pages 29 to 32)

---

33

```
 1   A   Eight states, roughly.
 2   Q   And then how did it work?  Did he have to bring --
 3       did he have to present every deal to you for
 4       approval, or could he enter into deals on his own?
 5       How did that work?
 6   A   Any standard deal, the territory managers have the
 7       authority to put together.  Anything nonstandard
 8       would go through me.
 9   Q   Would this be a standard or a nonstandard deal with
10       Harleman Manufacturing?
11   A   It would be a nonstandard type of...
12   Q   Now, for -- to contrast, you also sold what we call
13       flight material to Harleman; correct?
14   A   Correct.
15   Q   That was just -- that was pretty much a standard
16       deal?
17   A   Yes.
18   Q   Now, is Mr. Tomlen still with Pengo?
19   A   No.  He retired two years ago, I believe, maybe
20       three years.
21   Q   Do you know how long it took Pengo to do the reverse
22       engineering?
23   A   I don't know the exact days, no.
24   Q   What -- what would be typical, do you know, for
25       something like this?
```

34

```
 1   A   There is no typical because we've actually never
 2       done the reverse engineering side of it prior to
 3       this.
 4   Q   And as far as all the reverse engineering was
 5       concerned, was that handled by Mr. Matthias?
 6   A   It was all handled through our engineering group,
 7       yes.
 8   Q   Do you get involved in engineering at all?
 9   A   I do sometimes, yes.
10   Q   Did you get -- do you recall did you get involved in
11       the engineering aspects of the project for Harleman
12       with regard to the heads?
13   A   No, not from the design standpoint.
14   Q   And as far as choosing the supplier who was going to
15       manufacture the heads, did you -- did you do that,
16       or was that Mr. Matthias?  Or do you recall who did
17       that within Pengo?
18   A   We have a separate division within our group called
19       GST, which is our global sourcing team.  They
20       ultimately, then, make the decision on which foundry
21       that we go to based on product capacity.
22   Q   Do you know who ultimately made that decision in
23       this case?
24   A   I do not.
25   Q   It wasn't you, though?
```

35

```
 1   A   No, it was not me.
 2   Q   And just so you know, I'm trying to shorten things
 3       up for you.
 4   A   Oh, sure.
 5   Q   As far as which foundry went -- or who did the
 6       production and what went to the foundries, the
 7       discussions with the foundries, those types of
 8       things, you didn't have any direct involvement in
 9       any of that?  Would that be a fair statement on this
10       Harleman project?
11   A   That's correct.
12   Q   Now, at this time, were you aware that Pengo was
13       having some heads casted by another company?
14   A   Say that again.
15   Q   When you were doing this deal with Harleman
16       Manufacturing, did Ron Harleman make you aware that
17       he was having some heads cast by another company?
18       MR. SPERLING:  Your prior question was Pengo, I
19       think.
20   Q   (By Mr. Harris) I'm sorry.  That's a bad -- bad
21       question.  You were good to question me.
22       And I'll start over again.  During the time in
23       January of 2010, December of 2009, when this process
24       was developing, did Mr. Harleman make you aware that
25       Harleman Manufacturing was having some of its heads
```

36

```
 1       cast by another company?
 2   A   I was made aware of that.  I'm not positive on the
 3       time frame.
 4   Q   All right.  Now, we had -- we had mentioned earlier
 5       or I had asked the question about whether there was
 6       any desire on the part of Pengo to use the Harleman
 7       heads that were going to be cast.  And you said that
 8       wasn't part of the discussion; is that correct?
 9   A   That's correct.
10           (Exhibit 42 was marked for
11       identification.)
12   Q   (By Mr. Harris) I'll show you what we've marked as
13       Exhibit 42, which is a e-mail chain.  And it starts
14       at the bottom, I think, with an e-mail from
15       Eric Matthias dated March 17th, 2010, to
16       James Tomlen.  And it appears that you were copied
17       on the e-mail.  It's dated March 17th, and
18       Mr. Matthias states that as of that date, all of the
19       Harleman items have been reverse engineered;
20       correct?
21   A   Correct.
22   Q   And they were submitted to GST, which you said is a
23       division of your parent company; is that right?
24   A   A division of our company.
25   Q   And they were submitted for quote; is that correct?
```

12 (Pages 33 to 36)

---

37

1    A   Correct.
2    Q   That's what it says?
3        And in the final -- or not the final but the
4    second to the last paragraph, Mr. Matthias states
5    he's about two weeks ahead of schedule on this
6    project, and he hasn't heard anything about an
7    agreement between Pengo and Harleman.  And then he
8    mentions in there "i.e., tooling costs and
9    licensing the heads so we can use them in Pengo
10   product"; correct?
11   A   Correct.
12   Q   So was that -- do you know what Mr. Matthias meant
13   by that statement?
14   A   We had some internal discussions on a Harleman/Pengo
15   business venture.  And what he's referring to there
16   is some of those discussions that he was involved
17   with early on where we had some of those discussions
18   about how we might be able to do that.
19   Q   And you would agree with me at this point in time
20   that Mr. Harleman and his company were wanting to
21   move forward on this project?  They were wanting to
22   get heads?
23       MR. SPERLING:  By "this" project?
24   Q   (By Mr. Harris) The cast head project with Pengo.
25   A   Yes.

---

38

1    Q   And he -- in March was willing to place an order for
2    the heads; true?
3    A   Yes.
4    Q   And that wasn't a requirement for the project to
5    move forward, that he place those orders, was it, at
6    that point in time?
7        MR. SPERLING:  Can you explain what you mean by
8    "the project"?
9    Q   (By Mr. Harris) The Pengo cast head project.
10   A   Yes, it was a requirement.
11   Q   It was?
12   A   (Witness nodded head.)
13   Q   Well, but was it -- was it required that he do it at
14   that time before Pengo would move forward with the
15   project?
16   A   Correct.  We would not move forward without a PO to
17   produce heads for -- for Harleman.
18       (Exhibit 43 was marked for
19   identification.)
20   Q   (By Mr. Harris) I'll show you Exhibit No. 43, which
21   is labeled Pengo 273.  E-mail dated March 31, 2010,
22   from Mary Pohlman to Eric Matthias, Jame -- or
23   Jim Tomlen, copied to you.  In that e-mail,
24   Ms. Pohlman states that Mr. Harleman's willing to
25   put in an initial order to support moving the

---

39

1    project forward; correct?
2    A   Correct.
3        (Exhibit 44 was marked for
4    identification.)
5    Q   (By Mr. Harris) Then I'll show you Exhibit 44, which
6    is labeled Pengo 275.  It's a response from
7    Mr. Matthias to Ms. Pohlman's e-mail.  Again, it's
8    dated March 31st, 2010.  And in the second
9    paragraph he states, We do not need orders to
10   support this project -- or support the project?
11   A   Correct.
12       (Exhibit 45 was marked for
13   identification.)
14   Q   (By Mr. Harris) And then I'll show you Pengo 321,
15   which we've marked as Exhibit 45.  That's your
16   e-mail summarizing what?
17   A   Excuse me.  A summary of the tooling costs for the
18   margin, the cast parts cost for the margin, and the
19   cast heads with an average margin.
20   Q   Okay.  So the tooling, 42,000, that's what the "K"
21   means; correct?
22   A   Correct.
23   Q   25 percent margin?
24   A   Correct.
25   Q   And then the cast heads, 375,000 with an average

---

40

1    42 percent?
2    A   Correct.
3    Q   And would it be correct that at this point you
4    started working on an agreement, some type of
5    agreement form for this project with
6    Harleman Manufacturing for the cast heads?
7    A   Correct.
8    Q   And I think we've previously identified in
9    Mr. Harleman's deposition the agreement that was
10   actually entered into between the parties.  It was
11   marked as Harleman Exhibit 3.  And that's a copy of
12   the agreement that actually entered into between
13   the parties; correct?
14   A   Yes.  That's -- this is the Commitment Form that we
15   put together.
16   Q   And it was signed by you on behalf of Pengo?
17   A   Yes.
18   Q   Dated May 4th, 2010?
19   A   Yes.
20   Q   Did you draft this agreement?
21   A   I did not.
22   Q   Who did?
23   A   Dawn Jamison.
24   Q   And what was Ms. Jamison's position with the company
25   at that time?

---

13  (Pages 37 to 40)

41

1   A   Inside sales manager.  Her position's changed.  I
2       had to think about the time frame.
3   Q   Sure.  I understand.  Do you recall had there been
4       previous versions of this agreement that you
5       drafted?
6   A   I'm sure there was revisions to the original that
7       was put together before we got to this final
8       document.
9   Q   Do you recall whether or not you did that, those
10      prior versions?
11  A   I do not.  I would think that that was also done by
12      Dawn, but I'm not a hundred percent clear.
13  Q   And the terms of the document are self-explanatory,
14      but we'll summarize.  Obviously, Harleman was to pay
15      the tooling costs and maintenance costs; correct?
16  A   Correct.
17  Q   We talked about the tooling.  What were the
18      maintenance costs?  What -- what did those entail?
19  A   In essence, it's just over time as the tooling gets
20      used, things -- things wear and you start to lose
21      tolerances on parts, and so the tooling just needs
22      to be maintained in order to maintain overall --
23      overall quality.
24  Q   And then below that is a table that sets forth the
25      pricing for each particular item that is being

42

1       developed; is that true?
2   A   No.  It details out what the tooling costs for those
3       items is going to be.
4   Q   So that's just the tooling cost?
5   A   Correct.  For the heads and the parts.
6   Q   And the next paragraph says, "Samples, (3 to 5
7       of each to be provided in July of 2010)"?
8   A   Correct.
9   Q   We're talking about a sample of each thing that was
10      being cast; correct?
11  A   Correct.
12  Q   And the contracts to be -- in the next paragraph --
13      it states it's to be for the life of the patent; is
14      that right?
15  A   Correct.
16  Q   And then the fourth paragraph are the terms -- what
17      we commonly refer to as "credit terms"; correct?
18  A   Correct.
19  Q   And it was 1 percent, 10 net 30.  Which means that
20      if they paid within 10 days, they got a 1 percent
21      discount and the entire invoice would be due 30 days
22      after delivery?
23  A   Correct.
24  Q   And then it states, "FOB Laurens, Iowa."  That means
25      that Harleman had to pay from -- for shipping from

43

1       Laurens to its facility?
2   A   Correct.
3   Q   And then I'm not going to go through all of the
4       elements, but on the next page, it does set forth
5       the cast pricing in a table; correct?
6   A   Correct.
7   Q   And that pricing was to hold for twelve months from
8       the dated and signed agreement; correct?
9   A   Correct.
10  Q   So those prices were to be run from May 4, 2010,
11      through May 4, 2011?
12  A   Correct.
13  Q   And then the next paragraph said that Pengo agrees
14      to negotiate future prices -- or price increases
15      annually based on GPI, I believe, and export
16      conversion rates?
17  A   Correct.
18  Q   What's GPI?
19  A   Gross product index.
20  Q   And is that a figure that's put out by the Commerce
21      Department?
22  A   Correct.
23  Q   And the export conversion rates would be what?
24  A   Essentially exchange rates.
25  Q   So what you were preserving there was the right.  In

44

1       other words, if the government determined the gross
2       price index went up 10 percent, you could use that
3       in negotiating your prices up 10 percent?
4   A   As a rule, yes.
5   Q   And then, in other words -- and then won't try to
6       explain export conversion rates, but it's whatever
7       the Chinese currency would be trading versus the
8       American dollar?
9   A   Correct.
10  Q   Now, were there other terms of the agreement that
11      were not contained in Exhibit 3?
12  A   I guess I need more specific --
13  Q   Well --
14  A   For what you're asking.
15  Q   -- were there other things that Harleman
16      Manufacturing and Pengo agreed to that were not set
17      forth in that document?
18  A   No.
19          (Exhibit 46 was marked for
20      identification.)
21  Q   (By Mr. Harris) Mr. Scudder, I want to show you what
22      we've marked as Exhibit 46, a document labeled Pengo
23      347 and 348.  That's a memorandum to Dawn Jamison
24      from you; correct?
25  A   Correct.

14 (Pages 41 to 44)

                                                                45

1   Q   About Harleman contract and pricing. And you state,
2       "Please review and draft up to send out"?
3   A   Correct.
4   Q   And this is something that you put together?
5   A   Correct.
6   Q   You would agree with me on the second page of this
7       draft document, Paragraph 6 is different from what's
8       contained in the actual Commitment Form that was
9       signed by the parties; isn't it?
10  A   Correct.
11  Q   And it states, "Pengo will agree to pay X percent
12      for each head purchased"?
13  A   Correct.
14  Q   So at the time you drafted this document, Pengo was
15      still contemplating purchasing heads from
16      Harleman Manufacturing?
17  A   Correct.
18  Q   Do you know when this was sent to Ms. Jamison?
19  A   I do not.
20  Q   Why did that paragraph get taken out?
21  A   That was when we ultimately decided that we were
22      going to -- if we had a purchase agreement, we'd
23      have two separate agreements, so we'd have a
24      Commitment Form to purchase products as well as a
25      second agreement to be able to purchase products

                                                                46

1       back through Harleman.
2   Q   And -- and that's what you told Mr. Harleman, that
3       you thought it would be better if you did two
4       separate agreements?
5   A   I stated that it needed to be two separate
6       agreements, yes.
7   Q   Whatever happened to the second agreement?
8   A   We decided as a company not to -- to go that
9       direction.
10  Q   Did you ever advise Mr. Harleman that Pengo had made
11      that decision?
12  A   Yes.
13  Q   Do you know when you advised him of that?
14  A   I don't know specifically when. I do know that it
15      was on a -- on a phone call.
16  Q   Don't recall the date?
17  A   I do not.
18  Q   Did you record the conversation?
19  A   No, I did not.
20  Q   Do you know whether it was before or after the
21      Commitment Form labeled Exhibit 3 was signed by the
22      parties on May 4th, 2010?
23  A   I do not.
24  Q   And the reason that you gave to Mr. Harleman for
25      doing two separate agreements was that it would be

                                                                47

1       simpler?
2           MR. SPERLING: Could you read the question
3       back, please.
4   Q   (By Mr. Harris) Yes. The reason you gave to
5       Mr. Harleman for doing two separate agreements is
6       that it would be simpler?
7   A   I don't recall specifically what I wrote in the
8       e-mail that I sent to him on that subject.
9   Q   Do you know whether or not any of the samples had
10      been started at the time the commitment was signed?
11  A   I don't know.
12          (Exhibit 47 was marked for
13      identification.)
14  Q   (By Mr. Harris) I'll show you, Mr. Scudder, what
15      we've marked as Exhibit 47, which is an e-mail chain
16      labeled Pengo 396. I think it starts at the bottom
17      with an e-mail from Mary Pohlman to you and
18      Ms. Jamison, sending the signed agreement from
19      Harleman; correct?
20  A   Correct.
21  Q   And she states in that e-mail that he's requesting
22      drawings if Pengo has them available for the heads
23      and an update on the samples.
24          Then above that is an e-mail from Mr. Matthias
25      to you asking if you're comfortable to release the

                                                                48

1       drawings to Harleman. And stating to Mary that the
2       samples have not been started; correct?
3   A   Correct.
4   Q   And then Ms. Pohlman responds to Mr. Matthias and
5       states, "He is expecting samples in July as stated
6       on the agreement. Is that even doable"?
7   A   Correct.
8   Q   And you would agree with me the samples were not
9       delivered by July 2010 as set forth in the
10      agreement; true?
11  A   Correct.
12  Q   Now, at the time this agreement was entered into
13      here on May 4th, 2010, was there -- did anyone at
14      Pengo think that Harleman Manufacturing had copied a
15      design of Pengo?
16  A   No.
17  Q   Who is R. Frost?
18  A   He was a business development manager for a short
19      time frame.
20  Q   What was his full name?
21  A   Robert Frost.
22  Q   Do you know when he was business development
23      manager?
24  A   I don't know the exact time frame. He was there for
25      a little over a year, and he's been gone about two

**Alpha Reporting Service**

**417-887-4110**     **www.alphareportingservice.com**     **417-889-4246**

Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 17 of 54

---

**49**

1      years.  So in that 2012/2013 time frame.
2  Q   Was he there working for Pengo in 2010?
3  A   I believe he was.  Actually, that may be the time
4      frame, 2010 to 2012.
5  Q   What -- what did he do as business development
6      manager?
7  A   He was responsible for product development primarily
8      on the foundation tooling side.
9  Q   What involvement did he have with regard to the
10     Harleman cast head project?
11  A   Actually, very little.  I tried to bring him into
12     the project.  I know that he was on at least one,
13     possibly two conference calls with Ron and I and
14     others but essentially had very little impact on the
15     project.
16        (Exhibit 48 was marked for
17     identification.)
18  Q   (By Mr. Harris) I'll show you what we've marked as
19     Exhibit 48.  A document labeled Pengo 432, which
20     appears to be an e-mail from R. Frost to you,
21     Dana Scudder, dated May 20th, 2010; correct?
22  A   Correct.
23  Q   And in this e-mail, Mr. Frost states, "We know this
24     is the guy that copied our spiral (really didn't do
25     too well) but none the same, we did have a sell to

**50**

1      him for one of them.  Me and Wayne Beach were amazed
2     that they even got" -- is it "filing date"?
3  A   That's correct, yes.  Should be filing date.
4  Q   Did you discuss this e-mail with Mr. Frost and what
5     he meant by that?
6  A   I did.
7  Q   What did he tell you?
8  A   Well, first, I explained that the spiral rock auger
9     that Harleman has was not copied from the Pengo
10     spiral auger, that he was mistaken about that.
11     Because our spiral design is different than the
12     Harleman design, which is what he's referencing
13     there as far as not doing too well.  He's a very
14     opinionated person.  But the filing date just
15     referred to the patent that he had on that and that
16     was his opinion about what he thought about the
17     Harleman patent.
18  Q   Did anyone else in Pengo share Mr. Frost's belief?
19      MR. SPERLING:  Object to the extent you're
20     asking the witness to testify about what others
21     believed.
22  Q   (By Mr. Harris) Let me rephrase my question:  Did
23     anyone other than Mr. Frost at Pengo express to you
24     an opinion that they thought Harleman Manufacturing
25     had copied a design of Pengo?

**51**

1  A   Not that I'm aware of.
2  Q   Now, after the Commitment Form was signed May of
3     2010, would you agree with me that there were some
4     oral modifications to the agreement?
5  A   I guess I need a little more specific information.
6  Q   Well, was there ever a discussion about Pengo
7     assuming the tooling or maintenance costs?
8  A   There were discussions about Pengo paying for the
9     tooling cost, but I believe that was prior to the
10     agreement being signed, not after.
11  Q   You don't recall there being any discussions after
12     that date?
13  A   Not that I recall.
14  Q   Do you know did Jim Tomlen ever tell Mr. Harleman
15     that Pengo would agree to assume some of the
16     maintenance and tooling costs on the project?
17  A   Not that I recall.
18  Q   If he had said that, would he have the authority to
19     say that on behalf of Pengo?
20  A   No, he would not.
21      MR. SPERLING:  We've been going for about
22     another hour.  When you're at a convenient place.
23      MR. HARRIS:  That's fine.  Let me take a break
24     because I think I can't find something anyway, other
25     finding a fax that someone sent to me that somehow

**52**

1      got mixed in my...
2      THE VIDEOGRAPHER:  Okay.  We're off the record.
3      (Short break taken.)
4      THE VIDEOGRAPHER:  Okay.  We're back on the
5     record.
6  Q   (By Mr. Harris) All right.  Mr. Scudder, I want to
7     talk to you a little bit more about the
8     conversations that were had with Mr. Harleman
9     regarding Pengo purchasing the molds from Harleman.
10     Were there, in fact, discussions with Mr. Harleman
11     about that before the Commitment Form was signed?
12  A   Correct.
13  Q   Can you tell me what those discussions were?
14  A   They were basically generic discussions on what we
15     had as a sales force versus what Harleman had,
16     products that he had, products that we had, and how
17     we might be able to blend those things together to
18     come up with an agreement to help each other's
19     companies sell a product.
20  Q   Did you ever discuss quantities?
21  A   No.  Everything was very high level and what I would
22     call brainstorming type ideas.
23  Q   Did Mr. Harleman ever express to you that that was
24     important to him in this transaction?
25      MR. SPERLING:  And by "this transaction,"

---

53

1    you're referring to what?
2 Q   (By Mr. Harris) The agreement to do the -- to have
3      Pengo do the cast heads.
4 A   Say that one more time, please.
5 Q   Did Mr. -- in -- in the discussions regarding Pengo
6      purchasing or potentially purchasing heads from
7      Harleman, did Mr. Harleman ever express to you that
8      that was important to him in his decision for his
9      company to enter into the agreement with Pengo to
10     have Pengo cast the heads?
11 A   No. That was not part of the agreement on the
12     Commitment Form for cast heads.
13 Q   I know it wasn't that. I know you're -- it's not
14     part of that form that was signed, but in the
15     discussions, did he ever tell you words to the
16     effect, Dana, that's important to me, that's a big
17     reason I'm thinking about going with Pengo?
18     Anything like that?
19 A   No.
20 Q   Now, were these discussions just between you and
21     Mr. Harleman, or were there others involved?
22 A   Sometimes there were others involved. We had
23     multiple conference calls through this process, so
24     there was other people involved in the
25     conversations. And then in some cases, one of my

---

54

1      salespeople was with me when I was at the Harleman
2      facility.
3 Q   Do you recall who the other people at Pengo were
4      that were involved in these discussions?
5 A   Jim Tomlen, Eric Hennarichs, Brian Rickards,
6      Dawn Jamison, and Robert Frost.
7 Q   Anyone else that you can think of?
8 A   Not that I recall, but anybody in that initial list
9      that we went through and put together for Pengo
10     employees could have been on any one of those, you
11     know, conference calls.
12        (Exhibit 49 was marked for
13     identification.)
14 Q   (By Mr. Harris) I'll show you what I've marked as
15     Exhibit 49, a document labeled Pengo 389. That's an
16     e-mail that you sent to Mr. Harleman on May 3rd,
17     2010; correct?
18 A   Correct.
19 Q   And if you would, please, read that first sentence
20     for us.
21 A   "To simplify everything, I think we need two
22     separate agreements, one for us to supply castings
23     and a second for us to purchase other products. I
24     am having Dawn redo the agreement and put in the
25     changes we discussed. She will have it to you

---

55

1      today."
2 Q   And that was you telling Mr. Harleman that it wasn't
3      going to be one consolidated agreement regarding
4      Pengo purchasing heads and also casting heads for
5      Harleman?
6 A   Correct.
7 Q   And that was sent the day before the Commitment Form
8      is dated; correct?
9 A   Correct.
10 Q   And so you would agree with me, then, as of
11     May 3rd, 2010, you were still indicating to
12     Mr. Harleman that Pengo was going to buy heads from
13     Harleman. It was just going to be under a separate
14     agreement?
15        MR. SPERLING: I object to the characterization
16     of the statements in Exhibit 49.
17 Q   (By Mr. Harris) You can go ahead and answer the
18     question.
19        MR. SPERLING: Would you read the question back
20     for the witness, please.
21        (The requested portion of the record was
22     read by the reporter.)
23 A   I would state that we were still having some generic
24     discussions on the possibility of that coming
25     together.

---

56

1 Q   (By Mr. Harris) Well, you would agree with me that
2      in Exhibit 49, you don't say anything about Pengo's
3      not going to buy heads from Harleman Manufacturing?
4 A   I would agree from the standpoint that what I'm
5      indicating in my e-mail is that we have two separate
6      agreements that we need to put together for two
7      separate projects that don't tie into each other
8      from that standpoint.
9 Q   And you believe that simplifies everything?
10 A   I believe that two independent agreements would
11     simplify everything, yes.
12 Q   Now, I think before we took our break, I was talking
13     to you about after the Commitment Form was signed
14     whether Pengo agreed that it would absorb some of
15     the tooling and/or maintenance costs. And you said
16     that you did not recall that ever being said, and if
17     Mr. Tomlen said that, he didn't have authority;
18     correct?
19 A   Correct.
20        (Exhibit 50 was marked for
21     identification.)
22 Q   (By Mr. Harris) I'll show you what we've marked as
23     Exhibit 50, which is a document labeled Pengo 531.
24     An e-mail from James Tomlen to you dated June 9th,
25     2010. And he's talking about a conversation he had

---

17 (Pages 53 to 56)

Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 19 of 54

---

**57**

1    with Mr. Harleman; correct?

2  A  Correct.

3  Q  And in the second sentence he states, "Told him the

4    samples are being ordered and no need for a PO";

5    correct?

6  A  Correct.

7  Q  And then in the next sentence, he states, "I

8    apologized for the misunderstandings, and Ron was

9    understanding.  I feel that he was a bit

10    disappointed when he signed the agreement, and then

11    we asked for a PO"; correct?

12  A  Correct.

13  Q  And then he states that he -- that Ron mentioned a

14    conversation with you regarding maintenance costs on

15    the tooling, and you advised him that Pengo would

16    assume this responsibility?

17  A  Correct.

18  Q  Do you recall having such a conversation with

19    Mr. Harleman?

20  A  I do not recall having that conversation.

21  Q  Did you ever tell Mr. Tomlen that you never made

22    such a statement?

23  A  I do not recall telling Jim that, no.

24  Q  And you would agree with me that in this e-mail

25    Mr. Tomlen's telling you that Ron's asking for a new

---

**58**

1    agreement just to clarify?

2  A  Correct.

3  Q  Now, you would agree with me looking at Exhibit 50,

4    as of June 9th, 2010, the samples haven't even

5    been ordered yet?

6  A  I'm not clear on the exact date the samples were

7    ordered.

8  Q  And the Commitment Form provided that you were going

9    to provide those samples by the end of July;

10    correct?

11  A  Correct.

12  Q  Do you know did anyone advise Mr. Harleman as of

13    June 9th, 2010, that the deliveries of the samples

14    may not be done by the end of July?

15  A  Jim Tomlen was keeping Harleman in the loop as far

16    as the delivery schedule on products or samples

17    coming in.  And I believe there's also some e-mails

18    from Mary Pohlman, which also contain some updates

19    on the project.

20        (Exhibit 51 was marked for

21    identification.)

22  Q  (By Mr. Harris) I'll show you Exhibit 51, which is a

23    document labeled Pengo 621, e-mail from Mr. Matthias

24    to Mr. Rickards and you, copies to several people

25    including Mr. Tomlen.  The e-mail is dated

---

**59**

1    June 28th, 2010.  In the first sentence he states

2    he received this notice from GST that the supplier

3    (520) for Harleman castings issued a 30 percent

4    increase in price for all Harleman items; correct?

5  A  Correct.

6  Q  Now, do you know what 520 means or what it's

7    referring to?

8  A  We number our foundries that we use in China, so

9    it's referring to a specific foundry.  I can't give

10    you the correlation today of what 520 equals, but

11    it's one of our suppliers.

12  Q  It's simpler than trying to pronounce Chinese names?

13  A  Correct.

14  Q  Okay.  And then he goes on to state that GST has

15    obtained a new quote from a different supplier (910)

16    and has suggested that we move this project to them.

17    Again, you don't know which specific foundry 910 is?

18  A  I do not.  But it does reflect one of our suppliers.

19  Q  And then it states that if we move the project to

20    910, the average increase per item is 8.4 percent;

21    correct?

22  A  Correct.

23  Q  And then he's underlined, "The customer needs to be

24    notified of this delay in development"; true?

25  A  Correct.

---

**60**

1  Q  And he goes on to state that nothing has been done

2    on this project overseas; correct?

3  A  Correct.

4  Q  And it says that if it's moved to 910 or to a new

5    supplier, another 10 to 15 days will go by before

6    they actually start making the patterns?

7  A  Correct.

8  Q  And then he goes on to state in bold print that "At

9    this pace, samples will not start arriving until mid

10    to late September"?

11  A  Correct.

12  Q  Do you know was Mr. Harleman ever advised of that

13    delay?

14  A  Yes, at some point he was advised.

15  Q  Do you know who advised him?

16  A  I don't know specifically, but it's in the e-mail

17    trail of information.

18  Q  So you believe there's an e-mail from someone to

19    Harleman stating that there was going to be a delay?

20  A  Correct.

21  Q  You would agree with me that that would be a

22    variation from the Commitment Form that was signed

23    by the parties?

24    On the sample dates?

25  Q  Yes.

---

18  (Pages 57 to 60)

| | 61 |
|---|---|

```
 1   A   Correct.
 2   Q   Did anyone ever propose entering into a new
 3       agreement?
 4   A   Not that I'm aware of.
 5           (Exhibit 52 was marked for
 6       identification.)
 7   Q   (By Mr. Harris) I'll now show you what we've marked
 8       as Exhibit 52, a document labeled Pengo 669.  E-mail
 9       from Mary Pohlman to Dawn Jamison and you.  And
10       Mr. Tomlen, dated July 6th, 2010.  And she talks
11       about a phone call she had with Mr. Harleman, and
12       she states, "He is still anticipating samples end of
13       July.  I have not told him anything yet because I do
14       not know what the exact dates are."  That's what it
15       says; correct?
16   A   Correct.
17   Q   You would agree with me, then, as of July 6th,
18       2010, Mr. Harleman had not been informed that there
19       was going to be a delay in the samples?
20   A   Correct.
21   Q   Now, these samples getting from China, the process
22       was the foundry -- the foundry in China would make
23       the samples, and then they would ship them to Pengo
24       in Iowa; correct?
25   A   Correct.
```

| | 62 |
|---|---|

```
 1   Q   And that would be at Pengo's expense?
 2   A   Correct.
 3   Q   And then when the -- the items would be shipped from
 4       the Pengo facility in Iowa to Harleman, it would be
 5       at Harleman's expense?
 6   A   Correct.
 7           (Exhibit 53 was marked for
 8       identification.)
 9   Q   (By Mr. Harris) I'll now show you what's marked as
10       Exhibit 53, which is a document labeled Pengo 696.
11       And that appears to be an e-mail that Mr. Matthias
12       sent to you on July 9th of 2010 with a copy to
13       Mr. Tomlen entitled -- or subject line, Harleman
14       time line, saying that the first five samples will
15       be ready to ship to us in early September.  I should
16       see them in late September.  And then it says, "The
17       remaining castings will be shipping to us late
18       September with delivery in mid to late October";
19       correct?
20   A   Correct.
21   Q   And in that e-mail he states in bold, "Note we can
22       expedite some of these dates if we bring the samples
23       by here.  All dates listed above are using ocean
24       freight; correct?
25   A   Correct.
```

| | 63 |
|---|---|

```
 1   Q   You would agree with me that Pengo would not pay for
 2       air freight to get those samples over here quicker,
 3       would they?
 4   A   We approached Harleman about air freighting the
 5       samples in, and the answer back was no on the air
 6       freight.  We made the decision to bring them in
 7       ocean freight.
 8   Q   But you agreed with me that the process was to be
 9       Pengo was supposed to pay from China to Iowa; right?
10   A   On ocean freight.
11   Q   Well, there's nothing stated about that in the
12       Commitment Form, is there?
13   A   No, not in the Commitment Form.
14   Q   And there's nothing in the Commitment Form about
15       Harleman paying anything for shipping from China to
16       the Pengo facility in Iowa, is there?
17   A   No.
18   Q   And would you agree with me by this time,
19       Mr. Harleman was becoming a little frustrated?
20           (Exhibit 54 was marked for
21       identification.)
22   A   Correct.
23   Q   (By Mr. Harris) Would you agree that he had reason
24       to be frustrated?
25   A   Correct.
```

| | 64 |
|---|---|

```
 1   Q   And I'll show you Exhibit 54, which is labeled
 2       Pengo 778.  And the bottom's an e-mail from
 3       Mr. Tomlen, September 16th, 2010.  Doesn't say who
 4       it's to but just says "all."  And he's talking about
 5       a conversation that he and Ms. Pohlman just had with
 6       Mr. Harleman that was very tense over the delays on
 7       the cast head project.  States that he's close to
 8       walking away from this project.  That's what it
 9       says?
10   A   Correct.
11   Q   And then you responded by saying you were flying and
12       that you would call Ron that afternoon?
13   A   Correct.
14   Q   Do you recall whether you called Mr. Harleman or
15       not?
16   A   I did, yes.
17   Q   Do you recall what he said?
18   A   I do not recall the specifics of that conversation.
19   Q   Now, at this point, Mr. Harleman's company has
20       already paid you $43,000 for the tooling, hadn't he?
21   A   I'm not sure.
22   Q   And it was around this time that the subject came up
23       that -- that Mr. Harleman wanted a document saying
24       that the tooling belonged to him?
25   A   Around that time frame, yes.
```

19 (Pages 61 to 64)

---

65

1    Q    And what was Pengo's position on such a request?
2    A    Request for?
3    Q    An agreement that the tooling belonged to Harleman.
4    A    That we would not honor that request.
5    Q    And why is it that Pengo wouldn't honor that
6         request?
7    A    As a rule, as a company, we do not provide tooling
8         back to customers.
9    Q    Well, but you would agree with me this wasn't a
10        standard situation, was it?
11   A    No.
12   Q    And this was a patented product of Harleman?
13   A    Some of the parts were, yes.
14   Q    And you would agree with me that Pengo couldn't use
15        that tooling for any other customer?
16   A    Absolutely not.
17   Q    You wouldn't agree with that?
18   A    No, I mean, we couldn't use --
19   Q    Oh, right.
20   A    Sorry.
21   Q    Okay.
22   A    Rephrase.
23   Q    My poor question, probably.  I asked it in a leading
24        manner, and it's sometimes easier not to.
25             So the tooling had no use to Pengo?

---

66

1    A    Correct.
2    Q    But you knew that if you provided an agreement to
3         Mr. Harleman that said the tooling belonged to him,
4         he would have more leverage, wouldn't he?
5    A    We didn't view it as leverage.
6    Q    Well, but you viewed it as he would have the right
7         to walk away?
8    A    Well, per the Commitment Form, we both had the right
9         to walk away.
10   Q    But in practice, if you kept his tooling, he was
11        going to be out his $43,000?
12   A    Correct.  But we also offered to return that money.
13   Q    Did you do that at the time that he requested an
14        agreement saying that the tooling belonged to him?
15   A    I don't know the specific date, but it would have
16        been sometime after that initial request.
17   Q    And who made that offer to him?
18   A    I don't know specifically, but I believe it was
19        Brian Rickards.
20             (Exhibit 55 was marked for
21        identification.)
22   Q    (By Mr. Harris) I'll show you what we've marked as
23        Exhibit 55, Pengo 799.  Sorry.  The bottom e-mail is
24        from Mr. Matthias to you dated September 23rd,
25        2010, and that's where he informs you that

---

67

1         Mr. Harleman wants an agreement that if Pengo and
2         Harleman should part ways that he'll own the
3         tooling; correct?
4    A    Correct.
5    Q    And at the top is Mr. Rickards' response?
6    A    Correct.
7    Q    And he says, among other things, if he, being
8         Harleman, pulled the tooling and sent to another
9         foundry, we lose all the resources put into this
10        project?
11   A    Correct.
12             (Exhibit 56 was marked for
13        identification.)
14        MR. HARRIS:  Actually, you just want to stop
15   now for lunch?
16        MR. SPERLING:  That's fine.
17        MR. HARRIS:  Why don't we just stop now for
18   lunch.
19        THE VIDEOGRAPHER:  Okay.  We're off the record.
20             (Short break taken.)
21        THE VIDEOGRAPHER:  We're back on the record.
22   Q    (By Mr. Harris) Mr. Scudder, we're back from lunch.
23   We'll try to pick up where we left off.  And I think
24   we'd talked about Exhibit 55 with Mr. Rickards'
25   e-mail of September 24th, 2010.  I'm going to show

---

68

1    you now what I've marked as Exhibit 56.  It's
2    labeled Pengo 800.  And I think at the top is your
3    response to that e-mail; is that correct?
4    A    Correct.
5    Q    And you talk in there that you thought the biggest
6         issue was Ron had been talking with Eric, Dawn, Jim
7         and myself.  And you said he seems to be getting
8         different information, which I'm on top of.  What --
9         what did you mean by that?
10   A    We had had a conversation -- I'm not sure of the
11        exact time frame -- prior to that -- "we" being
12        myself and Ron -- about the time line, so when I got
13        the original e-mail, I was confused as to why he was
14        upset because the time line had not changed.  And so
15        my assumption was the fact that he was getting
16        information from more than one person, that it was
17        becoming confusing as far as the actual dates that
18        were coming out.
19   Q    Now, when you say you talked to him, was that by
20        phone?
21   A    I don't remember.
22   Q    Do you -- in your position with Pengo, do you make a
23        practice of logging phone calls?
24   A    No, we do not.
25   Q    So as far as there being any record of when you

---

20  (Pages 65 to 68)

---

**69**

1    would have talked to him, you're not aware of
2    anything that would exist?
3  A  No, I am not.
4  Q  Do you have a cell phone that you use primarily for
5    business?
6  A  Yes, I do.
7  Q  Would that be true back in 2010?
8  A  Yes, it would be.
9  Q  What was that cell phone number?
10  A  561-400-9311.
11  Q  And is that your primary method of communication for
12    your employment?
13  A  Yes, it is.
14  Q  I know you're in Florida, and the main office is in
15    Iowa. Do you have a separate office, or do you just
16    work out of your home?
17  A  I work from home.
18  Q  Do you have a land line or do you just use your cell
19    phone all the time for work?
20  A  I do have a land line.
21  Q  Is it your personal land line or is it dedicated to
22    company business?
23  A  Personal.
24  Q  All right. Do you make a practice of using it for
25    work?

**70**

1  A  Sometimes.
2  Q  Okay. And what's that number?
3  A  Can I look it up?
4  Q  Sure.
5  A  That's how often I use it, so -- sorry. Give me
6    just a second.
7  Q  That's fine.
8  A  I'm going to have to look it up another way. It's
9    not in my --
10  Q  All right. Well, just next time --
11  A  -- contacts.
12  Q  Next time we take a break, just do it and you can
13    give it to me. It's no problem.
14  A  Okay.
15  Q  And then you go on to state to Mr. Rickards that
16    you're going to talk to him to discuss what he -- I
17    assume you're referring to Mr. Harleman -- is
18    looking for in the letter. Do you recall did you
19    and Mr. Rickards have that conversation over the
20    weekend?
21  A  I do not recall if it happened over the weekend.
22  Q  All right. And then down below at the bottom of the
23    page, there appears to be -- looks like a response
24    from Mr. Tomlen. Or it's kind of difficult to tell
25    whether it's in relation to these e-mails or not,

**71**

1    but he's talking about he had a very cordial
2    conversation that he had with Mr. -- or with Ron
3    today. And he states he assured him that we would
4    be sending him a document stating that the tooling
5    would belong to him after payment in the eventuality
6    that Pengo and Harleman Manufacturing should part
7    company. Is that what he said?
8  A  Correct.
9  Q  And then he goes on to state, "Our decision to air
10    freight the samples was very positive." Was there a
11    subsequent decision to send the -- the samples by
12    air freight?
13  A  We did have discussions on air freight versus ocean
14    freight.
15  Q  Would you agree with me that this appears to be
16    Mr. Tomlen indicating that Pengo would send the
17    samples by air freight?
18  A  Correct. And just for reference, if you'll go back
19    to that Exhibit 56 where it says "fax number" under
20    my signature line.
21  Q  Uh-huh.
22  A  That's my home phone number.
23  Q  Okay. Very good. I didn't even look there. Thank
24    you.
25       (Exhibit 57 was marked for

**72**

1    identification.)
2  Q  (By Mr. Harris) And then I'm going to mark as
3    Exhibit No. 57 an e-mail from -- to Mr. Rickards
4    labeled Pengo 836. Oops, I gave you my copy. I
5    marked that one. Sorry.
6       And these are options that you outline in the
7    letter or proposed letter to Mr. Harleman for
8    Mr. Rickards to consider; correct?
9  A  Correct.
10  Q  There's Option 1. You say that you want to -- well,
11    I guess what are you saying there in Option 1? I
12    think I understand, but why don't you tell me.
13  A  Option 1 was to lock in the business for a five-year
14    time period.
15  Q  With him having the right to take the tooling?
16  A  That did not include the tooling.
17  Q  All right. Then what's Option 2?
18  A  Option 2 tied into the quality and delivery on the
19    castings. That was one of the concerns that
20    Harleman had verbalized. So that was to tie it in
21    to say that if the quality exceeds 10 percent of the
22    overall volume business and/or the delivery falls
23    below 80 percent on time delivery, then the contract
24    could be canceled at that point.
25  Q  And again, you're looking for a five-year agreement;

**Alpha Reporting Service**

**417-887-4110**      **www.alphareportingservice.com**      **417-889-4246**
Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 23 of 54

73

1    correct?
2    A   Correct.
3    Q   And then Option 3?
4    A   Option 3 would have been if we decided to let
5        Harleman have the tooling money back that we would
6        have to go back and adjust the net pricing to
7        reflect Pengo's expense on the tooling.
8    Q   And then your next sentence says, "If I agree to
9        Harleman ownership, I do not have any protection
10       should the decision be made to move the tooling
11       elsewhere." What -- what does that mean?
12   A   That means that Pengo would have had the expense of
13       putting all the tooling together, and then Harleman
14       could take that tooling and move it from Location A
15       to Location B and start doing their own
16       manufacturing of cast products.
17   Q   Do you know which of those options ultimately was
18       submitted to Mr. Harleman? Or were any of them
19       submitted to him?
20   A   I know options were submitted, but I wasn't involved
21       in the phone call on what was submitted. So I'm
22       not -- I'm not sure to answer the question.
23   Q   And it's your belief that was communicated to him
24       orally over the phone as opposed to e-mail or in
25       writing; is that right?

74

1    A   I'm not sure how it was communicated.
2            (Exhibit 58 was marked for
3        identification.)
4    Q   (By Mr. Harris) I'll show you Exhibit 58, which is
5        an e-mail from you September 28th, 2010, to
6        Mr. Harleman regarding tooling. Is that the
7        communication in which the option was submitted to
8        him?
9    A   Yes, it is.
10   Q   And that was the five-year agreement with the
11       cancellation only if quality issues exceed
12       10 percent or overall dollar business or on time
13       delivery falls below 80 percent; correct?
14   A   Correct.
15           (Exhibit 59 was marked for
16       identification.)
17   Q   (By Mr. Harris) Sorry, there's only one..
18           Then Exhibit 59 would be Mr. Harleman's
19       response on Tuesday, the 28th. And he states, "We
20       already have an agreement in place that says either
21       party can cancel with 180 days written notice. The
22       agreement I am seeking is an agreement that says
23       Harleman Manufacturing, LLC, owns the tooling and
24       after the 180 written notice of ending the contract,
25       the tooling will be turned over to Harleman

75

1    Manufacturing, LLC, at an agreed upon destination in
2        China, along with all supporting documents from
3        Pengo Corporation agreeing to the release of all
4        tooling in original contract." Did I read that
5        correctly?
6    A   Yes.
7    Q   Did anything more become of that discussion?
8    A   Yes. I'm not sure of the time line, but there was
9        certainly discussions at Pengo after the receipt of
10       that e-mail.
11   Q   What were the discussions of Pengo?
12   A   Discussing different options to resolve the
13       situation.
14   Q   Who did you have those discussions with?
15   A   Primarily with Brian Rickards.
16   Q   And do you recall were they phone calls?
17   A   Primarily.
18   Q   What would have been the other form of
19       communication?
20   A   If we would have been in the same location at the
21       same time or if I would have been at the Iowa plant.
22   Q   It would have been in person?
23   A   Correct.
24   Q   How frequently would you be at the Iowa plant back
25       in this 2010 time frame?

76

1    A   Typically I try for once a quarter on no set
2        schedule.
3    Q   Do you recall did you and Mr. Rickards reach any
4        type of consensus as to how you thought you should
5        proceed?
6    A   At this point, we had not made a final decision on
7        what our process was going to be.
8    Q   Did you ever make a decision on what your -- a final
9        decision?
10   A   Ultimately, that was made once we were contacted by
11       Harleman's counsel.
12   Q   And that's when Mr. Harleman's attorney was trying
13       to negotiate a settlement with Pengo?
14   A   Correct.
15   Q   Now, as part of the process of developing the cast
16       heads for Harleman Manufacturing, did you have
17       discussions with Mr. Harleman about the number of
18       heads he thought he would use in a given year?
19   A   Yes. When we put the Commitment Form together, we
20       asked for him to supply us EAU numbers, which is
21       estimated annual usage numbers, which were supplied
22       by Harleman.
23   Q   And as part of that, did you inquire as to the
24       number that he had used in the year before?
25   A   I don't believe so. I believe I just asked for

| | 77 |
|---|---|

1    estimated annual usage numbers.
2  Q  Did Mr. Harleman -- when he supplied you those
3      estimated annual usage numbers -- tell you that he
4      was factoring in what he anticipated that Pengo
5      would purchase from him?
6  A  No.
7        (Exhibit 60 was marked for
8      identification.)
9        MR. SPERLING:  Do you think we could turn the
10     air back on?
11       MR. HARRIS:  Oh, yeah.  Turn that down.
12       MR. SPERLING:  What do I do?
13       MR. HARRIS:  Just turn it down a little bit to
14     like 72.
15 Q  (By Mr. Harris) Then I'll show you Exhibit 60, which
16     is Pengo 897.  And these are kind of the
17     calculations based on Harleman's estimated annual
18     usage, what Pengo would make and what its profit
19     margin would be; is that correct?
20 A  That's correct.
21 Q  And as I understand that, if Mr. Harleman's company
22     had bought all of the estimated annual usage set
23     forth in the Commitment Form, Pengo would have total
24     sales on the deal in one year of $425,000,
25     47 percent average profit margin, and a profit of

| | 78 |
|---|---|

1      $199,000; is that right?
2  A  I'm not a hundred percent sure what I based the
3      numbers and the e-mail on.  I'd have to double-check
4      to verify what I used to develop that math for that
5      statement.
6        (Exhibit 61 was marked for
7      identification.)
8  Q  (By Mr. Harris) Then I'll show you Exhibit 61, which
9      appears to be an e-mail from you dated
10     November 11th, 2010, to Mr. Harleman; correct?
11 A  Correct.
12 Q  This is an updated schedule of when the samples are
13     going to arrive; is that correct?
14 A  That's correct.
15 Q  Do you know -- it looks like looking at Exhibit 61,
16     as of November 11th -- well, can you say looking
17     at that, had anything actually arrived at the Pengo
18     facility in Iowa?
19 A  Not to my knowledge.
20 Q  And I think what you're saying is you're waiting for
21     an update on the 11/9 parts to see where they're at?
22 A  Yes, those were in transit at the time of this
23     e-mail.
24 Q  So at the time this e-mail is sent, it's your
25     understanding there's still no samples in the hands

| | 79 |
|---|---|

1      of Harleman Manufacturing?
2  A  That is correct.
3        (Exhibit 62 was marked for
4      identification.)
5  Q  (By Mr. Harris) And then Exhibit 62, there's an
6      e-mail from Mr. Matthias in the middle of the page
7      dated Friday, November 19th, 2010, stating that
8      none of the Harleman samples are here.  The first
9      set of samples are due any day; correct?
10 A  Correct.
11 Q  And below that is an e-mail that Ms. Jamison had
12     sent a few minutes earlier stating that Harleman has
13     300 augers to build for Pike; correct?
14 A  Correct.
15 Q  And it states that Mr. Harleman's -- or he can't
16     build or won't build until he gets the heads.
17 A  Correct.
18 Q  Now, with regard to these samples, what was your
19     understanding of the purpose of the samples?
20 A  The purpose of the samples is for the customer, in
21     this case Harleman, to review, inspect and make sure
22     that they are built to his specifications and
23     requirements.
24 Q  And you wanted Harleman Manufacturing to test those
25     samples; correct?

| | 80 |
|---|---|

1  A  No.  I wanted Harleman to inspect and verify that
2      the samples met their criteria for what they were
3      looking for.
4  Q  Do you know did Mr. Matthias recommend that
5      Harleman Manufacturing field test the sample heads?
6  A  I don't recall that, but I wouldn't be surprised by
7      that.
8  Q  And Mr. Harleman was told that if they didn't test
9      the samples and they proceeded, it would be at their
10     peril; true?
11 A  I don't recall that.  But ultimately what we were
12     asking for was a sign-off saying that the samples
13     were inspected and/or tested but approved.
14 Q  Now, do you know when Mr. Harleman's company
15     actually received the samples?
16 A  I do -- do not recall the specific date.
17 Q  We know it was sometime after November 19th,
18     though; correct?
19 A  That is correct.
20 Q  And do you recall Mr. Harleman or someone from his
21     company alerting you to problems with the multiplane
22     heads?
23 A  Yes.  I believe it was an e-mail string where the
24     notification came through that there were some
25     changes requested.

81

```
1    Q   Because they weren't fitting properly?
2    A   Yeah.  Correct.  It was an ID clearance issue.
3    Q   How long, in your opinion, do you think is a
4        reasonable time for Harleman to inspect those sample
5        heads?
6    A   I would say a week to ten days would be a reasonable
7        time.
8    Q   Now, as part of that process to inspect the -- the
9        heads, did Mr. Harleman or someone from his company
10       request copies of the 3D part files?
11           MR. SPERLING:  Could you read the question
12       back, please.
13           (The requested portion of the record was
14       read by the reporter.)
15   A   It's not part of the standard process, but a request
16       was made for 3D drawings.
17   Q   (By Mr. Harris) And that request was refused by
18       Pengo; correct?
19   A   Correct.
20   Q   Why was that request refused?
21   A   Typically it's company policy that we don't release
22       3D drawings to any customers.
23   Q   And why is that the company policy?
24   A   Because that's what we use to manufacture the
25       products.
```

82

```
1    Q   And why did you choose to follow that policy in this
2        case?
3    A   Because we didn't want to give the ability -- turn
4        over the ability for Harleman to use our drawings to
5        go elsewhere to make the like same products.
6    Q   And do you -- did Pengo think that it had the right
7        to retain the 3D drawings?
8    A   Yes, Pengo spent the time and money to develop the
9        information to develop the drawings themselves.
10   Q   For which Mr. Harleman paid you?
11   A   No.
12   Q   That wasn't part of the $43,000?
13   A   No, it was not.
14   Q   You would agree with me there's nothing in the
15       Commitment Form about the 3D drawings?
16   A   Correct.
17   Q   Did Pengo submit a copyright for those 3D drawings?
18   A   Not that I'm aware of.
19   Q   Do you know does Pengo still have possession of
20       those 3D drawings?
21   A   Yes, we do.
22   Q   Is it Pengo's position --
23           MR. SPERLING:  Counsel, just -- just so you're
24       aware, they were produced --
25           MR. HARRIS:  Oh, I know.
```

83

```
1            MR. SPERLING:  -- in discovery.
2            MR. HARRIS:  I just -- I know.  I've got them.
3    Q   (By Mr. Harris) You said the 3D are used for
4        manufacturing; correct?
5    A   Correct.
6    Q   Would you agree that an adequate inspection of the
7        samples would also require a comparison of the
8        actual samples to the 3D drawings?
9    A   No.  We always provide a 2D drawing for sign-off and
10       approvals on sample parts.
11   Q   But the 3D drawings are what are used to actually
12       manufacture them?
13   A   That's correct.
14   Q   And if the 3D drawings aren't right, the
15       manufacturing process won't be right?
16   A   That's correct.
17   Q   But with that said, you don't think that Harleman
18       had a right to check those 3D drawings to make sure
19       that they were consistent with the samples?
20   A   That is correct.
21   Q   And you would agree with me that anyone who had
22       those 3D drawings in their possession, if they had
23       the manufacturing capability, would be able to
24       manufacture the Harleman heads?
25   A   That's correct.
```

84

```
1            (Exhibit 63 was marked for
2        identification.)
3    Q   (By Mr. Harris) I'll show you what I've marked as
4        Exhibit 63.  It's labeled Pengo pages 1047 and 1048.
5        That's a purchase order from Harleman Manufacturing
6        to Pengo for a purchase of 400 single cut heads;
7        correct?
8    A   Correct.
9    Q   And that's dated December 20th, 2010?
10   A   Correct.
11   Q   So you would agree that within less than a month of
12       having the sample heads, Harleman had already
13       submitted a purchase order for 400 of the single cut
14       heads?
15   A   That's correct.
16   Q   And this -- this order was fulfilled by Pengo?
17   A   I know the order was entered on -- I'm not fully
18       aware if it was fully fulfilled.  I'm not sure when
19       the termination portion came into this, but...
20   Q   Okay.
21   A   So, unclear.
22   Q   All right.
23   A   Unable to answer that question.
24   Q   Do you have any idea how much time Pengo had in the
25       3D drawings?
```

24 (Pages 81 to 84)

---

85

1    A    I believe we estimated around 100 hours.
2    Q    Was that both the reverse engineering and the 3D
3         drawings or was that just the 3D drawings?
4    A    That would have been both projects.
5    Q    And as I understand it -- well, help me out here. I
6         think I understand, but I want to make sure I do.
7         Pengo gets heads from Harleman and the engineer
8         people reverse engineer it, which means basically
9         coming up with all the specs and everything; is that
10        right? Is your understanding?
11   A    Yes.
12   Q    And then they also develop the 3D drawings?
13   A    Yes.
14   Q    And those 3D drawings were used to create the
15        tooling, what would be the patterns, in other words?
16   A    Yes.
17   Q    And then the 3D drawings were shipped to China to
18        the foundry so that the foundry could create the
19        toolings?
20   A    Yeah. I'm not sure of the method, but they did go
21        to 520 and 910.
22   Q    Both of those entities would have gotten copies of
23        the 3D drawings?
24   A    Initially 520 and eventually 910.
25   Q    Now, those foundries -- and I know we talked about

---

86

1         using the number instead of the name, but are those
2         separate companies, separate and apart from Pengo,
3         or did Pengo or its parent have an ownership
4         interest in those foundries?
5    A    No ownership. Purely supplier/vendor relationship.
6    Q    Purely contractual relationship?
7    A    Correct.
8    Q    Do you know is there a written contract between the
9         two foundries or each of the two foundries and
10        Pengo?
11   A    I don't know if we have contracts. I do know we
12        have nondisclosure agreements with all of our China
13        suppliers.
14   Q    And whose job is it to get those agreements? Is
15        that something Mr. Rickards does or Mr. Matthias?
16        Who handles that for Pengo?
17   A    That's also through our GST, global sourcing team.
18        I don't know whose signature is on those. My
19        assumption would be Phillip that runs that
20        operation. I can't remember his last name, but it's
21        in here somewhere.
22   Q    Now, shortly after the first of the year in 2011,
23        Pengo received price increases from a foundry; is
24        that correct?
25   A    That's correct.

---

87

1         (Exhibit 64 was marked for
2         identification.)
3    Q    (By Mr. Harris) I'm going to show you Exhibit 64.
4         That's an e-mail from Ms. Jamison to you advising
5         you of the increased costs from the foundry. And I
6         think the second page is the spreadsheet containing
7         those?
8    A    Correct.
9    Q    And even though Pengo was committed to a price to
10        Mr. Harleman's company through May of 2011, the
11        foundry was increasing the price on Pengo?
12   A    Correct.
13   Q    And as I take it from the column that is set forth
14        on the second page of Exhibit 64, that was going to
15        result in Pengo's profit margin being lowered to
16        some degree?
17   A    That's correct. Lower for all cast products.
18   Q    Was there a discussion among the people at Pengo
19        about passing those prices -- increases on to
20        Mr. Harleman?
21   A    Yes, there was.
22   Q    And did Pengo, in fact, increase the prices to
23        Mr. Harleman before May the 4th of 2011?
24   A    I know we went back and looked at it from an overall
25        standpoint because when we had the change from 520

---

88

1         to 910, we had increases on the tooling cost.
2         And we also had some increases on the cast
3         component cost. And at that time, we chose not to
4         change the pricing for Harleman and to take that
5         pricing on.
6         So we went back and reviewed that with these
7         increases to see where we were at. And I believe
8         it's around the same time frame, there were some
9         other requests to make some additional changes from
10        Harleman on the tooling. And at that point is when
11        we talked about a price variation based on the
12        Commitment Form or a price variation from the
13        Commitment Form.
14   Q    And did you -- and I say "you," I mean Pengo. Did
15        Pengo ultimately decide to pass some price increases
16        on to Harleman Manufacturing?
17   A    We did.
18   Q    Even though you had committed to him in the
19        Commitment Form that the prices would not increase
20        until May 4th of 2011?
21   A    Yes. Based on some of the changes that Harleman had
22        requested that were not part of the original design.
23   Q    Well, what portion of the costs were the result of
24        Harleman asking for changes in the design?
25   A    I really don't have any way to factor in a

---

25 (Pages 85 to 88)

**Alpha Reporting Service**
417-887-4110      www.alphareportingservice.com      417-889-4246
Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 27 of 54

89

1    percentage to determine what that is.

2  Q  But you would agree that you passed the entire price

3    increase on to Harleman, not just the increase

4    associated with changes that he wanted to be made.

5  A  I would actually have to verify if everything was

6    passed on a hundred percent on the price increase

7    that we received.

8  Q  Was there a discussion at some point during this

9    time right around the 1st of February about

10    Harleman taking the drawings and developing parts

11    with another source?

12  A  Yes. I believe it was in early January when I found

13    out that Harleman was working with a company in

14    Ningbo for the very same products.

15  Q  Did you verify that to be the case?

16  A  I wrote a letter that was e-mailed to Ron Harleman

17    where I stated that he was dealing with another

18    company in Ningbo. And it was not refuted from that

19    standpoint, so that would be my verification.

20  Q  You wrote a letter to Harleman?

21  A  Yes.

22  Q  But you knew he had another source for casting heads

23    as early as January of 2010, didn't you?

24  A  I knew he was bringing in other cast products from

25    Ningbo for some of his other products that they

90

1    manufacture. But I believe in 2011 is when I

2    verified that he was doing the cast head project.

3  Q  And you said "verified" being simply sending a

4    letter to Mr. Harleman and not getting any response?

5  A  And that based on what I was being told.

6  Q  And who was telling you that?

7  A  I believe it was Mary Pohlman -- but I can't be a

8    hundred percent -- that called me up one day and

9    said they had spoken to Ron and he made a comment

10    about cast heads and Ningbo, China.

11    (Exhibit 65 was marked for

12    identification.)

13  Q  (By Mr. Harris) I'm going to show you what I've

14    marked as Exhibit 65. It's a four-page e-mail chain

15    labeled Pengo 1163 through 1166. It's kind of hard

16    to follow, but I think if you start on the second

17    page of that document, Pengo 1164, it begins on the

18    bottom of 1165.

19    It's an e-mail from Mr. Tomlen (sic) saying,

20    "Well, we must all be on the same wave length. Ron

21    just called me. 1, he thought he received samples

22    from us last week, but he just checked and those are

23    from his secondary supplier. 2, they was all good,

24    and he received them from China in 3 months. 3, he

25    is not happy with us. 4, he said if you could just

91

1    refund my 42K in tooling, that would be great." Is

2    that the e-mail that you think brought that to your

3    attention?

4  A  Correct.

5  Q  And on the first page of that document, there's an

6    e-mail from Eric Hennarichs to Mr. Tomlen, and it

7    says, "Holy shit. Looks like they will blame Ron."

8    Do you know what Mr. Hennarichs meant by that?

9  A  I do not. That's an e-mail from him directly to

10    Jim.

11  Q  Was there any discussion about blaming Mr. Harleman

12    for anything?

13  A  I'm not sure what he's trying to reflect in that

14    statement.

15  Q  Well, do you recall, though, at that time there

16    being any discussion about blaming Mr. Harleman for

17    something?

18  A  I do not, no.

19  Q  You would agree with me that Mr. Harleman still

20    didn't have all of his samples as of February the

21    11th of 2011?

22  A  That's correct. We were making new samples based on

23    the changes that were requested.

24  Q  And the new samples that were being made were for

25    the multiplane heads that were not correct.

92

1  A  I don't remember specifically if it was on the

2    multiplane or the other heads as well that -- I know

3    on all of the heads there was a request to put part

4    numbers and logos and I believe a patent number, but

5    then there was an issue with the ID on the -- the

6    other headset that also had to be corrected.

7  Q  And you would agree that Mr. Harleman was within his

8    rights to request new samples on the multiplane

9    heads to make sure that they would get them correct?

10  A  Correct.

11  Q  And that he shouldn't order those for production

12    until the samples were correct?

13  A  Correct.

14    MR. SPERLING: We've been going about an hour.

15    MR. HARRIS: Yeah.

16    MR. SPERLING: When you reach a convenient

17    point.

18    MR. HARRIS: That's fine. Yeah, that's fine.

19    THE VIDEOGRAPHER: Okay. Going off the record.

20    (Short break taken.)

21    THE VIDEOGRAPHER: We're back on the record.

22  Q  (By Mr. Harris) Mr. Scudder, at some point after

23    Harleman was advised of the price increases, did you

24    become aware that Harleman Manufacturing was playing

25    a video at a trade show?

26 (Pages 89 to 92)

---

93

1  A   I'm not sure on the time frame, but I was made aware
2      of a video that was being played at a trade show.
3              (Exhibit 66 was marked for
4      identification.)
5  Q   (By Mr. Harris) And we'll mark as Exhibit 66 an
6      e-mail labeled Pengo 1259, which appears to be --
7      I'll give it to you there -- an e-mail from
8      Mr. Tomlen to Mr. Rickards and you and Ms. Jamison,
9      dated February 27th, advising that he was at a
10     farm show in Kansas City, and Harleman has a booth
11     displaying his augers and ag products.  And it says
12     he's got two TVs playing simultaneously.  One shows
13     his auger in action, and the other shows the Pengo
14     auger at the dig-off; correct?
15 A   Correct.
16 Q   What's he mean by "the dig-off"?
17 A   He's referring to the Pengo cast heads that we sent
18     to Harleman Manufacturing.
19 Q   And the events that took place at Mr. Harleman's
20     ranch?
21 A   Correct.
22 Q   Did you ask him why he referred to it as "the
23     dig-off"?
24 A   I did not.
25 Q   Mr. Tomlen was there, wasn't he?

---

94

1  A   Jim was there.
2  Q   And, in fact, in his next or couple sentences down
3      he says, "We were all caught on tape"?
4  A   Correct.
5  Q   What did you think of the video when you learned of
6      it?
7  A   I was disappointed that anyone would display a video
8      that puts human people in it.  If a competitor wants
9      to take our product and do whatever they want to do,
10     that's one ting, but then to have actual personnel
11     from the company in it, I thought was very
12     distasteful.
13 Q   But as far as the video itself, you didn't have any
14     problem with it?
15 A   I had a problem that Pengo personnel were in it.
16 Q   But other than Pengo personnel in it, you didn't
17     have any problem with what Harleman was doing with
18     it?
19 A   No.
20 Q   And I would be correct, you as the sales manager for
21     Pengo, it didn't bother you if Harleman was selling
22     auger heads, did it?
23 A   No, it did not.
24 Q   Because every auger head that he sold that he got
25     from Pengo, you made money on?

---

95

1  A   Every cast head auger he would have sold we would
2      have made money on.
3  Q   Right.  Did you discuss it with Mr. Rickards?
4  A   Meaning the video?
5  Q   Yes.
6  A   I did have a discussion with Mr. Rickards about the
7      video.
8  Q   Did Mr. Rickards tell you what he thought of the
9      video?
10 A   Mr. Rickards at that point in time had not seen the
11     video.
12 Q   Did he subsequently view it?
13 A   I'm not sure.
14 Q   Did he ever tell you what he thought of it?
15 A   Actually, I'll take that back because we did have a
16     comment.  He did see the video.  I'm not sure when
17     and where, but he did see the video.  We did have a
18     discussion afterwards.  He was also disappointed
19     that Pengo personnel were in this particular
20     marketing video.
21 Q   Did he have any other comment?
22 A   We were -- he was going to get with our legal
23     counsel to see what options that we might have from
24     a legal standpoint to get that removed, and then I
25     also called Ron that day and asked him not to play

---

96

1      that video.
2  Q   Did he honor your request?
3  A   To my knowledge, he did at that time.
4  Q   Did you know -- did that video, when you reviewed
5      it, did it show Eric Hennarichs from Pengo?
6  A   I don't recall.  I don't know.
7  Q   All right.
8              (Exhibit 67 was marked for
9      identification.)
10     MR. SPERLING:  Let me just take a moment before
11     you go on to the next one.
12     MR. HARRIS:  Oh, sure.
13     THE VIDEOGRAPHER:  We're off.
14             (Short break taken.)
15     THE VIDEOGRAPHER:  We are back on the record.
16 Q   (By Mr. Harris) Mr. Scudder, I'm going to show you
17     what we've marked as Exhibit 67 now, which is a
18     letter, I believe, that you authored and sent to
19     Mr. Harleman on March 3rd, 2011, a few days after
20     you learned of the video; is that correct?
21 A   That's correct.
22 Q   And it's dated -- actually, the letter is dated
23     March the 1st of 2011; correct?
24 A   Correct.
25 Q   What was the purpose of this letter?

---

27 (Pages 93 to 96)

97

1  A  The purpose was to outline the events that had taken
2     place and summarizing essentially basically where we
3     were at at that point in March with the relationship
4     between our two companies.
5  Q  And in the second paragraph you make a reference to
6     "during a conference call back in August of 2010."
7     Do you recall when that conference call was?
8  A  I do not.
9  Q  What did you refer to to establish that a conference
10    call occurred in August of 2010?
11 A  I believe I went and looked at my Outlook calendar.
12 Q  And it indicated a conference call with
13    Mr. Harleman?
14 A  Correct.
15 Q  Is there any reason you didn't put the specific date
16    of the conference call?
17 A  No specific reason.
18 Q  You go on to state, "During a conference call back
19    in August of 2010, and as per the MOU, we clearly
20    outline that the 3D drawings and the tooling for
21    each item would remain Pengo property." What is
22    MOU?
23 A  MOU is a memo of understanding.
24 Q  What document are you referring to there?
25 A  That's actually a mistake on my part. I was

98

1     actually referring to the Commitment Form. So now
2     when we put together Commitment Forms, we put them
3     together as MOUs. And we had made that transition
4     during this time frame, and I mistakenly referred to
5     the Commitment Form as the MOU.
6  Q  So what you were referring to was the Commitment
7     Form that was executed dated May 4, 2010, and has
8     been marked as Exhibit 3; correct?
9  A  That's correct.
10 Q  Where in Exhibit 3, the Commitment Form, does it
11    state that Pengo would retain the 3D drawings and
12    tooling?
13 A  It is not stated in the Commitment Form.
14 Q  So that was another error in your letter?
15 A  That was another error on my part, yes.
16 Q  You go on in what would be -- according to my --
17    well, it's the last paragraph on that page, Pengo
18    1339. You state, "Pengo was given the rights to
19    manufacture these castings exclusively for sale to
20    Harleman Manufacturing." Are you, again, referring
21    to the Commitment Form when you say that?
22 A  Yes.
23 Q  Where in the Commitment Form does it say that Pengo
24    will have the exclusive right to manufacture these
25    castings?

99

1     MR. SPERLING: Can you read the question back,
2     please.
3        (The requested portion of the record was
4     read by the reporter.)
5     MR. SPERLING: Objection. Mischaracterizes the
6     statement in the letter.
7  A  In my letter, I'm saying that we're given the right
8     to manufacture them, but I'm saying manufacture them
9     exclusively for Harleman, not manufacture -- not
10    having exclusive manufacturing rights.
11 Q  (By Mr. Harris) Did -- okay. So what you're saying
12    is we could make them only for Harleman?
13 A  Correct.
14 Q  Did Pengo ever take the position that it had a right
15    to be the exclusive manufacturer of the cast heads
16    for Harleman?
17    MR. SPERLING: By "the cast heads," do you mean
18    any cast heads or these specific cast heads?
19 Q  (By Mr. Harris) These cast heads that are the
20    subject of the Commitment Form.
21 A  Can you say that one more time, please.
22 Q  Sure. Did Pengo ever take the position that it had
23    the exclusive right to manufacture these cast heads
24    set forth in the Commitment Form?
25 A  Are you asking if that's what our company position

100

1     was?
2  Q  Yes.
3  A  That was our understanding, yes.
4  Q  But again, that's not contained in the Commitment
5     Form?
6  A  That's correct.
7  Q  And then in the first paragraph on page 1340,
8     Exhibit 67, in the first paragraph, you state, "In
9     communicating with our Laurens office on 2/10/2011,
10    you indicated that had received other samples in
11    from another source which further complicates the
12    situation as we are unsure of our commitment, and
13    these actions clearly are in direct conflict with
14    the agreement." How are they in direct conflict
15    with the agreement, assuming that occurred?
16 A  It's based on the standpoint of the agreement we had
17    to put the engineering hours in the reverse
18    engineering side of it. And then the signed
19    Commitment Form by both parties to be able to
20    manufacture and produce cast heads.
21 Q  And you go on in the next sentence to state your
22    position or the company's position that Pengo, being
23    the exclusive supplier and Harleman being the
24    exclusive buyer; correct?
25 A  Correct.

28 (Pages 97 to 100)

---

101

1  Q  And you go on in the last paragraph to state that if
2     Harleman terminates the project or confirms that
3     Harleman has already developed with another supplier
4     outside our agreement, then all tooling development
5     charges will be forfeit on this project.  Is that
6     stated anywhere in the Commitment Form?
7  A  No, it is not.
8  Q  And then you go on to state, "Pengo will also seek
9     reimbursement for the engineering hours that we will
10    not be able to recover as a result of Harleman's
11    decision to terminate the project before any
12    production orders."  And that's not a true statement
13    either, is it?
14  A  Well, we were certainly going to lose everything
15    from an engineering standpoint because there's no
16    products that we can use because they're of the
17    Harleman design.  But we had received some
18    production orders at the time this was written --
19    which the letter was also written because we had
20    other samples in -- I believe it was in December and
21    had still not gotten approval back, and we were also
22    trying to get approval on that to be able to proceed
23    with those series of heads.
24  Q  Do you recall which samples those were?
25  A  I do not.  I'd have to verify.

102

1  Q  Did Mr. Harleman ever contact you regarding this
2     letter?
3  A  I am -- I'm not sure.
4  Q  Other than looking at your Outlook calendar, did you
5     find any documents or records that confirmed this
6     conference call in August of 2010?
7  A  No.
8  Q  What changes had Harleman requested to the samples
9     that seriously affected the time line to get the
10    parts into production?
11  A  They wanted to add the logo and the part number and
12    the patent number as well as increase the tooth
13    holder size from inch and a quarter to inch and a
14    half.
15  Q  You would agree the adding of the part number and
16    the logo and the patent number, those would be minor
17    revisions?
18  A  Well, when you're talking about casting patterns,
19    there really is no minor revisions.
20  Q  Do you recall how much it would cost to make those
21    tooling changes?
22  A  I don't recall, but it's in one of the earlier
23    exhibits we looked at.
24  Q  And you would -- after you sent this letter, you
25    talked to Mr. Harleman, and I believe the parties

103

1     decided to move forward; is that correct?
2  A  That's correct.
3         (Exhibit 68 was marked for
4     identification.)
5  Q  (By Mr. Harris) Exhibit 68, I think, is your e-mail
6     to your folks at Pengo, summarizing your
7     conversation with Mr. Harleman; is that correct?
8  A  Correct.
9  Q  And then he sent in a new PO for a revised cost for
10    product and tooling?
11  A  Correct.
12  Q  And you state that you need to expedite -- or
13    expedite the purchase order for the heads and the
14    samples for the multiplane heads?
15  A  Correct.
16  Q  And you would agree, as we sit here on March 10th
17    of 2011, the purchase order that had been submitted
18    December 20th, 2010, no action had been taken to
19    build those heads at this point?
20  A  What product was the purchase order for?
21  Q  The single cuts.
22  A  To my knowledge, that order was being processed.
23  Q  All right.  And you want all information funneled to
24    you because you're going to give Mr. Harleman weekly
25    updates?

104

1  A  I actually had it set up for Jim to give him weekly
2     updates.  I just wanted to make sure that I was
3     copied on all the information so I knew everything
4     that was going on with the Harleman project.
5  Q  Do you know did Mr. Tomlen provide those weekly
6     updates?
7  A  He did, yes.
8         (Exhibit 69 was marked for
9     identification.)
10  Q  (By Mr. Harris) I'll hand you Exhibit 69, which is
11    an e-mail at the bottom from Mr. Harleman dated
12    March 21st, 2011.  He's asking for a verification
13    report on the purchase order that he had sent in
14    along with delivery dates; correct?
15  A  That's correct.
16  Q  Do you know why it had taken eleven days from your
17    e-mail of March 10th to get a verification report?
18  A  I would have to confirm what day we received the
19    purchase order.
20         (Exhibit 70 was marked for
21    identification.)
22  Q  (By Mr. Harris) I'll show you what we've marked as
23    Exhibit 70.  That's an e-mail from Harleman
24    Manufacturing to Ms. Jamison dated March 11th,
25    2011, with a purchase order attached labeled

---

105

1      Pengo 1388 through 1391.  You would agree with me
2      that that purchase order was submitted to Pengo
3      shortly after noon on March the 11th?
4   A   That's correct.
5   Q   Okay.  Do you know why it took ten days to get a
6      verification of that purchase order?  Or perhaps let
7      me rephrase the question.  Do you know why after the
8      passage of ten days Mr. Harleman had still not
9      gotten a verification of the purchase order?
10  A   I know that we were waiting on some information to
11     come back from China on processing, which seven to
12     ten days is not too uncommon for bringing products
13     in.
14        And then we also had a conference that Brian
15     wanted to schedule to discuss the Harleman
16     situation.  So if you refer back to my 68 -- or
17     Exhibit 68 and, you know, my comments there that
18     were made about "we'll give it one more try."
19     Because it was a very volatile situation, kind of on
20     again, off again, in several heated conversations
21     between myself and others at Pengo and with
22     Ron Harleman.
23  Q   Well, were those after the March 10th e-mail?
24  A   "Those" being?
25  Q   Those heated conversations with Mr. Harleman that

---

106

1      you say occurred?
2   A   It would have been during that 2010 through this
3      2011 time frame.
4   Q   So was there -- there a -- I mean, what you're
5      saying is before you would send out the verification
6      of the purchase order, you wanted to talk with
7      Mr. Rickards?
8   A   That's correct.
9   Q   Even though you'd sent Mr. Harleman a letter and
10     talked with him and said if you send in a purchase
11     order, we'll do this?
12  A   That's correct.
13  Q   And that purchase order -- those are for the
14     multiplane heads; correct?
15  A   The purchase order dated 3/11?
16  Q   Yes.
17  A   That's correct.
18  Q   The ones that he's not even seen accurate samples
19     for?
20  A   Correct.  And also the ones that he's requested
21     additional changes on.
22  Q   And as of that date, March 21st, 2011, the
23     purchase order had not even been sent to GST for
24     pricing, had it?
25  A   Actually, this purchase order dated 3/11 is only for

---

107

1      the tooling cost for those heads.  This is not a
2      purchase order for cast heads.
3   Q   So there wasn't anything to get from China as far as
4      production time or anything like that?
5   A   Not for this purchase order here, no.
6         MR. SPERLING:  When you're through with this,
7      before you move on to your next exhibit, let's take
8      a short break.
9         MR. HARRIS:  Okay.  Go ahead, if you're ready?
10        MR. SPERLING:  Are you --
11        MR. HARRIS:  Yeah, that's fine.
12        THE VIDEOGRAPHER:  Okay.  We're off the record.
13        (Short break taken.)
14        (Exhibit 71 was marked for
15     identification.)
16        THE VIDEOGRAPHER:  We're back on the record.
17  Q   (By Mr. Harris) All right.  Mr. Scudder, before we
18     took the break, we were talking about the delay in
19     the issuance of an order verification for Harleman's
20     March 21st -- I'm sorry -- yes, March 11th,
21     2011, purchase order.  I'll show you now Exhibit 71.
22     And the bottom of that is an e-mail from Mr. Tomlen
23     to Mr. Harleman March 21st, 2011, filed 11 p.m.;
24     correct?
25  A   Correct.

---

108

1   Q   And he's talking about a -- summarizing a phone
2      conversation that he and Mr. Harleman had; correct?
3   A   Correct.
4   Q   And then further down he talks about "regarding the
5      multiplane heads."  It states, "Eric Matthias will
6      be assigning part numbers to these items and will
7      then send to GST for pricing.  We should be able to
8      advise you of the revised pricing by April 18th."
9      Why was there any need for revised pricing?
10  A   Because of the changes requested on the part number
11     and the patent number.
12  Q   How would adding the part number and the patent
13     number increase the cost of producing the multiplane
14     head?
15  A   We would have to produce a pattern insert in order
16     to be able to cast those part numbers and patent
17     numbers onto the head itself.
18  Q   And that's what the tooling charge was for; correct?
19  A   That's correct.
20  Q   And then samples are going to be produced of the
21     multiplane.  Is that how you understand his e-mail?
22  A   That's correct.
23        (Exhibit 72 was marked for
24     identification.)
25  Q   (By Mr. Harris) Now, I've marked as Exhibit 72 an

---

30 (Pages 105 to 108)

### 109

1    e-mail labeled Pengo 1506.  That's an e-mail from
2    Phillip?
3    A    Zhou.
4    Q    And Mr. Zhou is the one at GST; is that correct?
5    A    That is correct.
6    Q    And in this e-mail, he's stating that the single cut
7    heads are conditionally approved for production;
8    correct?
9    A    Correct.
10   Q    So this is related to the purchase order that was
11   submitted back on December 20 of 2010; is that
12   right?
13   A    That's correct.
14   Q    Do you recall e-mailing to Mr. Rickards,
15   Mr. Matthias, a gentleman named John Rick, R-i-c-k;
16   is that correct?
17   A    Ricke.
18   Q    John Ricke and Robert Frost the Harleman patent in
19   preparation for a conference call?
20   A    I do, yes.
21   Q    What was the purpose -- well, first of all, who's
22   Mr. Ricke?
23   A    He is our controller.
24   Q    What --
25   A    Pengo's controller.

### 110

1    Q    What was the purpose of that conference call?
2    A    I'm not sure.
3    Q    What was the purpose of looking at Mr. Harleman's
4    patent?
5    A    As I stated earlier, I wanted to see what the patent
6    evolved around.
7    Q    Well, but you did that at the beginning of the
8    process, didn't you?
9    A    I'm not sure of the time frame.  At some point I
10   wanted to know what the patent was about, and I got
11   online and pulled up a copy, and I read it.
12   Q    But you don't have any recollection why you
13   circulated the patent to them?
14   A    I don't remember the topic of that particular
15   meeting that we were having, but certainly it was
16   something to do with Harleman, but I don't recall
17   specifically came what the nature of the call was about.
18   Q    That came three days after you'd received another
19   e-mail from Mr. Harleman, didn't it?
20          (Exhibit 73 was marked for
21          identification.)
22   A    Not sure on the time frame.
23   Q    (By Mr. Harris) All right.  Well, let me show you
24   Exhibit 73.  That's an e-mail from Mr. Harleman to
25   Dawn Jamison, Mr. Rickards, you, and Jim Tomlen,

### 111

1    dated April 12th, 2011; correct?
2    A    That's correct.
3    Q    And he states, It has now been thirty days ago that
4    we issued purchase order or PO No. RH03152011.  And
5    longer for PO No. LS03042013 with no updates of
6    value and no other verification report.  Now, that
7    first -- I'm sorry.  The second purchase order that
8    he refers to is the one that was sent to Pengo on
9    March 11th of 2011 and marked as Exhibit 70;
10   correct?
11   A    Is that referencing PO LS?
12   Q    Yes, where it says PO No. LS03042013.
13   A    Correct.  And that's the purchase order for the
14   tooling.  There's --
15   Q    Correct.
16   A    There's no -- there's no verification.  It's a PO to
17   change the tooling.  We would make the change on the
18   tooling and that would be it.  So there's nothing to
19   deliver on this PO or verify or...
20   Q    And the other purchase order, is that the one that
21   was sent to Pengo back in December of 2010?  I
22   believe it's Exhibit 63.
23   A    No, it is not that purchase order.
24   Q    Do you know which purchase order that is?
25   A    I do -- I'd have to see the purchase order.  I don't

### 112

1    know.
2    Q    So it's -- there's no verification needed, you're
3    saying, for tooling changes?
4    A    Correct.
5    Q    You agree with me that there had been no updates of
6    value.  Do you know what he's referring to there?
7    A    I do not.  I cannot speak to value.
8    Q    And in this e-mail, Mr. Harleman threatens that
9    Harleman Manufacturing will be forced to take legal
10   action if the same delays are experienced this time
11   around; correct?
12   A    That's what is stated.
13   Q    Now, then three days after that, you asked -- or you
14   want to have a conference call to look at
15   Mr. Harleman's patent.  Does that help refresh your
16   recollection as to why you were wanting to look at
17   Mr. Harleman's patent?
18   A    No.
19   Q    We're now almost a year since the Commitment Form
20   was signed, and Mr. Harleman still doesn't have any
21   cast heads; true?
22   A    Production cast heads.
23   Q    Right.  Heads that he could use in his business to
24   sell augers to other customers; correct?
25   A    Correct.

31 (Pages 109 to 112)

1    Q    And you would agree with me that on May 4th, 2011,
2         Mr. Rickards made the decision to terminate the
3         agreement with Harleman Manufacturing?
4    A    I would agree the decision was made on or about that
5         date.
6    Q    Why was that decision made?
7    A    We had to make a business decision, and based on the
8         events that had taken place, we ultimately made the
9         decision to cancel the commitment agreement --
10        Commitment Form agreement.
11   Q    And which events were those that prompted the
12        decision to terminate the agreement?
13   A    There were several key events that took place
14        throughout the process.  There were some very
15        volatile phone calls.  There was a lot of strong
16        language that was used.  There was actually some
17        threats that were relayed to some of our
18        salespeople.
19             And, you know, through the process and through
20        all the issues that we went through from that
21        December to March time frame in trying to get those
22        other samples approved to be able to keep the
23        project moving and keep things rolling, we
24        ultimately finally made the decision that it was
25        just in the best interest to cancel the agreement,

1         the Commitment Form agreement.
2    Q    Now, Mr. Harleman never made any threats to you, did
3         he?
4    A    Not to me, no.
5    Q    I think what you're referring to is Jim Tomlen sent
6         an e-mail that said something to the effect of
7         Mr. Harleman might just come whip your and
8         Brian Rickards' ass?
9    A    That's correct.
10   Q    You didn't take that seriously, did you?
11   A    I didn't disregard it.
12   Q    Well, would you agree with me that at the time that
13        statement was made, Mr. Harleman had reason to be
14        frustrated?
15   A    I would agree with that, yes.
16   Q    And in your business, having been in sales for
17        years, you've seen people make statements when
18        they're frustrated that they don't really mean,
19        haven't you?
20   A    I've seen it both ways.
21   Q    You would agree with me that as of the date that
22        Mr. Rickards terminated the agreement, not a single
23        production head had been given to Harleman?
24   A    I believe that's correct.
25   Q    Now, after Harleman made -- or excuse me, after

1         Pengo made the decision to terminate the Harleman
2         agreement, I believe it was you who raised an issue
3         about Mr. Harleman not buying all of the flights or
4         something from Pengo that he said he was going to
5         buy?
6    A    That's correct.
7    Q    And that was pursuant to a document dated
8         November 13th, 2007, that was signed; is that
9         right?
10   A    I'm not sure of the date, but I'm familiar with the
11        document.
12   Q    What was -- what was the issue regarding the flights
13        that you were bringing attention to?
14   A    The issue was that we -- when we put the flight
15        agreement together, we agreed to keep certain
16        levels, sizes and styles of flight in stock that
17        were flights specifically for Harleman's
18        specifications.  So when we were getting ready to
19        terminate the agreement, we wanted to be able to
20        move that flight since we didn't have any other use
21        for it other than Harleman.
22   Q    And Mr. Harleman informed Pengo that as soon as
23        Pengo would provide the heads, he would take the
24        flight?
25   A    I'm not aware of that, no.

1    Q    Do you know whether or not Mr. Harleman ever
2         purchased all of the flight that he was saying he
3         was going purchase?
4    A    Can you say that again, please.
5    Q    Yes.  Did Harleman Manufacturing ultimately purchase
6         all of the flight that it said it was going to
7         purchase pursuant to that agreement?
8    A    Not to my knowledge, no.
9             (Exhibit 74 was marked for
10        identification.)
11   Q    (By Mr. Harris) We'll mark as Exhibit 74 this
12        document labeled Pengo 1708.  And I'll ask you, is
13        that the flight agreement?
14   A    That's correct.
15   Q    And Ms. Jamison looked at that issue, didn't she?
16             (Exhibit 75 was marked for
17        identification.)
18   A    Looked at what issue?
19   Q    (By Mr. Harris) To see whether or not Mr. Harleman
20        had fulfilled his requirements under that agreement?
21   A    I'm not sure who initiated it, but I was given --
22        excuse me -- given a phone call or sent an e-mail
23        stating that we had approximately between 5,000 and
24        $6,000 worth of flight on the ground that was built
25        to Harleman's specifications in March of 2011.

### 117

1  Q  I'll show you e-mail marked Exhibit 75. It's
2      labeled Pengo 2055. That's an e-mail from
3      Dawn Jamison to Mary Pohlman, and it states,
4      "Harleman order history on blanket order flight";
5      correct?
6  A  Correct.
7  Q  And she states, Question, "Are the orders with no PO
8      part of the blanket?" And then it says, "From
9      looking at this history, it looks like the terms of
10     agreement were fulfilled. After the quantity was
11     taken, more orders were entered." So based upon
12     Ms. Jamison's review, Mr. Harleman's company had
13     fulfilled its requirements or terms of the
14     agreement, whatever you want to call it, regarding
15     flight; true?
16 A  That would be her opinion.
17 Q  Now, is it your opinion that that agreement,
18     Exhibit 74, that went on forever?
19 A  It -- it did not go on forever.
20 Q  It was just until he bought those quantities; right?
21 A  Or worked with a product manager to replenish
22     those -- those quantities. We built these
23     quantities several times.
24        So if you go up -- up to Item No. 3, for
25     example, in this agreement, where it states, "Pengo

### 118

1      will have quoted quantity" -- which is what's down
2      below -- "in stock to ship and replace after
3      shipment." So if we had a hundred of the 9-inch
4      flights in stock, and they ordered a hundred, we
5      would immediately build a hundred more and put them
6      on the shelf ready to go for the next time.
7         So while Dawn is semi-correct in fulfilling the
8      commitment to the chart, we still have flight left
9      over, which is what I illustrated in the layout that
10     we wanted Harleman to take at the end -- in March of
11     2011.
12 Q  And you said it was like -- your belief, was it five
13     or $6,000, something along that line?
14 A  I think -- I'm for sure it was less than ten, and I
15     want to say it was like five or six.
16 Q  Now, after Mr. Rickards made the decision to
17     terminate the agreement pursuant to the terms of the
18     agreement, there was a 180-day window; correct?
19 A  There was a 180-day window in the Commitment Form,
20     and we mistakenly listed that as 90 days.
21 Q  But my point in asking the question is heads came in
22     after Mr. Rickards made the decision to terminate?
23 A  That's correct.
24 Q  I -- well, strike that. Let me start over..
25        Were those heads shipped to Harleman

### 119

1      Manufacturing when they came in?
2  A  Yes, they were.
3  Q  And he paid through -- or he paid for all heads that
4      he had received up through, I think, March 20th of
5      2012; is that right?
6  A  I would have to confirm that. I couldn't verify on
7      what was or wasn't paid for.
8  Q  And, in fact, Harleman placed some additional orders
9      in that 180-day window; correct?
10 A  That's correct.
11 Q  And I've tried to follow the train or the trail,
12     whatever you want to call the e-mails, and it's
13     a little hard to keep together, but my question
14     ultimately is: Are there still Harleman heads at
15     Pengo?
16 A  Not to my knowledge.
17 Q  And I think from looking at all the documents, the
18     only issue was there was an invoice for a shipment
19     for approximately $41,000 of heads that did not get
20     paid; is that right?
21 A  That sounds like the number in that range.
22 Q  And the dispute there was over whether or not there
23     was going to be a credit for the $43,000 Harleman
24     paid for the tooling and that type of thing, wasn't
25     there?

### 120

1  A  That's correct.
2  Q  And that -- from looking at the documents, you
3      really weren't involved in those negotiations. That
4      was between Mr. Rickards and Mr. Harleman's
5      attorney; is that right?
6  A  It was between our -- yeah, two sets of attorneys,
7      between Pengo and Harleman.
8  Q  Were there any -- do you know were the new sample
9      heads for the multiplane auger heads ever built?
10 A  Not to my knowledge, no.
11 Q  Why was that?
12 A  Because of the termination of the agreement.
13 Q  Now, there was also an issue about whether or not
14     the tooling was going to be returned, and the
15     foundry in China returned that tooling to Pengo in
16     Iowa; correct?
17 A  That's correct.
18 Q  To your knowledge, is that tooling still at Pengo?
19 A  Yes, it is.
20 Q  Now, after the agreement was terminated in May of
21     2011, do you recall receiving some communication
22     from Mr. Harleman about some foundry in China
23     selling Harleman auger heads?
24 A  I became aware of that situation. I can't remember
25     exactly how I became aware of that.

33 (Pages 117 to 120)

                                                                        121

1  Q  Were you involved in investigating that at all?
2  A  I was involved in the discussions and the process.
3  Q  What do you recall being discussed about that?
4  A  A, as a company, we discussed how concerned we were
5     about that problem, and we took it very, very
6     seriously and actually got in contact with the
7     supplier and found out that there had been some
8     infringements and activities on their part and that
9     that employee was terminated and let go.  And we
10    made it clear to the owner of the company that they
11    were not to use our products or anybody else's
12    products in that nature whatsoever.
13 Q  You would agree with me that that was a violation of
14    the agreement that Pengo had with the supplier?
15 A  I would agree a hundred percent with that.
16 Q  And that was also not consistent with the terms of
17    the confidentiality agreement that Pengo executed
18    with Harleman?
19       MR. SPERLING:  What is it that you are asking
20    whether it was consistent or not with the
21    confidentiality agreement?
22 Q  (By Mr. Harris) The fact that a Chinese supplier was
23    offering Harleman heads for sale.
24 A  Well, the Pengo confidentiality agreement says that
25    we will not release any private information, which

                                                                        122

1     we did not do.
2  Q  And it also says that you'll make sure that your
3     suppliers don't do that as well; true?
4        MR. SPERLING:  I object to the character --
5  A  I'd have to --
6        MR. SPERLING:  I object to the characterization
7     of the terms of the agreement.
8  Q  (By Mr. Harris) You can go ahead and answer.
9  A  I would have to read through it to see.  I'm not
10    sure how that language is structured as far as that
11    goes.  But I can tell you we took it very, very
12    seriously and got right on top of that.
13 Q  And you agree, based upon your experience, that
14    happens with some companies in China, doesn't it, as
15    far as infringing upon patents and things of that
16    nature?
17 A  It does happen, yes.
18 Q  Did Pengo ever incorporate any of the design aspects
19    of the Harleman auger heads into any of its designs?
20 A  No.
21       (Exhibit 76 was marked for
22    identification.)
23 Q  (By Mr. Harris) I'll show you a picture that's
24    marked Exhibit 76.  I only got one.  I apologize..
25       Do you know is that a auger head that Pengo

                                                                        123

1     built for Blattner Energy?
2  A  Yes, it is.
3  Q  And Blattner energy asked Pengo to copy a design for
4     that auger head; correct?
5  A  No, that's not correct.  Blattner Energy sent me
6     some pictures of a Hartfuss auger and said they
7     wanted something built similar to the Hartfuss
8     design.
9  Q  And the Hartfuss is a European auger?
10 A  That's correct.
11 Q  Did you make any investigation to determine whether
12    or not the Hartfuss auger head had taken aspects of
13    the Harleman auger head and them?
14 A  No, and wasn't concerned about that.
15 Q  Why?
16 A  Because what we did is took our standard spiral
17    design, and the only variation to this than our
18    standard spiral auger is the pockets, which the
19    teeth are mounted in.  As you can see on Hartfuss,
20    they mount on top of the flight, and we moved those
21    up to mount on top of the flight just like the
22    Hartfuss.  But the design pattern and the cup
23    pattern is our standard spiral that we've built for
24    many, many years.
25 Q  But the placement of those pilots is the same as the

                                                                        124

1     Pengo auger head, isn't it -- or I'm sorry, the
2     Harleman auger head, isn't it?
3  A  Absolutely not.
4  Q  So it's your opinion that the teeth in the Harleman
5     auger head are not mounted into the flight?
6  A  They are mounted on the flights, yes.  But we all as
7     a manufacturer mount them on the flights.
8  Q  Well, but, I mean, on this head they're notched into
9     the flight, aren't they?
10 A  We notch them in on every flight.  On this one, if
11    this is the flight plane, the pocket would normally
12    be like this.  And on this one that we built, the
13    pockets raised up a little bit on the top.  It's the
14    only variation.  So the skew and tack angles on the
15    carbide teeth would be the same as our standard
16    spiral.
17       MR. HARRIS:  Okay.  Let's take a break.  I
18    think we're close to being --
19       THE VIDEOGRAPHER:  Okay.  We're off the record.
20       (Short break taken.)
21       THE VIDEOGRAPHER:  We're back on the record.
22 Q  (By Mr. Harris) Mr. Scudder, the head that's
23    reflected in Exhibit 76 that was built for Blattner
24    Energy, do you know how many of those Pengo built?
25 A  How many spiral augers or how many augers?

                                                   34 (Pages 121 to 124)

125

1  Q  How many of the specific ones that it built for
2     Blattner like this?
3  A  One spiral auger was built for Blattner Energy.
4  Q  That's it?
5  A  Yes.
6  Q  Did you build that specific auger for anyone else?
7  A  Not with the raised pockets like you see in the
8     picture.
9  Q  Do you know when you built the auger reflected in
10    Exhibit 76 for Blattner?
11 A  I don't recall the exact date it was built, no.
12 Q  Okay.  Now, we talked about the single cut heads
13    that were ordered by Harleman and the purchase order
14    submitted December 20th, 2010.  And those weren't
15    delivered to Harleman until after the termination of
16    the agreement.  Do you recall what price Harleman
17    was charged for those auger heads?  Was it the
18    original price in the Commitment Form or was it the
19    subsequently revised price?
20 A  I do not recall.
21       MR. HARRIS:  I think that's all I got, subject
22    to any follow-up after your attorney's done.
23            EXAMINATION
24    BY MR. SPERLING:
25 Q  Mr. Scudder, I have a few questions for you.  You

126

1     were asked some questions this afternoon about
2     exclusivity and specifically whether you understood
3     that the Commitment Form required Harleman to
4     exclusively purchase castings from Pengo, and you
5     said it was not required to do so.  Do you recall
6     that testimony?
7  A  I do, yes.
8  Q  I would like you to look again at Exhibit 67, which
9     has attached to an e-mail a letter from you to
10    Ron Harleman.
11 A  Okay.
12 Q  On the second page of that letter, you address your
13    understanding that Harleman was obtaining samples
14    from another source?
15 A  Correct.
16 Q  Why were you unhappy about that?
17 A  Because of the time, money, and effort that we had
18    put into this project.  This was specifically
19    designed for parts and components that could only be
20    sold to Harleman Manufacturing.  So for them to seek
21    out a second source meant that all of that time and
22    effort could be for nothing.  And that didn't seem
23    fair, in my opinion, to be able to do that.
24 Q  You were also asked this afternoon about a video
25    that Harleman created that you saw, and you

127

1     testified that you were unhappy that Pengo personnel
2     were shown in the video.  Do you remember that
3     testimony?
4  A  I do, yes.
5  Q  Did you view the video as a fair comparison of the
6     capabilities of comparable Pengo and Harleman
7     augers?
8  A  No, because this was where we get back to talking
9     about, you know, spiral augers, you know, double
10    cut, double carry; double cut, single carry; single
11    cut, double carry.  All the different, you know,
12    variations that, you know, one auger is designed to
13    drill in these conditions and the other is designed
14    to drill in these conditions.  So to take one that's
15    built this way and one that's built this way into a
16    comparison, if, in fact, that's what you're going to
17    do, clearly would not be a fair illustration of what
18    those two products could do side by side.
19       So an example of that would be the 72-inch
20    auger that was built for Blattner.  There's a lot of
21    wear on this picture.  And I actually went to this
22    job site, and we actually built a 72-inch double
23    cut, double carry and replaced this auger, which the
24    auger performed magically, just increased their
25    productivity, increased their drill time, because

128

1     they got the right tool into the right application.
2     So in doing comparisons, you have to do the same
3     thing.
4  Q  Had you understood that Mr. Harleman was going to do
5     comparative drilling, would you have provided the
6     Pengo auger that you provided?
7  A  No, I would not have.
8  Q  Finally, I'd like to ask you about your testimony
9     earlier today about whether you treated Harleman
10    Manufacturing in the way you would treat a standard
11    customer.  Did you?
12 A  Certainly not.  I certainly spent a lot more time
13    from my side being involved in the project and kept
14    a lot of our key managers involved in the project
15    being, you know, Jim Tomlen and Dawn Jamison.
16    Typically we don't have five or six people on one
17    account going through and trying to manage and do
18    everything.
19 Q  Why did you do that?
20 A  Well, we have a company philosophy, and it's just do
21    the right thing.  And it was a way to -- to be able
22    to resolve some of the issues and some of the
23    problems that we were having and maintain a
24    successful and satisfying relationship with a
25    customer.

**Alpha Reporting Service**

**417-887-4110**     **www.alphareportingservice.com**     **417-889-4246**

129

1        MR. SPERLING:  No further questions.

2        MR. HARRIS:  No questions.

3        MR. SPERLING:  We reserve the right to review

4    the transcript.

5        MR. HARRIS:  Oh, sure.

6        THE VIDEOGRAPHER:  We're off the record.

7        (Deposition concluded at 4:01 p.m.)

131

1                    REPORTER'S CERTIFICATE
2
     STATE OF MISSOURI    )
3                         )  ss
     COUNTY OF GREENE     )
4
5        I, PAULA JOHNSON KAVANAGH, Certified Court
     Reporter, do hereby certify that the witness was
6    duly sworn by me; that the facts stated by me in the
     caption hereof are true; that the said witness did
7    make the above and foregoing answers in response to
     questions propounded as shown; that I did, in
8    stenotype, report said proceedings; and that the
     above and foregoing typewritten pages contain a
9    full, true, and correct transcription of my
     shorthand notes taken on such occasion.  That
10   presentment by me to the witness for signature was
     waived; that the deposition will be thereafter by
11   the witness read over, signed, and sworn to on or
     before the date of trial; that said deposition is
12   now herewith returned.
13       I further certify that I am neither attorney
     for, nor counsel for, nor related to, nor employed
14   by any of the parties to the action in which this
     deposition was taken; and, further, that I am not a
15   relative or employee of any attorney or counsel
     employed by the parties hereto, or financially
16   interested in the action.
17
18       _____
         PAULA JOHNSON KAVANAGH
19       CCR, RPR
                    CCR No. 1222
20
21
22
23
         ALPHA REPORTING SERVICE
24       3230-G South National
         Springfield, MO 65807
25       417-887-4110

130

1            DEPONENT'S SIGNATURE PAGE

2

3

4    In Re.    Harleman vs. Pengo
              6:14-cv-03498-MDH; USDC

5

6

7    Taken.    January 28, 2015

8

9        - - - - -

10       _____
             DANA SCUDDER

11

12   Subscribed and sworn to before me this _____ day

13   of_____, 2015.

14

15       _____
             Notary Public

16

17   My commission expires.

18   _____

19

20

21

22

23

24

25

36  (Pages 129 to 131)

## A

**ability** 82:3,4
**able** 12:19 15:12
21:21 32:5 37:18
45:25 52:17 83:23
100:19 101:10,22
108:7,16 113:22
115:19 126:23
128:21
**above-captioned**
1:21
**Absolutely** 65:16
124:3
**absorb** 56:14
**account** 15:21,25
128:17
**accurate** 13:13
106:18
**action** 93:13 103:18
112:10 131:14,16
**actions** 100:13
**activities** 121:8
**actual** 22:22 45:8
68:17 83:8 94:10
**add** 102:11
**adding** 102:15
108:12
**addition** 18:24
**additional** 88:9
106:21 119:8
**address** 6:1 126:12
**adequate** 83:6
**adjust** 73:6
**advise** 46:10 58:12
108:8
**advised** 46:13 57:15
60:12,14,15 92:23
**advising** 87:4 93:9
**afternoon** 64:12
126:1,24
**ag** 93:11
**ago** 33:19 111:3
**agree** 14:19 15:2
16:22 21:16 26:2
27:14 29:20,23
31:9 37:19 45:6
45:11 48:8 51:3
51:15 55:10 56:1
56:4 57:24 58:3
60:21 61:17 63:1
63:18,23 65:9,14
65:17 71:15 73:8
82:14 83:6,21
84:11 89:2 91:19

92:7 102:15
103:16 105:1
112:5 113:1,4
114:12,15,21
121:13,15 122:13
**agreed** 44:16 56:14
63:8 75:1 115:15
**agreeing** 75:3
**agreement** 4:14
5:20 19:13,14,24
20:6 22:2,4,5 24:4
27:9,13 29:25
30:6,16,18 31:12
37:7 40:4,5,9,12
40:20 41:4 43:8
44:10 45:22,25
46:7 47:18 48:6
48:10,12 51:4,10
52:18 53:2,9,11
54:24 55:3,14
57:10 58:1 61:3
65:3 66:2,14 67:1
72:25 74:10,20,22
74:22 100:14,15
100:16 101:4
113:3,9,10,12,25
114:1,22 115:2,15
115:19 116:7,13
116:20 117:10,14
117:17,25 118:17
118:18 120:12,20
121:14,17,21,24
122:7 125:16
**agreements** 45:23
46:4,6,25 47:5
54:22 56:6,10
86:12,14
**agrees** 43:13
**agricultural** 7:20
9:24 10:8
**agriculture** 9:4
**ahead** 24:2 37:5
55:17 107:9 122:8
**air** 63:2,4,5 71:9,12
71:13,17 77:10
**alerting** 80:21
**ALPHA** 1:23
131:23
**amazed** 50:1
**ambiguous** 12:7
25:8
**American** 44:8
**and/or** 6:19 56:15
72:22 80:13

**angles** 124:14
**annual** 8:10 76:21
77:1,3,17,22
**annually** 43:15
**answer** 24:2 55:17
63:5 73:22 84:23
122:8
**answers** 131:7
**anticipated** 77:4
**anticipating** 61:12
**anybody** 54:8
121:11
**anyway** 16:2 51:24
**apart** 86:2
**apologize** 122:24
**apologized** 57:8
**appears** 31:2 36:16
49:20 62:11 70:23
71:15 78:9 93:6
**application** 128:1
**approached** 12:16
12:19 63:4
**approval** 33:4
101:21,22
**approvals** 83:10
**approved** 80:13
109:7 113:22
**approximate** 26:13
28:9
**approximately** 11:1
116:23 119:19
**April** 108:8 111:1
**area** 16:7 32:22,25
**arrive** 78:13
**arrived** 78:17
**arriving** 60:9
**asked** 15:6 36:5
57:11 65:23 76:20
76:25 95:25
112:13 123:3
126:1,24
**asking** 29:7 44:14
47:25 50:20 57:25
80:12 88:24 99:25
104:12 118:21
121:19
**aspects** 34:11
122:18 123:12
**ass** 114:8
**assigning** 108:6
**assignments** 32:5
**associated** 89:4
**assume** 23:12 32:21
51:15 57:16 70:17

**assuming** 51:7
100:15
**assumption** 68:15
86:19
**assured** 71:3
**attached** 4:21
104:25 126:9
**ATTEBERY** 2:10
**attention** 91:3
115:13
**attorney** 11:25 28:4
76:12 120:5
131:13,15
**attorneys** 7:15,16
120:6
**attorney's** 125:22
**auger** 4:16 6:19
7:22,24 8:21
13:19 14:2,10,25
15:1,10 18:6,10
18:11,14,18 19:19
19:20 20:24 21:11
22:10,14 23:20,24
25:11 26:11,18
50:8,10 93:13,14
94:22,24 95:1
120:9,23 122:19
122:25 123:4,6,9
123:12,13,18
124:1,2,5 125:3,6
125:9,17 127:12
127:20,23,24
128:6
**augers** 7:20 9:22
14:10,17 15:5,19
16:3,6,12,13,16
16:17 17:10,14,16
79:13 93:11
112:24 124:25,25
127:7,9
**August** 6:4 97:6,10
97:19 102:6
**authored** 29:15
96:18
**authority** 33:7
51:18 56:17
**available** 17:22
47:22
**average** 39:19,25
59:20 77:25
**aware** 12:12 24:7
35:12,16,24 36:2
51:1 61:4 69:1
82:18,24 84:18

92:24 93:1 115:25
120:24,25
**a.m** 1:15

## B

**B** 3:1 73:15
**back** 7:8 9:21,24
10:4,9,15 12:4
16:11 19:9 25:4
27:25 28:2,12
46:1 47:3 52:4
55:19 63:5 65:8
67:21,22 69:7
71:18 73:5,6
75:24 77:10 81:12
87:24 88:6 92:21
95:15 96:15 97:6
97:18 99:1 101:21
105:11,16 107:16
109:11 111:21
124:21 127:8
**background** 6:11
**bad** 10:14,15 35:20
35:20
**ballpark** 23:5
**based** 27:2 34:21
43:15 77:17 78:2
88:11,21 90:5
91:22 100:16
113:7 117:11
122:13
**bases** 8:2
**basically** 20:20
52:14 85:8 97:2
**Beach** 50:1
**becoming** 63:19
68:17
**beginning** 110:7
**begins** 90:17
**behalf** 1:21 30:12
40:16 51:19
**belief** 50:18 73:23
118:12
**believe** 13:6 33:19
43:15 49:3 51:9
56:9,10 58:17
60:18 66:18 76:25
76:25 80:23 85:1
88:7 89:12 90:1,7
92:4 96:18 97:11
101:20 102:25
111:22 114:24
115:2
**believed** 50:21

**belong** 71:5
**belonged** 64:24 65:3
  66:3,14
**best** 113:25
**better** 14:24 20:2
  46:3
**big** 32:25 53:16
**biggest** 9:18 68:5
**birth** 6:3
**bit** 52:7 57:9 77:13
  124:13
**blame** 91:7
**blaming** 91:11,16
**blanket** 117:4,8
**Blattner** 123:1,3,5
  124:23 125:2,3,10
  127:20
**blend** 52:17
**bobcats** 17:7
**bold** 60:8 62:21
**booth** 93:10
**bother** 94:21
**bottom** 18:20 24:19
  36:14 47:16 66:23
  70:22 90:18
  104:11 107:22
**bottom's** 64:2
**bought** 20:24 77:22
  117:20
**brainstorming**
  52:22
**break** 8:7 27:19,22
  28:3 29:7 51:23
  52:3 56:12 67:20
  70:12 92:20 96:14
  107:8,13,18
  117:17,20
**Brian** 10:20 19:1
  29:12 54:5 66:19
  75:15 105:14
  114:8
**bridges** 8:2
**bring** 29:2 33:2
  49:11 62:22 63:6
**bringing** 89:24
  105:12 115:13
**brought** 91:2
**build** 8:2 19:25
  25:12 79:13,16,16
  103:19 118:5
  125:6
**building** 24:5
**buildings** 8:1,2
**built** 15:18 16:3

26:1 27:10 79:22
116:24 117:22
120:9 123:1,7,23
124:12,23,24
125:1,3,9,11
127:15,15,20,22
**business** 14:5 21:23
  28:21 31:21,23,25
  37:15 48:18,22
  49:5 69:5,22
  72:13,22 74:12
  112:23 113:7
  114:16
**buy** 21:11 55:12
  56:3 115:5
**buyer** 100:24
**buying** 22:10 115:3

_____

**C**

**C** 2:1
**calculations** 3:23
  77:17
**calendar** 97:11
  102:4
**call** 17:7 20:4,8,16
  21:2 22:16 32:3
  32:21 33:12 46:15
  52:22 61:11 64:12
  73:21 97:6,7,10
  97:12,16,18 102:6
  109:19 110:1,17
  112:14 116:22
  117:14 119:12
**called** 6:21,24 7:2
  34:18 64:14 90:8
  90:21 95:25
**calls** 24:1 49:13
  53:23 54:11 68:23
  75:16 113:15
**cancel** 74:21 113:9
  113:25
**canceled** 72:24
**cancellation** 74:11
**candle** 2:11
**capabilities** 15:15
  18:3 29:1 127:6
**capability** 83:23
**capacity** 34:21
**caption** 131:6
**carbide** 124:15
**career** 6:18
**Carlisle** 2:11
**carry** 28:17 127:10
  127:10,11,23

**carrying** 27:7
**case** 1:6 7:5 11:24
  21:1 34:23 79:21
  82:2 89:15
**cases** 53:25
**cast** 15:5,11,12,18
  17:16,18 18:3,7
  19:16 21:21 22:14
  23:8,10,21 28:15
  28:16,16,17,19
  29:1,2 35:17 36:1
  36:7 37:24 38:9
  39:18,19,25 40:6
  42:10 43:5 49:10
  53:3,10,12 64:7
  73:16 76:15 87:17
  88:2 89:24 90:2
  90:10 93:17 95:1
  99:15,17,18,18,19
  99:23 100:20
  107:2 108:16
  112:21,22
**casted** 28:12 35:13
**casting** 22:23 23:1
  26:5 28:14 29:18
  55:4 89:22 102:18
**castings** 23:16
  54:22 59:3 62:17
  72:19 98:19,25
  126:4
**caught** 94:3
**cause** 1:21
**CCR** 1:20 131:19
  131:19
**cell** 69:4,9,18
**certain** 19:1 115:15
**certainly** 31:24 75:9
  101:14 110:15
  128:12,12
**CERTIFICATE**
  2:21 131:1
**Certified** 131:5
**certify** 131:5,13
**chain** 3:5,10 4:3
  36:13 47:15 90:14
**change** 25:21 87:25
  88:4 111:17,17
**changed** 15:22 41:1
  68:14
**changes** 54:25
  80:25 88:9,21,24
  89:4 91:23 102:8
  102:21 106:21
  108:10 112:3

**changing** 25:19
**character** 122:4
**characterization**
  55:15 122:6
**charge** 108:18
**charged** 125:17
**charges** 101:5
**chart** 118:8
**check** 83:18
**checked** 15:7 90:22
**Chicago** 2:8
**China** 31:19 59:8
  61:21,22 63:9,15
  75:2 85:17 86:12
  90:10,24 105:11
  107:3 120:15,22
  122:14
**Chinese** 44:7 59:12
  121:22
**choose** 82:1
**choosing** 34:14
**chose** 88:3
**circulated** 110:13
**citizen** 1:11
**City** 1:18 15:25
  93:10
**clarify** 58:1
**clear** 41:12 58:6
  121:10
**clearance** 81:2
**clearly** 97:19
  100:13 127:17
**Clithero** 1:16 2:3
**close** 64:7 124:18
**closer** 21:6
**college** 6:12
**column** 87:13
**come** 15:16 16:4
  52:18 105:11
  114:7
**comfortable** 47:25
**coming** 23:16 55:24
  58:17 68:18 85:9
**comment** 90:9
  95:16,21
**comments** 105:17
**Commerce** 43:20
**commission** 130:17
**commitment** 40:14
  45:8,24 46:21
  47:10 51:2 52:11
  53:12 55:7 56:13
  58:8 60:22 63:12
  63:13,14 66:8

76:19 77:23 82:15
88:12,13,19 98:1
98:2,5,6,10,13,21
98:23 99:20,24
100:4,12,19 101:6
112:19 113:9,10
114:1 118:8,19
125:18 126:3
**committed** 87:9
  88:18
**commonly** 42:17
**communicated**
  73:23 74:1
**communicating**
  100:9
**communication**
  69:11 74:7 75:19
  120:21
**companies** 21:23
  28:12 52:19 86:2
  97:4 122:14
**company** 1:4 6:21
  6:24 7:1 8:4 10:21
  20:17 25:11 30:19
  35:13,17 36:1,23
  36:24 37:20 40:24
  46:8 53:9 64:19
  65:7 69:22 71:7
  77:21 80:14,21
  81:9,21,23 87:10
  89:13,18 94:11
  99:25 117:12
  121:4,10 128:20
**company's** 100:22
**comparable** 18:11
  127:6
**comparative** 128:5
**comparing** 14:9
**comparison** 14:13
  15:14 83:7 127:5
  127:16
**comparisons** 128:2
**competition** 14:25
**competitor** 8:18
  28:20 94:8
**competitors** 8:14
  28:21
**complete** 31:7
**completely** 12:6
  22:1
**complicates** 100:11
**compliment** 20:20
**component** 88:3
**components** 126:19

concerned 31:15
34:5 121:4 123:14
concerns 72:19
concluded 129:7
conclusion 24:1
conditionally 109:7
conditions 127:13
127:14
conference 49:13
53:23 54:11 97:6
97:7,9,12,16,18
102:6 105:14
109:19 110:1
112:14
confidentiality
29:25 30:6 121:17
121:21,24
confirm 104:18
119:6
confirmed 102:5
confirms 101:2
conflict 100:13,14
confused 68:13
confusing 68:17
consensus 76:4
consider 8:17 72:8
consistent 83:19
121:16,20
consolidated 55:3
construction 7:21
9:6
contact 102:1 121:6
contacted 76:10
contacts 70:11
contain 58:18 131:8
contained 44:11
45:8 100:4
containing 87:6
contemplating
45:15
contract 45:1 72:23
74:24 75:4 86:8
contracts 42:12
86:11
contractual 86:6
contrast 33:12
controller 109:23
109:25
convenient 51:22
92:16
conversation 4:7
14:6 20:14,19,20
46:18 56:25 57:14
57:18,20 64:5,18

68:10 70:19 71:2
103:7 108:2
conversations 14:4
20:9,11 52:8
53:25 105:20,25
conversion 43:16,23
44:6
copied 36:16 38:23
48:14 49:24 50:9
50:25 104:3
copies 58:24 81:10
85:22
copy 30:5 40:11
62:12 72:4 110:11
123:3
copyright 82:17
coral 20:23
cordial 71:1
corporate 9:13
corporation 1:7,8
30:13 75:3
correct 6:5,6 11:25
13:9 22:17 23:22
24:8 25:12 26:5
29:25 30:10,11,14
30:17,20 31:7
32:9,12,14,15,16
32:18,23,24 33:13
33:14 35:11 36:8
36:9,20,21,25
37:1,10,11 38:16
39:1,2,11,21,22
39:24 40:2,3,7,13
41:15,16 42:5,8
42:10,11,15,17,18
42:23 43:2,5,6,8,9
43:12,17,22 44:9
44:24,25 45:3,5
45:10,13,17 47:19
47:20 48:2,3,7,11
49:21,22 50:3
52:12 54:17,18
55:6,8,9 56:18,19
57:1,2,5,6,11,12
57:17 58:2,10,11
59:4,5,13,21,22
59:25 60:2,3,7,11
60:20 61:1,15,16
61:20,24,25 62:2
62:6,19,20,24,25
63:22,25 64:10,13
66:1,12 67:3,4,6
67:11 68:3,4 71:8
71:18 72:8,9 73:1

73:2 74:13,14
75:23 76:14 77:19
77:20 78:10,11,13
78:14 79:2,9,10
79:13,14,17,25
80:18,19 81:2,18
81:19 82:16 83:4
83:5,13,16,20,25
84:7,8,10,15 86:7
86:24,25 87:8,12
87:17 91:4,22,25
92:9,10,12,13
93:14,15,21 94:4
94:20 96:20,21,23
96:24 97:14 98:8
98:9 99:13 100:6
100:24,25 103:1,2
103:7,8,11,15
104:14,15 105:4
106:8,12,14,17,20
107:24,25 108:2,3
108:18,19,22
109:4,5,8,9,13,16
111:1,2,10,13,15
112:4,11,24,25
114:9,24 115:6
116:14 117:5,6
118:18,23 119:9
119:10 120:1,16
120:17 123:4,5,10
126:15 131:9
corrected 92:6
correctly 75:5
correlation 59:10
cost 23:7,14 27:1,6
27:7 39:18 42:4
51:9 88:1,3
102:20 103:9
107:1 108:13
costs 37:8 39:17
41:15,15,18 42:2
51:7,16 56:15
57:14 87:5 88:23
counsel 7:11,13
76:11 82:23 95:23
131:13,15
Counter 2:2,6
County 1:18 131:3
couple 94:2
Court 1:1 131:5
cover 8:23 23:6
create 85:14,18
created 126:25
credit 42:17 119:23

criteria 80:2
cup 24:17 123:22
curious 24:19
currency 44:7
customer 10:3
59:23 65:15 79:20
128:11,25
customers 10:5 24:6
32:22 65:8 81:22
112:24
customer's 27:3
cut 4:1 17:18 28:17
84:6,13 109:6
125:12 127:10,10
127:11,23
cuts 103:21

_____

**D**

D 2:16
Dana 1:11,13 2:17
5:5,11 49:21
53:16 130:10
date 6:3 13:1 30:21
36:18 46:16 50:2
50:3,14 51:12
58:6 66:15 80:16
97:15 106:22
113:5 114:21
115:10 125:11
131:11
dated 29:12 30:9
31:5 36:15,17
38:21 39:8 40:18
43:8 49:21 55:8
56:24 58:25 61:10
66:24 78:9 79:7
84:9 93:9 96:22
96:22 98:7 104:11
104:24 106:15,25
111:1 115:7
dates 60:24 61:14
62:22,23 68:17
104:14
Dawn 3:9 11:17
40:23 41:12 44:23
54:6,24 61:9 68:6
110:25 117:3
118:7 128:15
day 1:15 31:12 55:7
79:9 90:8 95:25
104:18 130:12
days 33:23 42:20,21
60:5 74:21 81:6
96:19 104:16

105:5,8,12 110:18
111:3 112:13
118:20
deal 21:17 31:21
33:3,6,9,16 35:15
77:24
dealing 89:17
deals 33:4
December 27:16
29:9,13,22 35:23
84:9 101:20
103:18 109:11
111:21 113:21
125:14
decide 88:15
decided 20:12 21:14
27:5 45:21 46:8
73:4 103:1
decision 34:20,22
46:11 53:8 63:6
71:9,11 73:10
76:6,8,9 101:11
113:2,4,6,7,9,12
113:24 115:1
118:16,22
dedicated 69:21
Defendant 1:5,22
2:2,6 5:6
Defendant/Counter
1:9
degree 6:14 87:16
Delaware 1:8
delay 59:24 60:13
60:19 61:19
107:18
delays 64:6 112:10
deliver 111:19
delivered 48:9
125:15
deliveries 58:13
delivery 42:22
58:16 62:18 72:18
72:22,23 74:13
104:14
Department 43:21
depending 9:20
DEPONENT'S
130:1
deposition 1:13
4:22 5:12 7:4,7
11:24 12:4 17:3
30:5 40:9 129:7
131:10,11,14
Des 9:16,19

**DESCRIPTION**
3:2
**design** 15:13 18:11
   18:14,19 19:16
   20:1 34:13 48:15
   50:11,12,25 88:22
   88:24 101:17
   122:18 123:3,8,17
   123:22
**designed** 19:21
   126:19 127:12,13
**designs** 18:10
   122:19
**desire** 36:6
**destination** 75:1
**details** 42:2
**determine** 10:4 89:1
   123:11
**determined** 44:1
**develop** 78:4 82:8,9
   85:12
**developed** 25:10
   42:1 101:3
**developing** 35:24
   76:15 89:10
**development** 48:18
   48:22 49:5,7
   59:24 101:4
**diameters** 17:21
**different** 12:8 15:8
   17:21 20:10 23:7
   28:21 45:7 50:11
   59:15 68:8 75:12
   127:11
**difficult** 70:24
**dig-off** 4:5 93:14,16
   93:23
**direct** 35:8 100:13
   100:14
**direction** 20:13
   21:15 46:9
**directly** 91:9
**director** 11:14 32:8
**dirt** 17:23,24
**disappointed** 57:10
   94:7 95:18
**discount** 42:21
**discovery** 83:1
**discuss** 32:3 50:4
   52:20 70:16 95:3
   105:15
**discussed** 54:25
   121:3,4
**Discussing** 75:12

**discussion** 19:8
   21:22,25 26:21
   36:8 51:6 75:7
   87:18 89:8 91:11
   91:16 95:6,18
**discussions** 15:4
   21:12,20 27:1
   35:7 37:14,16,17
   51:8,11 52:10,13
   52:14 53:5,15,20
   54:4 55:24 71:13
   75:9,11,14 76:17
   121:2
**display** 94:7
**displaying** 93:11
**dispute** 119:22
**disregard** 114:11
**distasteful** 94:12
**distinct** 8:24
**DISTRICT** 1:1,1
**division** 1:2 7:1
   34:18 36:23,24
**doable** 48:6
**document** 12:10
   29:10 32:1 41:8
   41:13 44:17,22
   45:7,14 49:19
   54:15 56:23 58:23
   61:8 62:10 64:23
   71:4 90:17 91:5
   97:24 115:7,11
   116:12
**documents** 7:8,10
   11:4 75:2 102:5
   119:17 120:2
**doing** 15:5 18:6
   21:13,23 31:25
   35:15 46:25 47:5
   50:13 73:15 90:2
   94:17 128:2
**dollar** 26:10 44:8
   74:12
**Dorado** 13:8
**double** 17:18 28:17
   28:17 127:9,10,10
   127:11,22,23
**double-check** 78:3
**draft** 40:20 45:2,7
**drafted** 22:4 41:5
   45:14
**drawing** 83:9
**drawings** 20:3
   31:18 47:22 48:1
   81:16,22 82:4,7,9

82:15,17,20 83:8
   83:11,14,18,22
   84:25 85:3,3,12
   85:14,17,23 89:10
   97:20 98:11
**drill** 24:24 127:13
   127:14,25
**drilled** 16:9,13,16
   16:17
**drilling** 14:24 16:8
   16:14 17:7,11
   19:21 20:22 128:5
**drill-off** 17:13,14
**Drive** 2:7,11
**due** 42:21 79:9
**duly** 131:6

_____
        **E**
**E** 2:1,1,2,4,16 3:1
**EAGLE** 2:10
**earlier** 36:4 79:12
   102:22 110:5
   128:9
**early** 37:17 62:15
   89:12,23
**easier** 65:24
**East** 1:17
**EAU** 3:23 76:20
**educational** 6:11
**effect** 53:16 114:6
**effort** 126:17,22
**eight** 6:10,25 33:1
**either** 6:18 74:20
   101:13
**El** 13:8
**elected** 25:21
**Electric** 20:16
**elements** 43:4
**eleven** 104:16
**else's** 121:11
**employed** 6:5
   131:13,15
**employee** 121:9
   131:15
**employees** 8:7
   54:10
**employment** 69:12
**ended** 15:16 25:18
   25:19,24
**energy** 13:15,18
   123:1,3,5 124:24
   125:3
**engineer** 85:7,8
**engineered** 27:16

36:19
**engineering** 11:13
   11:14 20:3 23:12
   23:15 27:11 30:20
   31:18 32:8 33:22
   34:2,4,6,8,11 85:2
   100:17,18 101:9
   101:15
**entail** 41:18
**enter** 33:4 53:9
**entered** 27:9 40:10
   40:12 48:12 84:17
   117:11
**entering** 61:2
**entire** 42:21 89:2
**entities** 85:22
**entitled** 62:13
**equals** 59:10
**equipment** 6:18,22
**Eric** 11:11 12:17
   15:20 19:2 31:2
   32:2 36:15 38:22
   54:5 68:6 91:6
   96:5 108:5
**error** 98:14,15
**essence** 41:19
**essentially** 6:17
   21:7 43:24 49:14
   97:2
**establish** 97:9
**estimated** 23:17
   76:21 77:1,3,17
   77:22 85:1
**European** 123:9
**events** 93:19 97:1
   113:8,11,13
**eventuality** 71:5
**eventually** 85:24
**everybody** 32:5
**evolved** 110:6
**exact** 26:12 28:8
   30:21 33:23 48:24
   58:6 61:14 68:11
   125:11
**exactly** 4:25 23:4
   24:15 25:24
   120:25
**EXAMINATION**
   2:18 5:8 125:23
**examined** 1:14 5:7
**example** 117:25
   127:19
**exceed** 74:11
**exceeds** 72:21

**exception** 31:17
**exchange** 43:24
**exclusive** 98:24
   99:10,15,23
   100:23,24
**exclusively** 98:19
   99:9 126:4
**exclusivity** 126:2
**excuse** 18:9 19:4
   30:1 39:17 114:25
   116:22
**executed** 98:7
   121:17
**exhibit** 3:3,4,5,6,7,8
   3:9,10,11,12,13
   3:14,15,16,17,18
   3:19,20,21,22,23
   3:24 4:1,2,3,4,6,7
   4:8,9,11,12,13,14
   4:15,16 27:23
   29:11 30:5,23
   31:1 36:10,13
   38:18,20 39:3,5
   39:12,15 40:11
   44:11,19,22 46:21
   47:12,15 49:16,19
   54:12,15 55:16
   56:2,20,23 58:3
   58:20,22 61:5,8
   62:7,10 63:20
   64:1 66:20,23
   67:12,24 68:1
   71:19,25 72:3
   74:2,4,15,18 77:7
   77:15 78:6,8,15
   79:3,5 84:1,4 87:1
   87:3,14 90:11,14
   93:3,5 96:8,17
   98:8,10 100:8
   103:3,5 104:8,10
   104:20,23 105:17
   107:7,14,21
   108:23,25 110:20
   110:24 111:9,22
   116:9,11,16 117:1
   117:18 122:21,24
   124:23 125:10
   126:8
**exhibits** 4:21 102:23
**exist** 69:2
**expecting** 48:5
**expedite** 62:22
   103:12,13
**expense** 62:1,5 73:7

**Alpha Reporting Service**

417-887-4110          www.alphareportingservice.com          417-889-4246
Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 42 of 54

73:12
**experience** 122:13
**experienced** 112:10
**expires** 130:17
**explain** 5:22 7:18
  38:7 44:6
**explained** 50:8
**explaining** 32:2
**export** 43:15,23
  44:6
**express** 50:23 52:23
  53:7
**extent** 23:25 50:19
**EYE** 2:10
**e-mail** 3:3,4,5,6,7,8
  3:10,11,12,13,14
  3:15,16,17,18,19
  3:20,21,24 4:2,3,4
  4:7,8,9,11,12,13
  4:15 29:12,15,24
  31:1 32:1,13
  36:13,14,17 38:21
  38:23 39:7,16
  47:8,15,17,21,24
  49:20,23 50:4
  54:16 56:5,24
  57:24 58:23,25
  60:16,18 61:8
  62:11,21 64:2
  66:23 67:25 68:3
  68:13 72:3 73:24
  74:5 75:10 78:3,9
  78:23,24 79:6,11
  80:23 87:4 90:14
  90:19 91:2,6,9
  93:6,7 103:5
  104:11,17,23
  105:23 107:22
  108:21 109:1,1,6
  110:19,24 112:8
  114:6 116:22
  117:1,2 126:9
**e-mailed** 89:16
**e-mailing** 109:14
**e-mails** 58:17 70:25
  119:12

**F**

**facilities** 13:7
**facility** 13:23 14:2,8
  14:15 16:5 21:3
  43:1 54:2 62:4
  63:16 78:18
**fact** 52:10 68:15

87:22 94:2 119:8
  121:22 127:16
**factor** 88:25
**factored** 23:13
**factoring** 77:4
**factors** 27:3
**facts** 131:6
**fair** 5:24 8:15 35:9
  126:23 127:5,17
**fall** 13:11
**falls** 72:22 74:13
**familiar** 5:17
  115:10
**far** 8:10,20 16:18
  31:15 34:4,14
  35:5 50:13 58:15
  68:17,25 94:13
  107:3 122:10,15
**farm** 93:10
**fashion** 21:24
**fax** 51:25 71:19
**February** 89:9
  91:20 93:9
**feel** 57:9
**fell** 31:24
**felt** 29:3
**field** 12:24 80:5
**figure** 11:4 43:20
**filed** 107:23
**files** 81:10
**filing** 50:2,3,14
**final** 37:3,3 41:7
  76:6,8
**finally** 113:24 128:8
**financially** 131:15
**find** 51:24 102:5
**finding** 51:25
**fine** 51:23 67:16
  70:7 92:18,18
  107:11
**finished** 16:10
**first** 12:12,15 13:3
  14:1,16 50:8
  54:19 59:1 62:14
  79:8 86:22 91:5
  100:7,8 109:21
  111:7
**fitting** 81:1
**FitzGerald** 1:17 2:3
**five** 12:14 118:12,15
  128:16
**five-year** 72:13,25
  74:10
**flat** 18:20 24:19

**flight** 4:14 28:23
  33:13 115:14,16
  115:20,24 116:2,6
  116:13,24 117:4
  117:15 118:8
  123:20,21 124:5,9
  124:10,11
**flighting** 12:20 14:5
  19:14
**flights** 12:18 115:3
  115:12,17 118:4
  124:6,7
**Florida** 1:11 6:2
  20:17 69:14
**flying** 64:11
**FOB** 42:24
**folks** 103:6
**follow** 82:1 90:16
  119:11
**follows** 5:7
**follow-up** 125:22
**force** 52:15
**forced** 112:9
**foregoing** 131:7,8
**forever** 117:18,19
**forfeit** 101:5
**form** 30:15 40:5,14
  45:8,24 46:21
  51:2 52:11 53:12
  53:14 55:7 56:13
  58:8 60:22 63:12
  63:13,14 66:8
  75:18 76:19 77:23
  82:15 88:12,13,19
  98:1,5,7,10,13,21
  98:23 99:20,24
  100:5,19 101:6
  112:19 113:10
  114:1 118:19
  125:18 126:3
**forms** 22:25 98:2
**forth** 41:24 43:4
  44:17 48:9 77:23
  87:13 99:24
**forward** 19:15
  37:21 38:5,14,16
  39:1 103:1
**found** 89:12 121:7
**foundation** 7:21,25
  9:9 49:8
**foundries** 35:6,7
  59:8 85:25 86:4,9
  86:9
**foundry** 4:2 34:20

35:5 59:9,17
  61:22,22 67:9
  85:18,18 86:23
  87:5,11 120:15,22
**four** 8:23
**fourth** 9:8 42:16
**four-page** 90:14
**frame** 10:16 13:2
  15:22 27:12 28:13
  36:3 41:2 48:19
  48:24 49:1,4
  64:25 68:11 75:25
  88:8 93:1 98:4
  106:3 110:9,22
  113:21
**FREDERICK** 2:6
**freight** 62:24 63:2,6
  63:7,10 71:10,12
  71:13,14,17
**freighting** 63:4
**frequently** 75:24
**Friday** 31:5 79:7
**Frost** 3:11 48:17,21
  49:20,23 50:4,23
  54:6 109:18
**Frost's** 50:18
**frustrated** 63:19,24
  114:14,18
**fulfilled** 84:16,18
  116:20 117:10,13
**fulfilling** 118:7
**full** 5:10 48:20
  131:9
**fully** 84:17,18
**funneled** 103:23
**further** 100:11
  108:4 129:1
  131:13,14
**future** 43:14
**FYI** 31:5

**G**

**general** 10:7,22
  12:2
**generally** 8:4
**generic** 20:8 21:12
  52:14 55:23
**gentleman** 11:6,19
  109:15
**gentlemen** 22:20
**geographic** 32:22
  32:25
**getting** 21:6,8 61:21
  68:7,15 90:4

115:18
**give** 8:20 9:15 59:9
  70:5,13 82:3 93:7
  103:24 104:1
  105:18
**given** 76:18 98:18
  99:7 114:23
  116:21,22
**global** 34:19 86:17
**go** 5:19 7:11 12:22
  12:23 16:18 19:4
  20:12 21:14 24:2
  33:8 34:21 43:3
  46:8 55:17 60:5
  70:15 71:18 73:6
  82:5 85:20 96:11
  97:18 98:16
  100:21 101:1,8
  107:9 117:19,24
  118:6 121:9 122:8
**goes** 59:14 60:1,8
  71:9 122:11
**going** 12:2 14:15
  17:11,13 18:5
  19:25 20:9 21:18
  25:11 26:21,25
  27:2,3,5 34:14
  36:7 42:3 43:3
  45:22 51:21 53:17
  55:3,12,13 56:3
  58:8 60:19 61:19
  66:11 67:25 70:8
  70:16 72:2 76:7
  78:13 87:3,14
  90:13 92:14,19
  95:22 96:16
  101:14 103:24
  104:4 108:20
  115:4 116:3,6
  119:23 120:14
  127:16 128:4,17
**good** 10:14,15,17,17
  35:21 71:23 90:23
**gotten** 85:22 101:21
  105:9
**government** 44:1
**GPI** 43:15,18
**great** 91:1
**Greene** 1:19 131:3
**gross** 43:19 44:1
**ground** 5:19 7:24
  116:24
**group** 32:21 34:6,18
**GST** 34:19 36:22

Case 6:14-cv-03498-MDH Document 86-2 Filed 12/04/15 Page 43 of 54

59:2,14 86:17
106:23 108:7
109:4
**guess** 17:22 31:20
44:12 51:5 72:11
**guy** 49:24
**guys** 12:24
**Gwinnett** 5:11

_____

**H**

**H** 3:1
**half** 102:14
**hand** 104:10
**handle** 24:18
**handled** 15:21 34:5
34:6
**handles** 86:16
**hands** 78:25
**happen** 122:17
**happened** 46:7
70:21
**happens** 122:14
**happy** 90:25
**hard** 90:15 119:13
**HARDIN** 2:7
**Harleman** 1:3 2:13
3:12,21,24 4:5,6,7
4:8,13 7:5,10 8:17
12:13,16,20 13:4
13:5,15,19 14:8,9
15:1,5,7,11,17,25
16:5,11,12,17,22
17:11 18:6,22
19:16,25 20:5,7
20:15,21,24,24
21:3,9,11,17,19
21:22 22:6,9,11
22:13 23:21,22,23
23:23 24:4,8 25:2
25:23 26:4,8,10
26:18,20 27:5,8
27:10,14 29:8,21
30:21 31:6 33:10
33:13 34:11 35:10
35:15,16,24,25
36:6,19 37:7,20
38:17 40:6,11
41:14 42:25 44:15
45:1,16 46:1,2,10
46:24 47:5,19
48:1,14 49:10
50:9,12,17,24
51:14 52:8,9,10
52:15,23 53:7,7

53:21 54:1,16
55:2,5,12,13 56:3
57:1,19 58:12,15
59:3,4 60:12,19
61:11,18 62:4,13
63:4,15,19 64:6
64:14,23 65:3,12
66:3 67:1,2,8
70:17 71:6 72:7
72:20 73:5,9,13
73:18 74:6,23,25
76:16,17,22 77:2
78:10 79:1,8,12
79:21,24 80:1,5,8
80:20 81:4,9 82:4
82:10 83:17,24
84:5,12 85:7
87:20,23 88:4,10
88:16,21,24 89:3
89:10,13,16,20
90:4 91:11,16,19
92:7,23,24 93:10
93:18 94:17,21
96:19 97:13 98:20
99:9,12,16 100:23
101:2,3,17 102:1
102:8,25 103:7,24
104:4,11,23 105:8
105:15,22,25
106:9 107:23
108:2 109:18
110:16,19,24
112:8,9,20 113:3
114:2,7,13,23,25
115:1,3,21,22
116:1,5,19 117:4
118:10,25 119:8
119:14,23 120:7
120:22,23 121:18
121:23 122:19
123:13 124:2,4
125:13,15,16
126:3,10,13,20,25
127:6 128:4,9
130:4
**Harleman's** 3:22
11:23 12:4 13:7
13:10,23 14:1,15
14:21,23 25:10
30:5,19 32:11
38:24 40:9 62:5
64:19 74:18 76:11
76:12 77:17,21
79:15 80:14 87:10

93:19 101:10
107:19 110:3
112:15,17 115:17
116:25 117:12
120:4
**Harleman/Pengo**
37:14
**Harris** 1:17 2:2,3,19
4:23 5:9 12:9 19:6
19:11 24:2 25:9
27:20 28:2 30:25
35:20 36:12 37:24
38:9,20 39:5,14
44:21 47:4,14
49:18 50:22 51:23
52:6 53:2 54:14
55:17 56:1,22
58:22 61:7 62:9
63:23 66:22 67:14
67:17,22 72:2
74:4,17 77:11,13
77:15 78:8 79:5
81:17 82:25 83:2
83:3 84:3 87:3
90:13 92:15,18,22
93:5 96:12,16
99:11,19 103:5
104:10,22 107:9
107:11,17 108:25
110:23 116:11,19
121:22 122:8,23
124:17,22 125:21
129:2,5
**Hartfuss** 123:6,7,9
123:12,19,22
**head** 4:16 14:25
15:1,5 17:16 18:7
19:16 20:7 23:24
25:1 28:25 37:24
38:9,12 45:12
49:10 64:7 90:2
94:24 95:1 108:14
108:17 114:23
122:25 123:4,12
123:13 124:1,2,5
124:8,22
**heads** 4:1 13:20
14:3 15:10,11,13
15:18 17:12,18,25
18:3 20:1 21:11
21:19,21 22:6,11
22:14 23:21 25:11
26:4,7,11,18
27:10,15 28:12,14

28:15,16,17,19
29:8,17,21 30:19
30:22 31:6,10
34:12,15 35:13,17
35:25 36:7 37:9
37:22 38:2,17
39:19,25 40:6
42:5 45:15 47:22
52:9 53:3,6,10,12
55:4,4,12 56:3
76:16,18 79:16
80:5,22 81:5,9
83:24 84:6,12,14
85:7 89:22 90:10
91:25 92:2,3,9
93:17 94:22 99:15
99:17,18,18,19,23
100:20 101:23
103:13,14,19
106:14 107:1,2
108:5 109:7
112:21,22,23
115:23 118:21,25
119:3,14,19 120:9
120:9,23 121:23
122:19 125:12,17
**headset** 92:6
**heard** 12:14 37:6
**heated** 105:20,25
**held** 19:8
**helicoid** 12:18 28:22
**help** 52:18 85:5
112:15
**Hemerick** 11:19
**Hennarichs** 11:20
11:21 12:17 15:20
19:2 54:5 91:6,8
96:5
**hereof** 131:6
**hereto** 131:15
**herewith** 131:12
**Hey** 19:20
**he'll** 67:2
**high** 31:22 52:21
**higher** 31:24
**history** 117:4,9
**hold** 43:7
**holder** 102:13
**hole** 7:24
**Holy** 91:7
**home** 6:1 69:16,17
71:22
**honor** 65:4,5 96:2
**hot** 22:24

28:15,16,17,19
29:8,17,21 30:19
30:22 31:6,10
34:12,15 35:13,17
35:25 36:7 37:9
37:22 38:2,17
39:19,25 40:6
42:5 45:15 47:22
52:9 53:3,6,10,12
55:4,4,12 56:3
76:16,18 79:16
80:5,22 81:5,9
83:24 84:6,12,14
85:7 89:22 90:10
91:25 92:2,3,9
93:17 94:22 99:15
99:17,18,18,19,23
100:20 101:23
103:13,14,19
106:14 107:1,2
108:5 109:7
112:21,22,23
115:23 118:21,25
119:3,14,19 120:9
120:9,23 121:23
122:19 125:12,17
**hour** 51:22 92:14
**hours** 9:19,19 23:17
85:1 100:17 101:9
**Houston** 6:22
**human** 94:8
**hundred** 8:9 26:14
41:12 78:2 89:6
90:8 118:3,4,5
121:15

_____

**I**

**ID** 81:2 92:5
**idea** 8:20 9:15 10:2
23:20 84:24
**ideas** 52:22
**identification** 27:24
30:24 36:11 38:19
39:4,13 44:20
47:13 49:17 54:13
56:21 58:21 61:6
62:8 63:21 66:21
67:13 72:1 74:3
74:16 77:8 78:7
79:4 84:2 87:2
90:12 93:4 96:9
103:4 104:9,21
107:15 108:24
110:21 116:10,17
122:22
**identified** 3:2 40:8
**IL** 2:8
**illustrate** 18:2
**illustrated** 118:9
**illustration** 127:17
**immediate** 10:19
**immediately** 118:5
**impact** 49:14
**important** 52:24
53:8,16
**inaccurate** 12:6
**inch** 102:13,13
**include** 72:16
**included** 25:14 28:6
**including** 58:25
**incorporate** 122:18
**incorrect** 12:6
**increase** 25:20,22
59:4,20 87:22
88:19 89:3,3,6
102:12 108:13
**increased** 87:5
127:24,25
**increases** 4:2 43:14
86:23 87:19 88:1

88:2,7,15 92:23
**increasing** 87:11
**independent** 56:10
**index** 43:19 44:2
**indicated** 97:12
   100:10
**indicating** 55:11
   56:5 71:16
**individuals** 14:20
**industry** 7:21 8:21
   10:9,17 12:14
**information** 7:12
   51:5 60:17 68:8
   68:16 82:9 103:23
   104:3 105:10
   121:25
**informed** 61:18
   115:22
**informs** 66:25
**infringements**
   121:8
**infringing** 122:15
**initial** 38:25 54:8
   66:16
**Initially** 85:24
**initiated** 116:21
**inquire** 76:23
**inquired** 20:5
**insert** 108:15
**Inside** 41:1
**inspect** 79:21 80:1
   81:4,8
**inspected** 80:13
**inspection** 83:6
**intent** 21:18
**interest** 86:4 113:25
**interested** 22:10
   131:16
**internal** 37:14
**inventory** 15:7
**investigating** 121:1
**investigation**
   123:11
**invoice** 42:21
   119:18
**involved** 6:18 34:8
   34:10 37:16 53:21
   53:22,24 54:4
   73:20 120:3 121:1
   121:2 128:13,14
**involvement** 35:8
   49:9
**Iowa** 9:14,17 42:24
   61:24 62:4 63:9

63:16 69:15 75:21
   75:24 78:18
   120:16
**issuance** 107:19
**issue** 68:6 81:2 92:5
   115:2,12,14
   116:15,18 119:18
   120:13
**issued** 59:3 111:4
**issues** 74:11 113:20
   128:22
**item** 41:25 59:20
   97:21 117:24
**items** 36:19 42:3
   59:4 62:3 108:6
**i.e** 37:8

---

**J**

**J** 2:6
**Jacinto** 6:12
**Jame** 38:22
**James** 36:16 56:24
**Jamison** 3:9 4:2,15
   11:17 40:23 44:23
   45:18 47:18 54:6
   61:9 79:11 87:4
   93:8 104:24
   110:25 116:15
   117:3 128:15
**Jamison's** 40:24
   117:12
**January** 1:15 30:9
   31:5,10 35:23
   89:12,23 130:7
**Jim** 11:7 15:20,24
   19:1 32:4,10,13
   38:23 51:14 54:5
   57:23 58:15 68:6
   91:10 94:1 104:1
   110:25 114:5
   128:15
**job** 12:23 20:21
   86:14 127:22
**John** 109:15,18
**JOHNSON** 1:20
   131:5,18
**joint** 20:9
**July** 42:7 48:5,9
   58:9,14 61:10,13
   61:17 62:17
**June** 56:24 58:4,13
   59:1
**Jupiter** 6:2
**jury** 22:20

---

**K**

**K** 39:20
**Kansas** 15:25 93:10
**KAVANAGH** 1:20
   131:5,18
**keep** 12:9,11 25:23
   113:22,23 115:15
   119:13
**keeping** 58:15
**kept** 66:10 128:13
**key** 113:13 128:14
**Keys** 20:16
**kind** 10:2 11:4
   12:10 15:13 19:20
   19:21 20:9 31:15
   70:24 77:16 90:15
   105:19
**knew** 18:5 66:2
   89:22,24 104:3
**know** 7:23 8:22
   11:13 14:6 16:2
   17:18,19 20:25
   23:15,19 24:17
   26:9,10,12,17
   27:4,17 28:4
   33:21,23,24 34:22
   35:2 37:12 45:18
   46:13,14,14,20
   47:9,11 48:22,24
   49:12,23 51:14
   53:13,13 54:11
   58:12 59:6,17
   60:12,15,16 61:14
   66:15,18 69:14
   73:17,20 78:15
   80:4,14,17 82:19
   82:25 83:2 84:17
   85:25 86:8,11,11
   86:18 87:24 91:8
   92:2 96:4,6 104:5
   104:16 105:5,7,10
   105:17 110:10
   111:24 112:1,6
   113:19 116:1
   120:8 122:25
   124:24 125:9
   127:9,9,11,12
   128:15
**knowledge** 10:7
   12:15 78:19 96:3
   103:22 116:8
   119:16 120:10,18

---

**L**

**labeled** 29:11 38:21
   39:6 44:22 46:21
   47:16 49:19 54:15
   56:23 58:23 61:8
   62:10 64:1 68:2
   72:4 84:4 90:15
   93:6 104:25 109:1
   116:12 117:2
**lack** 14:24 20:2
**ladies** 22:19
**Lake** 9:18
**LANCE** 2:2
**land** 16:7 69:18,20
   69:21
**language** 113:16
   122:10
**large** 8:4
**late** 60:10 62:16,17
   62:18
**Laurens** 9:14 31:6
   42:24 43:1 100:9
**law** 1:16
**layout** 24:23 118:9
**lead** 32:4,14
**leader** 9:2,21
**leading** 65:23
**learned** 94:5 96:20
**left** 67:23 118:8
**legal** 24:1 95:22,24
   112:9
**length** 90:20
**letter** 4:6 70:18 72:7
   72:7 89:16,20
   90:4 96:18,22,25
   98:14 99:6,7
   101:19 102:2,24
   106:9 126:9,12
**let's** 8:7 27:19 107:7
   124:17
**level** 52:21
**levels** 115:16
**leverage** 66:4,5
**liability** 1:4
**licensing** 20:6 37:9
**life** 42:13
**limited** 1:3
**line** 8:3 32:3 62:13
   62:14 68:12,14
   69:18,20,21 71:20
   75:8 102:9 118:13
**lines** 21:14
**liquid** 22:24
**list** 12:10,11 54:8
**listed** 62:23 118:20

**little** 10:12 48:25
   49:11,14 51:5
   52:7 63:19 77:13
   119:13 124:13
**lived** 15:24
**LLC** 1:3 74:23 75:1
**located** 9:13 32:11
   75:20
**location** 73:14,15
   75:20
**lock** 72:13
**logging** 68:23
**logo** 102:11,16
**logos** 92:4
**long** 6:9 33:21 81:3
**longer** 111:5
**look** 16:4 70:3,8
   71:23 112:14,16
   126:8
**looked** 15:11 87:24
   97:11 102:23
   116:15,18
**looking** 58:3 70:18
   72:25 78:15,16
   80:3 102:4 110:3
   117:9 119:17
   120:2
**looks** 70:23 78:15
   91:7 117:9
**loop** 58:15
**lose** 41:20 67:9
   101:14
**lot** 29:2 113:15
   127:20 128:12,14
**low** 31:22
**Lower** 87:17
**lowered** 87:15
**LS** 111:11
**LS03042013** 111:5
   111:12
**lunch** 67:15,18,22

---

**M**

**machine** 17:8
**magically** 127:24
**main** 69:14
**maintain** 41:22
   128:23
**maintained** 41:22
**maintenance** 41:15
   41:18 51:7,16
   56:15 57:14
**making** 12:19 60:6
   91:22
**manage** 128:17

**manager** 10:22
12:18 32:20 41:1
48:18,23 49:6
94:20 117:21
**managers** 15:23,24
33:6 128:14
**manner** 65:24
**manufacture** 7:20
20:1 34:15 81:24
83:12,24 90:1
98:19,24 99:8,8,9
99:23 100:20
**manufacturer**
99:15 124:7
**manufacturing** 1:3
6:19 7:2,5 8:17
12:13,16,20 19:17
20:21 26:8 27:10
33:10 35:16,25
40:6 44:16 45:16
48:14 50:24 56:3
71:6 73:16 74:23
75:1 76:16 79:1
79:24 80:5 83:4
88:16 92:24 93:18
98:20 99:10
104:24 112:9
113:3 116:5 119:1
126:20 128:10
**March** 36:15,17
38:1,21 39:8
96:19,23 97:3
103:16 104:12,17
104:24 105:3,23
106:22 107:20,20
107:23 111:9
113:21 116:25
118:10 119:4
**margin** 25:15,17
26:1 29:4 39:18
39:18,19,23 77:19
77:25 87:15
**margins** 3:8 25:24
**mark** 72:2 93:5
116:11
**marked** 27:23 29:11
30:4,23 31:1
36:10,12 38:18
39:3,12,15 40:11
44:19,22 47:12,15
49:16,18 54:12,14
56:20,22 58:20
61:5,7 62:7,9

63:20 66:20,22
67:12 68:1 71:25
72:5 74:2,15 77:7
78:6 79:3 84:1,3
87:1 90:11,14
93:3 96:8,17 98:8
103:3 104:8,20,22
107:14 108:23,25
110:20 111:9
116:9,16 117:1
122:21,24
**market** 8:24 9:1,2,3
9:21 10:18 20:10
**marketing** 6:8,12
95:20
**marketplace** 8:13
**markets** 8:23,24,25
**markup** 27:7 28:5,7
**Mary** 11:9 19:2
38:22 47:17 48:1
58:18 61:9 90:7
117:3
**material** 33:13
**math** 78:4
**Matthias** 3:4,14,16
3:18 11:11 31:2,3
31:4 32:7 34:5,16
36:15,18 37:4,12
38:22 39:7 47:24
48:4 58:23 62:11
66:24 79:6 80:4
86:15 108:5
109:15
**mean** 10:13 12:9
24:17 38:7 65:18
68:9 73:11 88:14
93:16 99:17 106:4
114:18 124:8
**Meaning** 95:4
**means** 39:21 42:19
42:24 59:6 73:12
85:8
**meant** 32:21 37:12
50:5 91:8 126:21
**measure** 8:5
**meet** 7:13 13:4
**meeting** 14:23 16:5
19:12 21:10
110:15
**meetings** 22:8
**memo** 97:23
**memorandum** 3:9
44:23
**mentioned** 36:4

57:13
**mentions** 37:8
**met** 7:11 13:3 28:3
80:2
**method** 69:11 85:20
**mid** 60:9 62:18
**middle** 9:7,11 79:6
**minor** 102:16,19
**minutes** 79:12
**Mischaracterizes**
99:5
**Missouri** 1:1,3,19
1:24 131:2
**mistake** 97:25
**mistaken** 50:10
**mistakenly** 98:4
118:20
**misunderstandings**
57:8
**mixed** 52:1
**MO** 2:4,11 131:24
**Mobile** 6:22
**model** 17:17
**modifications** 51:4
**Moines** 9:16,19
**mold** 22:23
**molds** 23:7,10
**moment** 27:19
96:10
**money** 66:12 73:5
82:8 94:25 95:2
126:17
**month** 84:11
**months** 43:7 90:24
**MOU** 97:19,22,23
98:5
**mount** 123:20,21
124:7
**mounted** 123:19
124:5,6
**MOUs** 98:3
**move** 19:15 37:21
38:5,14,16 59:16
59:19 73:10,14
103:1 107:7
115:20
**moved** 60:4 123:20
**moving** 38:25
113:23
**multiplane** 80:21
91:25 92:2,8
103:14 106:14
108:5,13,21 120:9
**multiple** 18:9,9

53:23

_____

**N**

**N** 2:1,16
**name** 5:10 11:6
12:14 18:15 48:20
86:1,20
**named** 109:15
**names** 11:3 59:12
**National** 1:24
131:24
**nature** 20:19 26:24
110:17 121:12
122:16
**near** 9:17
**need** 10:12 39:9
44:12 51:5 54:21
56:6 57:4 103:12
108:9
**needed** 46:5 112:2
**needs** 32:4 41:21
59:23
**negotiate** 43:14
76:13
**negotiating** 44:3
**negotiations** 26:20
26:24 120:3
**neither** 131:13
**net** 42:19 73:6
**never** 17:6 21:25
22:1,2,4 34:1
57:21 114:2
**new** 57:25 59:15
60:4 61:2 91:22
91:24 92:8 103:9
120:8
**Ningbo** 89:14,18,25
90:10
**Nixa** 2:11
**nodded** 38:12
**nondisclosure**
30:15 31:12 86:12
**nonstandard** 33:7,9
33:11
**noon** 105:3
**normal** 5:19
**normally** 124:11
**northwest** 9:17
**Notary** 130:15
**notch** 124:10
**notched** 124:8
**Note** 62:21
**notes** 131:9
**notice** 59:2 74:21,24

**notification** 80:24
**notified** 59:24
**November** 78:10,16
79:7 80:17 115:8
**number** 23:13 26:9
26:12,13 59:8
69:9 70:2 71:19
71:22 76:17,24
86:1 92:4 102:11
102:12,15,16
108:10,11,12,13
119:21
**numbers** 27:8 76:20
76:21 77:1,3 78:3
92:4 108:6,16,17

_____

**O**

**object** 25:7 50:19
55:15 122:4,6
**Objection** 12:7
23:25 99:5
**obtained** 24:10
59:15
**obtaining** 20:5
24:13 126:13
**Obviously** 41:14
**occasion** 14:19
16:14 17:6 131:9
**occurred** 13:7 97:10
100:15 106:1
**occurring** 14:12
**ocean** 62:23 63:7,10
71:13
**October** 62:18
**offer** 66:17
**offered** 66:12
**offering** 121:23
**office** 69:14,15
100:9
**offices** 1:16 9:13
**Oh** 18:14 35:4
65:19 77:11 82:25
96:12 129:5
**okay** 11:23 15:3
17:15 18:1 19:7,9
27:18,20,21,25
28:24 39:20 52:2
52:4 59:14 65:21
67:19 70:2,14
71:23 84:20 92:19
99:11 105:5 107:9
107:12 124:17,19
125:12 126:11
**Omaha** 9:20

**Alpha Reporting Service**
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 46 of 54

once 23:21 27:4
76:1,10
ones 17:15,19,20
18:4 106:18,20
125:1
online 110:11
Oops 72:4
operates 8:14
operation 86:20
opinion 50:16,24
81:3 117:16,17
124:4 126:23
opinionated 50:14
opportunity 29:3
opposed 73:24
option 72:10,11,13
72:17,18 73:3,4
74:7
options 72:6 73:17
73:20 75:12 95:23
oral 51:4
orally 73:24
order 4:1,10 11:5
38:1,25 41:22
84:5,13,16,17
92:11 103:13,17
103:20,22 104:13
104:19,25 105:2,6
105:9 106:6,11,13
106:15,23,25
107:2,5,19,21
108:15 109:10
111:4,7,13,20,23
111:24,25 117:4,4
125:13
ordered 57:4 58:5,7
118:4 125:13
orders 38:5 39:9
101:12,18 117:7
117:11 119:8
original 4:22 26:1
41:6 68:13 75:4
88:22 125:18
originally 6:21
other's 52:18
ourself 25:22
outline 72:6 97:1,20
Outlook 97:11
102:4
outside 101:4
overall 27:4 41:22
41:23 72:22 74:12
87:24
overhead 23:14

overseas 60:2
owner 121:10
ownership 73:9
86:3,5
owns 74:23

—————

**P**

P 2:1,1
pace 60:9
pack 9:7,12
page 43:4 45:6
70:23 79:6 87:6
87:14 90:17 91:5
98:17 100:7
126:12 130:1
pages 84:4 131:8
paid 42:20 64:20
82:10 119:3,3,7
119:20,24
paragraph 37:4
39:9 42:6,12,16
43:13 45:7,20
97:5 98:17 100:7
100:8 101:1
parent 36:23 86:3
part 15:12 21:25
22:2 23:14 24:10
25:14 36:6,8
53:11,14 67:2
71:6 76:15,23
81:8,10,15 82:12
88:22 92:3 97:25
98:15 102:11,15
108:6,10,12,16
117:8 121:8
particular 24:20
41:25 95:19
110:14
parties 40:10,13
45:9 46:22 60:23
100:19 102:25
131:14,15
parts 14:5 28:22
39:18 41:21 42:5
65:13 78:21 83:10
89:10 102:10
126:19
party 74:21
pass 25:22 88:15
passage 105:8
passed 89:2,6
passing 87:19
patent 23:24 24:7
24:11,13,16,17,18

24:22 42:13 50:15
50:17 92:4 102:12
102:16 108:11,12
108:16 109:18
110:4,5,10,13
112:15,17
patented 24:16,19
65:12
patents 122:15
pattern 18:20 24:24
108:15 123:22,23
patterns 60:6 85:15
102:18
PAULA 1:20 131:5
131:18
pay 20:20 22:5
26:21,25 27:2,3,5
41:14 42:25 45:11
63:1,9
paying 51:8 63:15
payment 71:5
pecking 11:5
Pengo 1:7 6:5,7,16
6:20 7:6,18,19,19
8:4,5,8,14,20 9:21
10:5,19 11:5
14:10,20,25 16:6
16:9,16,19,21
17:10 18:25 19:19
20:2,6 21:11,18
22:5,9,14 23:9,15
23:20 25:1,15
26:4,15 27:11,15
28:6,12,18,19
29:3,11,21,24
30:13,15,19,22
33:18,21 34:17
35:12,18 36:6
37:7,9,24 38:9,14
38:21 39:6,14
40:16 43:13 44:16
44:22 45:11,14
46:10 47:16,22
48:14,15 49:2,19
50:9,18,23,25
51:6,8,15,19 52:9
53:3,5,9,10,17
54:3,9,15 55:4,12
56:14,23 57:15
58:23 61:8,23
62:4,10 63:1,9,16
64:2 65:5,14,25
66:23 67:1 68:2
68:22 71:6,16

72:4 73:12 75:3,9
75:11 76:13 77:4
77:16,18,23 78:17
81:18 82:6,8,17
82:19 84:4,6,16
84:24 85:7 86:2,3
86:10,16,23 87:9
87:11,18,22 88:14
88:15 90:15,17
93:6,13,17 94:15
94:16,21,25 95:19
96:5 97:21 98:11
98:17,18,23 99:14
99:22 100:22
101:8 103:6 105:1
105:2,21 109:1
111:8,21 115:1,4
115:22,23 116:12
117:2,25 119:15
120:7,15,18
121:14,17,24
122:18,25 123:3
124:1,24 126:4
127:1,6 128:6
130:4
Pengo's 7:16 9:13
10:7,13 11:24
56:2 62:1 65:1
73:7 82:22 87:15
109:25
people 10:13,24
11:1 16:19 18:22
53:24 54:3 58:24
85:8 87:18 94:8
114:17 128:16
people's 11:3
percent 26:2 28:10
39:23 40:1 41:12
42:19,20 44:2,3
45:11 59:3,20
72:21,23 74:12,13
77:25 78:2 89:6
90:8 121:15
percentage 22:5
28:8,9 89:1
perception 10:5,8
percussion 24:24
performed 127:24
peril 80:10
period 72:14
person 50:14 68:16
75:22
personal 69:21,23
personnel 94:10,15

94:16 95:19 127:1
ph 4:24
Phillip 4:12 86:19
109:2
philosophy 128:20
phone 20:4,16 21:2
46:15 61:11 68:20
68:23 69:4,9,19
71:22 73:21,24
75:16 108:1
113:15 116:22
Phonetic 4:24
Photo 4:16
pick 67:23
picture 122:23
125:8 127:21
pictures 123:6
Pierre 6:2
Pike 79:13
pilots 123:25
place 19:13 31:16
38:1,5 51:22
74:20 93:19 97:2
113:8,13
placed 119:8
placement 123:25
Plaintiff 1:9 2:2,6
Plaintiff/Counter
1:5,22
plane 124:11
plant 32:11 75:21
75:24
play 95:25
played 93:2
playing 92:24 93:12
please 5:10,22 25:4
45:2 47:3 53:4
54:19 55:20 81:12
99:2,21 116:4
plus 8:9
PO 38:16 57:4,11
103:9 111:4,5,11
111:12,16,19
117:7
pocket 124:11
pockets 123:18
124:13 125:7
Pohlman 3:6,10,15
4:15 11:9 19:2
38:22,24 47:17
48:4 58:18 61:9
64:5 90:7 117:3
Pohlman's 39:7
point 15:4 16:9,12

18:21 19:18 20:8
21:4 22:8,13
37:19 38:6 40:3
60:14 64:19 72:24
76:6 88:10 89:8
92:17,22 95:10
97:3 103:19 110:9
118:21
**policy** 81:21,23 82:1
**poor** 65:23
**portion** 25:5 55:21
81:13 84:19 88:23
99:3
**position** 6:7,9 10:21
10:23 40:24 65:1
68:22 82:22 99:14
99:22,25 100:22
100:22
**positions** 15:22
**position's** 41:1
**positive** 36:2 71:10
**possession** 82:19
83:22
**possibility** 21:13,23
55:24
**possibly** 13:24
49:13
**potentially** 53:6
**pour** 22:24
**power** 20:16
**practice** 66:10
68:23 69:24
**preparation** 17:2
109:19
**prepare** 7:6
**prepared** 7:9 21:8
**present** 2:13 7:15
11:23 18:24 21:8
33:3
**presented** 7:9 27:8
32:2
**presentment** 131:10
**preserving** 43:25
**president** 6:8 10:22
10:23
**pretty** 33:15
**previous** 41:4
**previously** 30:4
32:7 40:8
**price** 4:2 23:2 25:20
25:22 43:14 44:2
59:4 86:23 87:9
87:11 88:11,12,15
89:2,6 92:23

125:16,18,19
**priced** 22:16
**prices** 43:10,14 44:3
87:19,22 88:19
**pricing** 19:16 22:14
25:10,14,23 27:4
41:25 43:5,7 45:1
73:6 88:4,5
106:24 108:7,8,9
**primarily** 7:25 49:7
69:4 75:15,17
**primary** 69:11
**print** 60:8
**prior** 6:16 13:14
14:15 20:4 34:2
35:18 41:10 51:9
68:11
**priority** 31:16,17,22
31:22,24
**private** 121:25
**probably** 9:7,11
65:23
**problem** 70:13
94:14,15,17 121:5
**problems** 20:25
80:21 128:23
**proceed** 76:5
101:22
**proceeded** 80:9
**proceedings** 131:8
**process** 5:17 19:23
24:10 25:19 35:23
53:23 61:21 63:8
76:7,15 81:8,15
83:15 110:8
113:14,19 121:2
**processed** 103:22
**processing** 105:11
**produce** 20:3 23:7
23:10 31:18 38:17
100:20 108:15
**produced** 1:14 5:6
24:25 28:17 82:24
108:20
**producing** 18:3
108:13
**product** 12:17
15:23 20:23 24:5
29:4,4 34:21
37:10 43:19 49:7
52:19 65:12 94:9
103:10,20 117:21
**production** 35:6
92:11 101:12,18

102:10 107:4
109:7 112:22
114:23
**productivity** 127:25
**products** 10:13
20:10 23:8 28:16
29:2,2 45:24,25
52:16,16 54:23
58:16 73:16 81:25
82:5 87:17 89:14
89:24,25 93:11
101:16 105:12
121:11,12 127:18
**profit** 25:1,14,17
26:1,15,17 29:5,6
77:18,25,25 87:15
**project** 31:15 32:6
32:17 34:11 35:10
37:6,21,23,24
38:4,8,9,15 39:1
39:10,10 40:5
49:10,12,15 51:16
58:19 59:16,19
60:2 64:7,8 67:10
90:2 101:2,5,11
104:4 113:23
126:18 128:13,14
**projects** 56:7 85:4
**prompted** 113:11
**pronounce** 59:12
**properly** 81:1
**property** 97:21
**proposal** 15:12
**propose** 21:10 61:2
**proposed** 22:4 72:7
**propounded** 131:7
**protection** 73:9
**provide** 21:21 22:13
58:9 65:7 83:9
104:5 115:23
**provided** 42:7 58:8
66:2 128:5,6
**providing** 8:1
**Public** 130:15
**publicly** 8:12
**publish** 8:11
**pulled** 67:8 110:11
**purchase** 4:1,9
21:18 45:22,24,25
54:23 77:5 84:5,6
84:13 103:13,17
103:20 104:13,19
104:25 105:2,6,9
106:6,10,13,15,23

106:25 107:2,5,21
109:10 111:4,7,13
111:20,23,24,25
116:3,5,7 125:13
126:4
**purchased** 45:12
116:2
**purchasing** 22:6
45:15 52:9 53:6,6
55:4
**Purely** 86:5,6
**purpose** 18:2 21:5
24:13 79:19,20
96:25 97:1 109:21
110:1,3
**pursuant** 115:7
116:7 118:17
**put** 7:24 16:6,16
21:7,17 27:6 33:7
38:25 40:15 41:7
43:20 45:4 54:9
54:24 56:6 67:9
76:19 92:3 97:15
98:2,2 100:17
115:14 118:5
126:18
**puts** 94:8
**putting** 19:15,24
32:4 73:13
**p.m** 107:23 129:7

---

**Q**

**quality** 41:23 72:18
72:21 74:11
**quantities** 52:20
117:20,22,23
**quantity** 15:8
117:10 118:1
**quarter** 76:1 102:13
**question** 5:21 12:2
24:1 25:3,9 35:18
35:21,21 36:5
47:2 50:22 55:18
55:19 65:23 73:22
81:11 84:23 99:1
105:7 117:7
118:21 119:13
**questions** 125:25
126:1 129:1,2
131:7
**quicker** 63:2
**quote** 36:25 59:15
**quoted** 118:1

---

**R**

**R** 2:1 48:17 49:20
**RACHEL** 2:6
**raised** 115:2 124:13
125:7
**ranch** 14:21,23
15:17 19:12,18
93:20
**range** 119:21
**ranks** 8:20
**rate** 23:18,19
**rates** 43:16,23,24
44:6
**reach** 76:3 92:16
**read** 25:3,6 47:2
54:19 55:19,22
75:4 81:11,14
99:1,4 110:11
122:9 131:11
**ready** 29:8,17,21
62:15 107:9
115:18 118:6
**real** 12:15
**really** 49:24 88:25
102:19 114:18
120:3
**reason** 5:21 25:18
46:24 47:4 53:17
63:23 97:15,17
114:13
**reasonable** 81:4,6
**reasons** 7:25
**recall** 12:5,25 13:10
13:14,18,24 14:7
14:8,12 17:17
19:3 23:9 24:23
25:17 26:7 28:6,8
28:13 29:10 30:21
32:25 34:10,16
41:3,9 46:16 47:7
51:11,13,17 54:3
54:8 56:16 57:18
57:20,23 64:14,17
64:18 70:18,21
75:16 76:3 80:6
80:11,16,20 91:15
96:6 97:7 101:24
102:20,22 109:14
110:16 120:21
121:3 125:11,16
125:20 126:5
**receipt** 75:9
**received** 7:10 59:2
80:15 86:23 89:7

Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 48 of 54

90:21,24 100:10
101:17 104:18
110:18 119:4
**receiving** 120:21
**recollection** 17:5
110:12 112:16
**recommend** 80:4
**record** 5:1 19:5,7,8
19:10 25:5 27:21
28:1,3 46:18 52:2
52:5 55:21 67:19
67:21 68:25 81:13
92:19,21 96:15
99:3 107:12,16
124:19,21 129:6
**records** 102:5
**recover** 101:10
**redo** 54:24
**Reedrill** 6:25
**refer** 42:17 97:9
105:16
**reference** 71:18
97:5
**referencing** 50:12
111:11
**referred** 50:15
93:22 98:4
**referring** 37:15
53:1 59:7,9 70:17
93:17 97:24 98:1
98:6,20 112:6
114:5
**refers** 111:8
**reflect** 59:18 73:7
91:13
**reflected** 124:23
125:9
**reflecting** 12:4
**refresh** 112:15
**refund** 91:1
**refused** 81:17,20
**refuted** 89:18
**regard** 7:4 34:12
49:9 79:18
**regarding** 4:4 26:25
52:9 53:5 55:3
57:14 74:6 102:1
108:4 115:12
117:14
**region** 32:11
**regularly** 8:11
**reimbursement**
101:9
**related** 109:10

131:13
**relation** 9:16 70:25
**relationship** 86:5,6
97:3 128:24
**relative** 131:15
**relayed** 113:17
**relaying** 30:1,2
**release** 42:25 75:3
81:21 121:25
**remain** 97:21
**remaining** 62:17
**remember** 15:19
25:18 68:21 86:20
92:1 110:14
120:24 127:2
**REMKE** 2:6
**removed** 95:24
**rephrase** 5:22 25:9
50:22 65:22 105:7
**replace** 118:2
**replaced** 127:23
**replenish** 117:21
**report** 11:15 104:13
104:17 111:6
131:8
**reporter** 25:6 55:22
81:14 99:4 131:5
**REPORTER'S**
2:21 131:1
**REPORTING** 1:23
131:23
**representative**
32:10
**reputation** 10:15,15
10:17
**request** 65:1,2,4,6
66:16 81:10,15,17
81:20 92:3,8 96:2
**requested** 25:5
55:21 66:13 80:25
81:13 88:22 91:23
99:3 102:8 106:20
108:10
**requesting** 29:24
47:21
**requests** 88:9
**require** 83:7
**required** 38:13
126:3,5
**requirement** 38:4
38:10
**requirements** 79:23
116:20 117:13
**research** 14:16

**reserve** 129:3
**resolve** 75:12
128:22
**resolved** 20:25
**resources** 67:9
**responded** 64:11
**responds** 48:4
**response** 3:7,19,22
39:6 67:5 68:3
70:23 74:19 90:4
131:7
**responsibility** 57:16
**responsible** 49:7
**result** 19:11 20:11
20:12 22:25 26:5
87:15 88:23
101:10
**retain** 82:7 98:11
**retired** 33:19
**return** 66:12
**returned** 120:14,15
131:12
**reverse** 20:2 27:11
27:15 30:20 33:21
34:2,4 36:19 85:2
85:8 100:17
**review** 17:2 21:8
45:2 79:21 117:12
129:3
**reviewed** 7:8 24:11
88:6 96:4
**reviewing** 17:5
24:14
**revised** 103:9 108:8
108:9 125:19
**revisions** 41:6
102:17,19
**RH03152011** 111:4
**Rick** 109:15
**Rickards** 3:3,20
10:20 11:15 19:1
29:12 30:2,12
54:5 58:24 66:19
67:5,24 70:15,19
72:3,8 75:15 76:3
86:15 93:8 95:3,6
95:8,10 106:7
109:14 110:25
113:2 114:8,22
118:16,22 120:4
**Ricke** 109:17,18,22
**Ridgeview** 1:17 2:4
**right** 5:19 8:13 9:10
12:12 13:12 30:16

30:25 36:4,23
42:14 43:25 52:6
63:9 65:19 66:6,8
69:24 70:10,22
72:15,17 73:25
78:1 82:6 83:14
83:15,18 84:22
85:10 89:9 95:3
96:7 98:24 99:7
99:14,23 103:23
107:17 109:12
110:23 112:23
115:9 117:20
119:5,20 120:5
122:12 128:1,1,21
129:3
**rights** 92:8 98:18
99:10
**Ripper** 18:17,19
**roads** 8:2
**Robert** 48:21 54:6
109:18
**rock** 16:8,8 17:23
17:24,25 18:14,17
18:18,19 50:8
**role** 32:4,14
**rolling** 113:23
**Ron** 2:13 13:4 16:7
29:17 35:16 49:13
57:8,13 64:12
68:6,12 71:2
89:16 90:9,20
91:7 95:25 105:22
126:10
**Ron's** 57:25
**ROSKENS** 2:2
**roughly** 33:1
**royalty** 22:6
**RPR** 1:20 131:19
**rule** 44:4 65:7
**rules** 5:20
**run** 43:10
**runs** 86:19
**R-i-c-k** 109:15

─────────
**S**
─────────

**S** 2:1,11 3:1 18:20
**Saint** 6:2
**sale** 98:19 121:23
**sales** 6:8,12,18 8:10
8:21 10:23 15:23
26:10,15,18 32:10
41:1 52:15 77:24
94:20 114:16

**salespeople** 54:1
113:18
**sample** 42:9 60:24
80:5 81:4 83:10
84:12 120:8
**samples** 15:6,14
17:12 42:6 47:9
47:23 48:2,5,8
57:4 58:4,6,9,13
58:16 60:9 61:12
61:19,21,23 62:14
62:22 63:2,5
71:10,11,17 78:12
78:25 79:8,9,18
79:19,20,25 80:2
80:9,12,15 83:7,8
83:19 90:21 91:20
91:22,24 92:8,12
100:10 101:20,24
102:8 103:14
106:18 108:20
113:22 126:13
**San** 6:2
**satisfaction** 10:3
**satisfying** 128:24
**saw** 14:13 126:25
**saying** 31:5 62:14
64:11,23 66:14
72:11 78:20 80:12
90:19 99:7,8,11
106:5 112:3 116:2
**says** 29:17 37:2 42:6
60:4 61:15 62:16
64:4,9 67:7 71:19
73:8 74:20,22
91:7 93:11 94:3
111:12 117:8
121:24 122:2
**scans** 4:22
**schedule** 3:24 37:5
58:16 76:2 78:12
105:15
**SCHIFF** 2:7
**Scudder** 1:11,13
2:17 3:20,21 5:5
5:11,12 28:2
44:21 47:14 49:21
52:6 67:22 92:22
96:16 107:17
124:22 125:25
130:10
**second** 19:5 37:4
39:8 45:6,25 46:7
54:23 57:3 70:6

**Alpha Reporting Service**
417-887-4110          www.alphareportingservice.com          417-889-4246
Case 6:14-cv-03498-MDH   Document 86-2   Filed 12/04/15   Page 49 of 54

87:6,14 90:16
97:5 111:7 116:12
126:21
**secondary** 90:23
**sectional** 12:20
28:22
**see** 12:3 15:11 24:15
62:16 78:21 88:7
95:16,17,23 110:5
111:25 116:19
122:9 123:19
125:7
**seeing** 29:20
**seek** 101:8 126:20
**seeking** 74:22
**seen** 16:25 17:1
24:12 95:10
106:18 114:17,20
**segment** 9:3
**segments** 10:18
**self-explanatory**
41:13
**sell** 12:20 23:20
24:4 26:4 49:25
52:19 112:24
**selling** 94:21 120:23
**semi-correct** 118:7
**send** 15:6 17:15
20:1 27:11 45:2
71:11,16 106:5,10
108:7
**sending** 47:18 71:4
90:3
**sent** 4:22 17:10,12
17:13,16,19,20,24
17:24 18:4,7,10
18:14 30:19 45:18
47:8 51:25 54:16
55:7 62:12 67:8
78:24 79:12 93:17
96:18 102:24
103:9 104:13
106:9,23 111:8,21
114:5 116:22
123:5
**sentence** 54:19 57:3
57:7 59:1 73:8
100:21
**sentences** 94:2
**separate** 18:18
21:20 22:1 34:18
45:23 46:4,5,25
47:5 54:22 55:13
56:5,7 69:15 86:2

86:2
**September** 60:10
62:15,16,18 64:3
66:24 67:25 74:5
**series** 101:23
**seriously** 102:9
114:10 121:6
122:12
**SERVICE** 1:23
**set** 25:1,7 43:4
44:16 48:9 76:1
77:22 79:9 87:13
99:24 104:1
**sets** 41:24 120:6
**settlement** 76:13
**seven** 17:21 105:11
**shape** 21:24
**share** 8:24 50:18
**shelf** 118:6
**ship** 29:9,18,21
61:23 62:15 118:2
**shipment** 118:3
119:18
**shipped** 15:10 27:15
30:21 31:6,10
62:3 85:17 118:25
**shipping** 42:25
62:17 63:15
**shit** 91:7
**short** 16:10 27:22
48:18 52:3 67:20
92:20 96:14 107:8
107:13 124:20
**shorten** 35:2
**shorthand** 131:9
**shortly** 86:22 105:3
**show** 15:14 29:10
30:25 36:12 38:20
39:5,14 44:21
47:14 49:18 54:14
56:22 58:22 61:7
62:9 64:1 66:22
67:25 74:4 77:15
78:8 84:3 87:3
90:13 92:25 93:2
93:10 96:5,16
104:22 107:21
110:23 117:1
122:23
**shown** 127:2 131:7
**shows** 93:12,13
**sic** 4:25 90:19
**side** 7:11,25 16:14

16:15 17:7,7
28:22,23,25 34:2
49:8 100:18
127:18,18 128:13
**sign** 29:24
**signature** 71:20
86:18 130:1
131:10
**signed** 27:13 30:7
30:12,18 31:13
40:16 43:8 45:9
46:21 47:10,18
51:2,10 52:11
53:14 56:13 57:10
60:22 100:18
112:20 115:8
131:11
**signified** 4:24
**sign-off** 80:12 83:9
**similar** 123:7
**simpler** 47:1,6
59:12
**simplifies** 56:9
**simplify** 54:21
56:11
**simply** 90:3
**simultaneously**
93:12
**single** 4:1 84:6,13
103:21 109:6
114:22 125:12
127:10,10
**sir** 5:25 6:15 8:16
8:19 10:25 11:8
11:10,12,14,16
12:1 14:18,22
22:15,18 23:5,14
25:13,16 26:3,6
26:19,23 29:14,16
29:19
**sit** 12:3 18:12
103:16
**site** 17:8 20:22
127:22
**situation** 65:10
75:13 100:12
105:16,19 120:24
**six** 118:15 128:16
**size** 8:5 102:13
**sizes** 115:15 116
**skew** 124:14
**small** 27:7 28:5
**sold** 7:1 25:2 26:7
33:12 94:24 95:1

126:20
**solid** 8:2
**soon** 115:22
**sorry** 20:6 35:20
65:20 66:23 70:5
72:5 74:17 107:20
111:7 124:1
**sound** 13:12
**sounds** 119:21
**source** 89:11,22
100:11 126:14,21
**sourcing** 34:19
86:17
**South** 1:24 2:7
131:24
**southern** 1:2 32:20
**speak** 112:7
**specific** 10:12 13:1
14:4 44:12 51:5
59:9,17 66:15
80:16 97:15,17
99:18 125:1,6
**specifically** 17:19
23:11 46:14 47:7
60:16 66:18 92:1
110:17 115:17
126:2,18
**specifications** 79:22
115:18 116:25
**specifics** 64:18
**specs** 85:9
**spellings** 4:24
**Spencer** 9:17
**spent** 23:9,15 82:8
128:12
**Sperling** 2:6,20
4:23 12:7 23:25
25:3,7 27:19
35:18 37:23 38:7
47:2 50:19 51:21
52:25 55:15,19
67:16 77:9,12
81:11 82:23 83:1
92:14,16 96:10
99:1,5,17 107:6
107:10 121:19
122:4,6 125:24
129:1,3
**spiral** 15:13 18:14
18:16,19 20:1
49:24 50:8,10,11
123:16,18,23
124:16,25 125:3
127:9

**spiral-type** 18:11
**spoken** 90:9
**spreadsheet** 87:6
**Springfield** 1:18,24
2:4 131:24
**Springs** 13:8
**ss** 131:3
**Stafford** 1:16 2:3
**standard** 30:15
31:17,22,25 33:6
33:9,15 65:10
81:15 123:16,18
123:23 124:15
128:10
**standpoint** 27:7
34:13 56:4,8
87:25 89:19 95:24
100:16 101:15
**start** 35:22 41:20
60:6,9 73:15
90:16 118:24
**started** 6:21 40:4
47:10 48:2
**starts** 36:13 47:16
**state** 1:19 5:10
32:13 45:1 55:23
59:14 60:1,8
70:15 71:9 97:18
98:11,18 100:8,21
101:1,8 103:12
131:2
**stated** 4:25 46:5
48:5 63:11 89:17
98:13 101:6 110:5
112:12 131:6
**statement** 8:15 15:2
19:20 35:9 37:13
57:22 78:5 91:14
99:6 101:12
114:13
**statements** 55:16
114:17
**states** 1:1 33:1
36:18 37:4 38:24
39:9 42:13,24
45:11 47:21 48:5
49:23 57:3,7,13
59:1,19 61:12
62:21 64:7 71:3
74:19 79:15 108:5
111:3 117:3,7,25
**stating** 48:1 60:19
71:4 79:7,12
109:6 116:23

**statistic** 8:11
**stenotype** 131:8
**step** 19:23
**STEVE** 2:10
**stock** 115:16 118:2
  118:4
**stop** 18:22 67:14,17
**Storm** 9:18
**Street** 1:17
**strike** 118:24
**string** 80:23
**strong** 113:15
**structured** 122:10
**style** 24:24
**styles** 115:16
**subject** 47:8 62:13
  64:22 99:20
  125:21
**submit** 82:17
**submitted** 36:22,25
  73:18,19,20,21
  74:7 84:13 103:17
  105:2 109:11
  125:14
**Subscribed** 130:12
**subsequent** 71:11
**subsequently** 95:12
  125:19
**successful** 128:24
**suggested** 59:16
**Suite** 1:18 2:4,8
**summarize** 41:14
**summarizing** 3:8
  4:7 39:16 97:2
  103:6 108:1
**summary** 39:17
**supervise** 10:24
  11:1
**supervised** 11:6
**supervision** 11:7
**supervisor** 10:19
**supplied** 76:21 77:2
**supplier** 34:14 59:2
  59:15 60:5 90:23
  100:23 101:3
  121:7,14,22
**suppliers** 25:20,21
  59:11,18 86:13
  122:3
**supplier/vendor**
  86:5
**supply** 29:4 54:22
  76:20
**supplying** 19:14

**support** 12:24 38:25
  39:10,10
**supporting** 75:2
**supposed** 63:9
**sure** 17:24 19:6
  23:4 27:12 35:4
  41:3,6 64:21
  68:10 70:4 73:22
  74:1 75:8 78:2
  79:21 83:18 84:18
  85:6,20 91:13
  92:9 93:1 95:13
  95:16 96:12 99:22
  102:3 104:2 110:2
  110:9,22 115:10
  116:21 118:14
  122:2,10 129:5
**surprised** 80:6
**surveys** 10:3
**swear** 5:3
**sworn** 1:14 5:6
  130:12 131:6,11

---

**T**

**T** 3:1
**table** 41:24 43:5
**tack** 124:14
**tackle** 32:6
**take** 16:4 25:22
  27:19 32:4,14
  51:23 70:12 72:15
  73:14 87:13 88:4
  94:9 95:15 96:10
  99:14,22 107:7
  112:9 114:10
  115:23 118:10
  124:17 127:14
**taken** 1:21 5:13
  11:24 27:22 45:20
  52:3 67:20 92:20
  96:14 97:1 103:18
  104:16 107:13
  113:8 117:11
  123:12 124:20
  130:7 131:9,14
**talk** 14:2,5 52:7
  68:5 70:16 106:6
**talked** 20:15 41:17
  67:24 68:19 69:1
  85:25 88:11
  102:25 106:10
  125:12
**talking** 22:21 28:4
  42:9 56:12,25

  64:4 68:6 71:1
  102:18 107:18
  108:1 127:8
**talks** 61:10 108:4
**tape** 94:3
**Taylor** 1:16 2:3
**team** 15:23 34:19
  86:17
**teeth** 123:19 124:4
  124:15
**tell** 5:22 15:9 22:19
  25:24 50:7 51:14
  52:13 53:15 57:21
  70:24 72:12 77:3
  95:8,14 122:11
**telling** 32:3 55:2
  57:23,25 90:6
**ten** 5:16 6:23 7:3
  81:6 105:5,8,12
  118:14
**tense** 64:6
**Terex** 20:23
**term** 20:2 25:7
**terminate** 101:11
  113:2,12 115:1,19
  118:17,22
**terminated** 114:22
  120:20 121:9
**terminates** 101:2
**termination** 84:19
  120:12 125:15
**terms** 41:13 42:16
  42:17 44:10 117:9
  117:13 118:17
  121:16 122:7
**territory** 15:24
  32:20 33:6
**test** 18:5,6 79:24
  80:5,8
**tested** 80:13
**testified** 5:7 127:1
**testify** 50:20
**testimony** 2:17
  13:11 17:9 126:6
  127:3 128:8
**Texas** 6:22
**Texoma** 6:25
**Thank** 71:23
**thing** 6:17 42:9
  119:24 128:3,21
**things** 8:3 12:5,8
  35:2,8 41:20,20
  44:15 52:17 67:7
  113:23 122:15

**think** 10:13,14
  13:10 23:2 29:7
  30:4 32:7 35:19
  36:14 40:8 41:2
  41:11 47:16 48:14
  51:24 54:7,21
  56:12 67:23 68:2
  72:12 77:9 78:20
  81:3 82:6 83:17
  85:6 87:6 90:16
  91:2 94:5 103:5
  114:5 118:14
  119:4,17 124:18
  125:21
**thinking** 53:17
**Thirteen** 11:2
**thirty** 111:3
**thought** 12:6 46:3
  50:16,24 68:5
  76:4,18 90:21
  94:11 95:8,14
**thousand** 26:14
**threatens** 112:8
**threats** 113:17
  114:2
**three** 9:19,19 33:20
  110:18 112:13
**tie** 56:7 72:20
**tied** 72:18
**time** 7:2 10:4,15
  12:11,15,17 13:2
  13:3 14:16 15:4
  15:19,22 16:1,10
  21:17 22:8 23:12
  23:15 24:15 27:12
  28:13 31:18 32:3
  32:19 35:12,22
  36:3 37:19 38:6
  38:14 40:25 41:2
  41:19 45:14 47:10
  48:12,19,24 49:1
  49:3 53:4 62:14
  63:18 64:22,25
  66:13 68:11,12,14
  69:19 70:10,12
  72:14,23 74:12
  75:8,21,25 78:22
  78:24 81:4,7 82:8
  84:24 88:3,8 89:9
  91:15 93:1 95:10
  96:3 98:4 99:21
  101:18 102:9
  106:3 107:4 110:9
  110:22 112:10

  113:21 114:12
  118:6 126:17,21
  127:25 128:12
**times** 5:15 13:16
  117:23
**ting** 94:10
**title** 32:19
**today** 7:5 12:4 15:9
  18:12 31:6 55:1
  59:10 71:3 128:9
**told** 13:19 32:7 46:2
  57:3 61:13 80:8
  90:5
**tolerances** 41:21
**Tomlen** 31:17 4:4
  4:11 11:7 15:20
  15:24 19:1 32:10
  33:18 36:16 38:23
  51:14 54:5 56:17
  56:24 57:21 58:15
  58:25 61:10 62:13
  64:3 70:24 71:16
  90:19 91:6 93:8
  93:25 104:5
  107:22 110:25
  114:5 128:15
**Tomlen's** 57:25
**tool** 24:20 128:1
**tooling** 22:16,19,22
  23:10 26:22,25
  27:1,6,6 28:4,6
  31:19 37:8 39:17
  39:20 41:15,17,19
  41:21 42:2,4 49:8
  51:7,9,16 56:15
  57:15 64:20,24
  65:3,7,15,25 66:3
  66:10,14 67:3,8
  71:4 72:15,16
  73:5,7,10,13,14
  74:6,23,25 75:4
  85:15 88:1,10
  91:1 97:20 98:12
  101:4 102:21
  103:10 107:1
  108:18 111:14,17
  111:18 112:3
  119:24 120:14,15
  120:18
**toolings** 85:19
**tools** 16:9
**tooth** 24:24 102:12
**top** 67:5 68:2,8
  122:12 123:20,21

124:13
topic 110:14
total 26:10,17 77:23
tough 16:8 20:23
towns 9:18
trade 92:25 93:2
trading 44:7
trail 60:17 119:11
train 119:11
transaction 52:24
  52:25
transcript 4:22
  129:4
transcription 131:9
transfer 15:21
transit 78:22
transition 98:3
treat 128:10
treated 31:20 128:9
trial 131:11
tried 49:11 119:11
trip 13:15,16 21:2,5
trouble 20:22
truck 16:6,11
true 9:24 27:11 38:2
  42:1 48:10 59:24
  69:7 80:10 101:12
  112:21 117:15
  122:3 131:6,9
try 44:5 67:23 76:1
  105:18
trying 35:2 59:12
  76:12 91:13
  101:22 113:21
  128:17
Tuesday 74:19
turn 77:9,11,13
  82:3
turned 74:25
turning 32:17
TVs 93:12
twelve 43:7
twenty-five 22:10
two 9:18 15:8,10
  16:2 17:6,16,25
  21:20,23 22:1
  33:19 37:5 45:23
  46:3,5,25 47:5
  48:25 49:13 54:21
  56:5,6,10 86:9,9
  93:12 97:4 120:6
  127:18
type 33:11 40:4
  52:22 76:4 119:24

**U**

types 35:7
typewritten 131:8
typical 33:24 34:1
Typically 76:1
  81:21 128:16

**U**

Uh-huh 71:21
ultimately 20:12
  21:14 26:4 34:20
  34:22 45:21 73:17
  76:10 80:11 88:15
  113:8,24 116:5
  119:14
Unable 84:23
unclear 84:21
uncommon 105:12
underlined 59:23
understand 5:21,23
  22:21 41:3 72:12
  77:21 85:5,6
  108:21
understanding 17:9
  24:21 57:9 78:25
  79:19 85:10 97:23
  100:3 126:13
understood 126:2
  128:4
unhappy 126:16
  127:1
UNITED 1:1
University 6:13
unsure 100:12
update 47:23 78:21
updated 3:24 78:12
updates 58:18
  103:25 104:2,6
  111:5 112:5
upset 68:14
usage 76:21 77:1,3
  77:18,22
USDC 130:4
use 28:18 36:6 37:9
  44:2 59:8 65:14
  65:18,25 69:4,18
  70:5 76:18 81:24
  82:4 101:16
  112:23 115:20
  121:11
utility 7:20 9:1,3,22
  10:8

**V**

value 111:6 112:6,7

variation 60:22
  88:11,12 123:17
  124:14
variations 127:12
varies 8:9,23,24
various 7:25
venture 20:9 37:15
verbalized 72:20
verification 89:19
  104:12,17 105:6,9
  106:5 107:19
  111:6,16 112:2
verified 90:2,3
verify 78:4 80:1
  89:5,15 101:25
  111:19 119:6
versions 41:4,10
versus 7:6 44:7
  52:15 71:13
vice 6:8 10:22,23
video 4:5 14:9,14
  16:25 17:6 22:20
  92:25 93:2 94:5,7
  94:13 95:4,7,9,11
  95:16,17,20 96:1
  96:4,20 126:24
  127:2,5
VIDEOGRAPHER
  5:1 19:4,7,9 27:21
  27:25 52:2,4
  67:19,21 92:19,21
  96:13,15 107:12
  107:16 124:19,21
  129:6
videoing 18:22
videos 14:13
Videotaped 1:13
  2:10
videotaping 16:20
  16:21,23
view 22:20 66:5
  95:12 127:5
viewed 14:9 66:6
viewing 31:9
violation 121:13
visit 12:19 14:1,8,15
  20:15 21:6
visited 13:22
visiting 13:14
visits 13:24
VISUALS 2:10
volatile 105:19
  113:15
volume 8:21 72:22

vs 1:6 130:4

**W**

Wacker 2:7
waiting 78:20
  105:10
waived 131:10
walk 66:7,9
walking 64:8
want 11:4 29:10
  32:13 44:21 52:6
  67:14 72:10 82:3
  85:6 94:9 103:23
  112:14 117:14
  118:15 119:12
wanted 12:21,21,23
  16:3 24:15 64:23
  79:24 80:1 89:4
  102:11 104:2
  105:15 106:6
  110:5,10 115:19
  118:10 123:7
wanting 37:20,21
  112:16
wants 67:1 94:8
WARREN 2:2
wasn't 34:25 36:8
  38:4 53:13 55:2
  65:9 73:20 82:12
  93:25 107:3 119:7
  119:24 123:14
wave 90:20
way 6:2 12:10 31:20
  31:25 70:8 88:25
  127:15,15 128:10
  128:21
Wayne 50:1
ways 67:2 114:20
wear 41:20 127:21
Wednesday 1:14
week 81:6 90:22
weekend 70:20,21
weekly 103:24
  104:1,5
weeks 37:5
weldments 19:25
  31:7
went 6:24 7:8,9 13:4
  14:20 15:23 16:4
  35:5,6 44:2 54:9
  87:24 88:6 97:11
  113:20 117:18
  127:21
weren't 81:1 120:3

125:14
Westar 13:15,18,25
WESTERN 1:1
we'll 12:3 41:14
  67:23 93:5 105:18
  106:11 116:11
we're 7:4 19:7,9
  22:21 27:2,21,25
  28:2 42:9 52:2,4
  67:19,21,22 92:21
  96:13 99:7 107:12
  107:16 112:19
  124:18,19,21
  129:6
we've 7:18 30:25
  34:1 36:12 39:15
  40:8 44:22 47:15
  49:18 51:21 56:22
  61:7 66:22 92:14
  96:17 104:22
  123:23
whatsoever 121:12
whip 114:7
willing 28:19,24
  38:1,24
window 118:18,19
  119:9
witness 5:3 38:12
  50:20 55:20 131:5
  131:6,10,11
word 14:24
words 29:5 44:1,5
  53:15 85:15
work 6:20 33:2,5
  69:16,17,19,25
worked 11:22
  117:21
working 6:16 40:4
  49:2 89:13
Works 11:18
worth 116:24
wouldn't 17:13 18:7
  21:16 65:5,17
  66:4 80:6
writing 73:25
written 27:9 74:21
  74:24 86:8 101:18
  101:19
wrote 47:7 89:16,20

**X**

X 2:16 3:1 45:11

**Y**

**yeah** 23:4 24:4
  77:11 81:2 85:20
  92:15,18 107:11
  120:6
**year** 22:11 48:25
  76:18,24 77:24
  86:22 112:19
**years** 6:10,23 7:1,3
  33:19,20 49:1
  114:17 123:24
**Yesterday** 7:14

_____
**Z**
**Zhou** 4:12 109:3,4

_____
**$**
**$199,000** 78:1
**$41,000** 119:19
**$425,000** 77:24
**$43,000** 23:3,13
  26:22 64:20 66:11
  82:12 119:23
**$6,000** 116:24
  118:13

_____
**0**
**08** 13:2

_____
**1**
**1** 8:21 29:13 42:19
  42:20 72:10,11,13
  90:21
**1st** 29:9,22 89:9
  96:23
**1/8/10** 3:4
**1/9/09** 3:3
**10** 31:6 42:19,20
  44:2,3 60:5 72:21
  74:12
**10th** 103:16 104:17
  105:23
**100** 85:1
**100-plus** 23:17
**1000** 1:18 2:4
**103** 4:7
**104** 4:8,9
**1047** 84:4
**1048** 84:4
**107** 4:11
**108** 4:12
**11** 107:23
**11th** 78:10,16 91:21
  104:24 105:3
  107:20 111:9

**11/11/10** 3:24
**11/9** 78:21
**110** 4:13
**116** 4:14,15
**1163** 90:15
**1164** 90:17
**1165** 90:18
**1166** 90:15
**12th** 111:1
**122** 4:16
**1222** 131:19
**125** 2:20
**1259** 93:6
**13th** 115:8
**131** 2:21
**132** 6:2
**1339** 98:18
**1340** 100:7
**1388** 105:1
**1391** 105:1
**14** 17:22
**144** 2:11
**147** 29:11
**15** 60:5
**1506** 109:1
**16th** 64:3
**17th** 36:15,17
**1708** 116:12
**18th** 108:8
**180** 74:21,24
**180-day** 118:18,19
  119:9
**19th** 79:7 80:17
**1963** 6:4

_____
**2**
**2** 8:22 30:5 72:17,18
  90:23
**2D** 83:9
**2/10/2011** 100:9
**20** 28:10 109:11
**20th** 6:4 49:21 84:9
  103:18 119:4
  125:14
**2007** 13:11 115:8
**2008/2009** 9:21 10:9
**2009** 27:16 28:13
  29:9,13,22 35:23
**2010** 30:9 31:5,10
  35:23 36:15 38:21
  39:8 40:18 42:7
  43:10 46:22 48:9
  48:13 49:2,4,21
  51:3 54:17 55:11

**56:25 58:4,13
  59:1 61:10,18
  62:12 64:3 66:25
  67:25 69:7 74:5
  75:25 78:10 79:7
  84:9 89:23 97:6
  97:10,19 98:7
  102:6 103:18
  106:2 109:11
  111:21 125:14
**2011** 43:11 86:22
  87:10,23 88:20
  90:1 91:21 96:19
  96:23 103:17
  104:12,25 106:3
  106:22 107:21,23
  111:1,9 113:1
  116:25 118:11
  120:21
**2012** 49:4 119:5
**2012/2013** 49:7
**2015** 1:15 130:7,13
**2055** 117:2
**21st** 104:12 106:22
  107:20,23
**23rd** 66:24
**233** 2:7
**24th** 67:25
**25** 39:23
**27th** 93:9
**273** 38:21
**275** 39:6
**28** 1:15 130:7
**28th** 59:1 74:5,19
**29** 3:3

_____
**3**
**3** 40:11 42:6 44:11
  46:21 73:3,4
  90:24,24 98:8,10
  117:24
**3D** 81:10,16,22 82:7
  82:15,17,20 83:3
  83:8,11,14,18,22
  84:25 85:2,3,12
  85:14,17,23 97:20
  98:11
**3rd** 54:16 55:11
  96:19
**3,500** 22:10
**3/1/11** 4:6
**3/11** 106:15,25
**3/11/11** 4:9
**3/17/10** 3:5

**3/21/11** 4:8,11
**3/31/10** 3:6,7
**30** 42:19,21 59:3
**300** 79:13
**31** 3:4 38:21
**31st** 39:8
**321** 39:14
**3230-G** 1:24 131:24
**3315** 1:17 2:4
**33458** 6:2
**347** 44:23
**348** 44:23
**36** 3:5
**375,000** 39:25
**38** 3:6
**389** 54:15
**39** 3:7,8
**396** 47:16

_____
**4**
**4** 43:10,11 90:25
  98:7
**4th** 40:18 46:22
  48:13 87:23 88:20
  113:1
**4-page** 4:3
**4/12/11** 4:3
**4:01** 129:7
**40** 3:3 4:21 27:23
  29:11
**400** 84:6,13
**41** 3:4 30:23 31:1
  32:2
**417** 1:25
**417-887-4110**
  131:25
**42** 3:5 36:10,13 40:1
**42K** 91:1
**42,000** 39:20
**43** 3:6 23:4 38:18,20
**432** 49:19
**44** 3:7,9 39:3,5
**45** 3:8 39:12,15
**46** 3:9 44:19,22
**47** 3:10,10 26:2
  47:12,15 77:25
**48** 3:11 49:16,19
**49** 3:11,12 54:12,15
  55:16 56:2

_____
**5**
**5** 2:19 42:6
**5,000** 116:23
**5/20/10** 3:11

**5/3/10** 3:12
**50** 3:13 56:20,23
  58:3
**51** 3:14 58:20,22
**52** 3:15 61:5,8
**520** 59:3,6,10 85:21
  85:24 87:25
**53** 3:16 62:7,10
**531** 56:23
**54** 3:12,17 63:20
  64:1
**55** 3:18 66:20,23
  67:24
**56** 3:13,19 67:12
  68:1 71:19
**561-400-9311** 69:10
**57** 3:20 71:25 72:3
**58** 3:14,21 74:2,4
**59** 3:22 74:15,18

_____
**6**
**6** 45:7
**6th** 61:10,17
**6/28/10** 3:14
**6/9/10** 3:13
**6:14-cv-03498-M...**
  1:7 130:4
**60** 3:23 77:7,15
**60606** 2:8
**61** 3:15,24 78:6,8,15
**62** 3:16 79:3,5
**621** 58:23
**63** 4:1 84:1,4 111:22
**64** 3:17 4:2 87:1,3
  87:14
**65** 4:3 90:11,14
**65714** 2:11
**65804** 2:4
**65807** 1:24 131:24
**66** 3:18 4:4 93:3,5
**6600** 2:8
**669** 61:8
**67** 4:6 96:8,17 100:8
  126:8
**68** 3:19 4:7 103:3,5
  105:16,17
**69** 4:8 104:8,10
**696** 62:10

_____
**7**
**7/6/10** 3:15
**7/9/10** 3:16
**70** 4:9 104:20,23
  111:9

**71** 4:11 107:14,21
**72** 3:20 4:12 77:14
   108:23,25
**72-inch** 127:19,22
**73** 4:13 110:20,24
**74** 3:21,22 4:14
   116:9,11 117:18
**75** 4:15 116:16
   117:1
**76** 4:16,21 122:21
   122:24 124:23
   125:10
**77** 3:23
**778** 64:2
**78** 3:24
**799** 66:23

────────── **8** ──────────

**8th** 30:9 31:5,10
**8.4** 59:20
**80** 72:23 74:13
**800** 68:2
**836** 72:4
**84** 4:1
**87** 4:2
**887-4110** 1:25
**897** 77:16

────────── **9** ──────────

**9th** 56:24 58:4,13
   62:12
**9-inch** 118:3
**9/16/10** 3:17
**9/23/10** 3:18,19
**9:32** 1:15 5:2
**90** 4:3 118:20
**910** 59:15,17,20
   60:4 85:21,24
   88:1
**93** 4:4
**96** 4:6